No. 22-1223

# In the
# United States Court of Appeals
# for the Third Circuit

RALPH "TREY" JOHNSON, *ET AL.*,
*Plaintiffs-Appellees*

v.

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, A/K/A THE NCAA*, ET AL.*,
*Defendants-Appellants*

On appeal by permission from the
United States District Court for the
Eastern District of Pennsylvania
Case No. 2:19-cv-05230-JP
Hon. John R. Padova, Presiding

## APPELLANTS' OPENING BRIEF

### CONSTANGY, BROOKS, SMITH & PROPHETE LLP

Steven B. Katz
  skatz@constangy.com
2029 Century Park East, Suite 1100
Los Angeles, California 90067
Telephone: (310) 909-7775
Facsimile: (424) 465-6630

John E. MacDonald
  jmacdonald@constangy.com
989 Lenox Drive, Suite 206 (2nd Floor)
Lawrenceville, New Jersey 08648
Telephone: (609) 454-0096
Facsimile: (609) 844-1102

Donald S. Prophete
  dprophete@constangy.com
Dean Kpere-Daibo
  dkdaibo@constangy.com
2600 Grand Boulevard, Suite 750
Kansas City, Missouri 64108-4600
Telephone: (816) 472-6400
Facsimile: (816) 472-6401

COUNSEL FOR APPELLANTS NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,
CORNELL UNIVERSITY, FORDHAM UNIVERSITY, LAFAYETTE COLLEGE,
SACRED HEART UNIVERSITY AND VILLANOVA UNIVERSITY.

# CORPORATE DISCLOSURE STATEMENT

Under FED. R. APP. PROC. 26.1 and 3RD CIR. R. 26.1, Appellants certify that each of them (the National Collegiate Athletic Association, Cornell University, Fordham University, Lafayette College, Sacred Heart University and Villanova University) is a 26 U.S.C. § 501(c)(3) organization. They have no parent corporations, and no publicly held company owns ten percent (10%) or more interest in any Appellant.

By: _____

COUNSEL FOR APPELLANTS

# TABLE OF CONTENTS

PAGE

CORPORATE DISCLOSURE STATEMENT ...................................................... 2

TABLE OF CONTENTS .............................................................................. 3

TABLE OF AUTHORITIES ......................................................................... 6

INTRODUCTION ...................................................................................... 14

JURISDICTIONAL STATEMENT ................................................................. 17

ISSUE PRESENTED .................................................................................. 18

RELATED CASES AND PROCEEDINGS........................................................ 19

COMBINED PROCEDURAL HISTORY AND
STATEMENT OF THE CASE........................................................................ 20

SUMMARY OF ARGUMENT....................................................................... 24

ARGUMENT ........................................................................................... 28

    I.   THIS CIRCUIT REVIEWS *DE NOVO* THE DISTRICT COURT'S
        RULING THAT THE STUDENTS STATE A CLAIM FOR WAGES
        FOR PLAYING COLLEGE SPORT .................................................... 28

    II.  LAST TERM THE SUPREME COURT REAFFIRMED THE
        CORE PRINCIPLE THAT PROFESSIONAL ATHLETES
        MAY BE BANNED FROM PLAYING COLLEGE SPORT ...................... 29

    III. BECAUSE STUDENT ATHLETES ARE NOT *IPSO FACTO*
        EMPLOYEES UNDER THE FLSA, THE DISTRICT COURT
        ERRED WHEN IT HELD THE STUDENTS STATE A CLAIM............. 35

        A.  THE SEVENTH CIRCUIT, CONSISTENT WITH THIS
            CIRCUIT'S PRECEDENT, HELD STUDENT ATHLETES
            ARE NOT EMPLOYEES SOLELY BECAUSE THEY PLAY SPORT.
            THE DISTRICT COURT ERRED BY DISREGARDING IT ............... 37

# TABLE OF CONTENTS

PAGE

B.   THE ABSENCE OF A COMPENSATION BARGAIN FOR PLAYING
     SPORT DOOMS THE STUDENTS' CLAIMS UNDER THE FLSA.... 41

   1.   THE SUPREME COURT HAS LONG HELD A
        COMPENSATION BARGAIN ESSENTIAL
        TO THE ECONOMIC REALITY OF EMPLOYMENT .................. 41

   2.   THE ORDINARY CONTEMPORARY MEANING OF THE
        FLSA'S TEXT CONTEMPLATES A COMPENSATION
        BARGAIN ......................................................................... 46

C.   THE SEVENTH CIRCUIT CORRECTLY DISREGARDED
     MULTI-FACTOR TESTS OF ECONOMIC REALITY
     IN FAVOR OF A HOLISTIC STANDARD BASED ON THE
     NON-PROFESSIONAL IDEAL. THE DISTRICT COURT
     ERRED BY APPLYING INSTEAD THE SECOND CIRCUIT'S
     TEST FOR STUDENT INTERNSHIPS ......................................... 50

D.   THE DISTRICT COURT COMPOUNDED ERROR BY
     MISAPPLYING THE SECOND CIRCUIT TEST ............................ 53

   1.   IT GAVE INSUFFICIENT WEIGHT TO "CRUCIAL"
        FACTORS CONCERNING A COMPENSATION BARGAIN,
        WHICH POINT STRONGLY AWAY FROM EMPLOYMENT......... 55

   2.   IT MISCONSTRUED FACTORS CONCERNING THE
        EDUCATIONAL VALUES OF INTERNSHIP TO CONCLUDE
        THEY ARE NEUTRAL WHEN APPLIED TO SPORT.
        BECAUSE THE STUDENTS CONCEDE SPORT'S BROADER
        EDUCATIONAL VALUE, THESE FACTORS POINT
        AWAY FROM EMPLOYMENT ................................................. 57

# TABLE OF CONTENTS

PAGE

    3.   IT CONFUSED THE CONCEDED FACTOR OF WHETHER STUDENT ATHLETES DISPLACE REGULAR EMPLOYEES WITH OTHER FACTORS, ERRONEOUSLY CONCLUDING THE FACTOR POINTS TOWARD EMPLOYMENT WHEN IT ACTUALLY POINTS AWAY ..................................... 60

    4.   FIVE OF SEVEN FACTORS—INCLUDING THE "CRUCIAL" ONES—POINT AWAY FROM EMPLOYMENT FOR STUDENT ATHLETES ............................................. 62

  E.  THE DEPARTMENT OF LABOR'S LONGSTANDING VIEW THAT STUDENT-ATHLETES ARE NOT EMPLOYEES NOT ONLY ACCORDS WITH THE CASE LAW—IT PROVIDES A COMPLETE *STATUTORY* DEFENSE TO THIS ACTION ............... 66

  F.  THE STUDENTS SEEK TO REWRITE THE FLSA TO SUIT THEIR POLICY PREFERENCES. THAT ARGUMENT IS FOR CONGRESS, NOT THE COURTS. ................................................... 76

IV. THE DISTRICT COURT ERRED WHEN IT HELD THE STUDENTS STATED A CLAIM UNDER STATE LAW. THEIR STATE LAW CLAIMS FAIL AS A MATTER OF LAW ALONG WITH THEIR FLSA CLAIM ........................................................... 77

CONCLUSION ..................................................... 82

COMBINED CERTIFICATIONS OF COMPLIANCE ..................................... 84

CERTIFICATE OF SERVICE .................................................. 85

# TABLE OF AUTHORITIES

PAGE(S)

CASES

*Agnew v. National Collegiate Athletic Ass'n,*
    683 F.3d 328 (7th Cir. 2012) .......................................................... 39, 45
*Aldridge v. Mississippi Dept. of Corrections,*
    990 F.3d 868 (5th Cir. 2021) ................................................................. 79
*Alvarez v. IBP, Inc.,*
    339 F.3d 894 (9th Cir. 2003) ........................................................... 69-70
*Anderson v. Sara Lee Corp.,*
    508 F.3d 181 (4th Cir. 2007) ........................................................... 79-81
*Ashcroft v. Iqbal,*
    556 U. S. 662 (2009) ............................................................................. 28
*AT&T Corp. v. Core Commc'ns, Inc.,*
    806 F.3d 715 (3d Cir. 2015) .................................................................. 75
*Barbato v. Greystone All., LLC,*
    916 F.3d 260 (3d Cir. 2019) .................................................................. 29
*Barfield v. N.Y.C. Health & Hospital Corp.,*
    537 F.3d 132 (2d Cir. 2008) .................................................................. 51
*Benjamin v. B & H Education, Inc.,*
    877 F.3d 1139 (9th Cir. 2017) .................................................. 51, 64-65
*Berger v. National Collegiate Athletic Ass'n,*
    162 F. Supp. 3d 845 (S.D. Ind. 2016) .................................................. 34
*Berger v. National Collegiate Athletic Ass'n,*
    843 F.3d 285 (7th Cir. 2016) ........................................................ *Passim*
*Bloom v. National Collegiate Athletic Ass'n,*
    93 P.3d 621 (Colo. App. 2004) ............................................................. 60
*Christopher v. SmithKline Beecham Corp.,*
    567 U.S. 142 (2012) .............................................................................. 69
*Cohen v. Brown University,*
    991 F.2d 888 (1st Cir. 1993) ................................................................ 59
*Colby v. J.C. Penney Co.,*
    811 F.2d 1119 (7th Cir. 1987) .............................................................. 15

# TABLE OF AUTHORITIES

PAGE(S)

CASES

*Coleman v. Western Michigan University*,
125 Mich. App. 35 (1983) .................................................................. 34
*Dawson v. Nat'l Collegiate Athletic Ass'n*,
250 F. Supp. 3d 401 (N.D. Cal. 2017),
*aff'd*, 932 F.3d 905 (9th Cir. 2019)............................34, 36-37, 68, 71
*Dixon v. Zabka*,
2014 WL 6084351 (D. Conn. Nov. 13, 2014) .................................. 79
*Donovan v. DialAmerica Mktg., Inc.*,
757 F.2d 1376 (3d Cir. 1985) ............................................... 38, 51-52
*Ellington v. City of East Cleveland*,
689 F.3d 549 (6th Cir. 2012)............................................................ 50
*Encino Motorcars, LLC v. Navarro*,
138 S.Ct. 1134 (2018) ...................................................................... 67
*Enterprise Rent-A-Car Wage & Hour Emp't Practices Litig.*,
683 F.3d 462 (3rd Cir. 2012)................................................. 38, 51-52
*Equal Employment Opportunity Comm'n v. Home Ins. Co.*,
672 F.2d 252 (2d Cir. 1982) ........................................................ 69-70
*Fast v. Applebee's Int'l, Inc.*,
638 F.3d 872 (8th Cir. 2011)............................................................ 75
*Figas v. Horsehead Corp.*, No. CIV. A.,
2008 WL 4170043 (W.D. Pa., Sept. 3, 2008) .............................. 73-74
*Food Marketing Institute v. Argus Leader Media*,
139 S.Ct. 2356 (2019)...................................................................... 47
*Formica v. US Environmental Inc.*,
2018 WL 3374764 (E.D. Pa., July 11, 2018)................................ 79-80
*Frank v. McQuigg*,
950 F.2d 590 (9th Cir.1991).............................................................. 69
*Friedrich v. U.S. Computer Svcs.*,
974 F.2d 409 (3rd Cir. 1992)............................................................ 75
*Gagnon v. United Technisource, Inc.*,
607 F.3d 1036 (5th Cir. 2010).......................................................... 76

# TABLE OF AUTHORITIES

PAGE(S)

CASES

*Garfield v. Shutterfly, Inc.*,
  857 Fed. App'x 71 (3d Cir. 2021) ..................................... 59
*Glatt v. Fox Searchlight Pictures, Inc.*,
  811 F.3d 528 (2d Cir. 2016) ...................... 25-26, 51-57, 59, 61, 63-66
*Goldberg v. Whitaker House Coop., Inc.*,
  366 U.S. 28 (1961) ................................................. 35, 38, 42
*Gutwirth v. Woodford Cedar Run Wildlife Refuge*,
  38 F.Supp.3d 485 (D.N.J. 2014) ....................................... 80
*Henry v. Quicken Loans Inc.*,
  2009 WL 3270768 (E.D. Mich., July 16, 2009) .............................. 73
*Hill v. Delaware North Cos. Sportservice, Inc.*,
  838 F.3d 281 (2d Cir. 2016) ............................................ 75
*Hultgren v. Cty. of Lancaster, Neb.*,
  913 F.2d 498 (8th Cir. 1990) ........................................... 69
In re *Cargill Meat Solutions Wage and Hour Litig.*,
  632 F.Supp.2d 368 (M.D. Pa. 2008) ..................................... 74
In re *Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap*
  *Antitrust Lit.*, 958 F.3d 1239 (9th Cir. 2020) ........................... 15, 32
*INS v. Chadha*,
  462 U.S. 919 (1983) ................................................. 46-47
*James v. City of Wilkes–Barre*,
  700 F.3d 675 (3d Cir. 2012) ........................................... 28
*Kavanagh v. Trustees of Boston Univ.*,
  440 Mass. 195 (2003) ................................................. 34
*Knepper v. Rite Aid Corp.*,
  675 F.3d 249 (3d Cir. 2012) ...................................... 78-80, 82
*Korellas v. Ohio State Univ.*,
  121 Ohio Misc. 2d 16, (Ohio Ct. Cl. 2002) ............................... 34
*Kronick v. bebe Stores, Inc.*,
  2008 WL 4509610 (D.N.J. Sept. 29, 2008) ................................. 80

# TABLE OF AUTHORITIES

PAGE(S)

<u>CASES</u>

*Lawson v. FMR LLC*,
  571 U.S. 429 (2014) ........................................................................... 49
*Lewis v. Huntington Nat'l Bank*,
  838 F.Supp.2d 703 (S.D. Ohio 2012) ................................................ 74
*Lilley v. Elk Grove Unified School Dist.*,
  68 Cal.App.4th 939 (1998) ................................................................ 59
*Livers v. Nat'l Collegiate Athletic Ass'n*,
  2018 WL 2291027 (E.D. Pa. May 17, 2018) ......................... 34, 51, 71
*Lopez v. Gonzales*,
  549 U.S. 47 (2006) ............................................................................ 49
*Marsh v. J. Alexander's LLC*,
  905 F.3d 610 (9th Cir. 2018) ............................................................ 75
*McMaster v. Eastern Armored Services, Inc.*,
  780 F.3d 167 (3rd Cir. 2015) ............................................................ 75
*Moeck v. Gray Supply Corp.*,
  2006 WL 42368 (D.N.J. Jan. 5, 2006) ............................................... 80
*National Collegiate Athletic Ass'n v. Alston*,
  141 S.Ct. 2141 (2021) ...................................... 15, 24-25, 29-33, 35-36
*National Collegiate Athletic Ass'n v. Board of Regents of the
  University of Oklahoma*, 468 U.S. 85 (1984) ........ 25, 30-35, 39, 45, 70
*New Prime Inc. v. Oliveira*,
  139 S.Ct. 532 (2019) ......................................................................... 46
*Newman v. Advanced Tech. Innovation Corp.*,
  749 F.3d 33 (1st Cir. 2014) ............................................................... 75
*O'Bannon v. National Collegiate Athletic Ass'n*,
  802 F.3d 1049 (9th Cir. 2015) ................................... 29, 31-32, 39, 45
*Ortega v. Denver Institute LLC*,
  2015 WL 4576976 (D. Colo. July 30, 2015) ...................................... 77

# TABLE OF AUTHORITIES

PAGE(S)

CASES

*Palardy v. Hornerm,*
711 F.Supp. 667 (D. Mass. 1989)..................................... 73

*Pennsylvania v. Navient Corp.,*
967 F.3d 273 (3d Cir. 2020) ............................................ 28

*Perez v. Mortgage Bankers Ass'n,*
575 U.S. 92 (2015)........................................................... 67

*Perry v. Randstad Gen'l Partner (US) LLC,*
876 F.3d 191 (6th Cir. 2017)............................................ 70

*Quinn v. New York State Electric and Gas Corp.,*
621 F. Supp. 1086 (N.D. N.Y. 1985) ................................ 74

*Razak v. Uber Technologies, Inc.,*
951 F.3d 137 (3d Cir. 2020) ............................................ 79

*Rensing v. Indiana State Univ. Board of Trustees,*
444 N.E.2d 1170 (Ind. 1983)............................................ 34

*Rutherford Food Corp. v. McComb,*
331 U.S. 722 (1947)......................................................... 38

*Sandoz Inc. v. Amgen Inc.,*
137 S.Ct. 1664 (2017)...................................................... 77

*Schumann v. Collier Anesthesia, P.A.,*
803 F.3d 1199 (11th Cir. 2015)........................................ 55

*Sethi v. Narod,*
974 F. Supp. 2d 162 (E.D.N.Y. 2013)............................... 79

*Shephard v. Loyola Marymount Univ.,*
102 Cal.App.4th 837 (2002) ............................................ 34

*Skidmore v. Swift & Co.,*
323 U.S. 134 (1944).................................................... 66, 75

*Solis v. Laurelbrook Sanitarium and Sch., Inc.,*
642 F.3d 518 (6th Cir. 2011)............................................ 51

# TABLE OF AUTHORITIES

PAGE(S)

CASES

*State Comp. Ins. Fund v. Industrial Commission*,
  135 Colo. 570 (1957)............................................................ 34
*Steelman v. Hirsch*,
  473 F.3d 124 (4th Cir. 2007)............................................ 49
*Swigart v. Fifth Third Bank*,
  870 F. Supp. 2d 500 (S.D. Ohio 2012) ............................ 70
*Szczachor v. All Granite & Marble Corp.*,
  2014 WL 7365780 (D.N.J., Dec. 19, 2014)...................... 80
*Tennessee Coal Co. v. Muscoda Local*,
  321 U.S. 590 (1944).............................................................. 49
*Tony & Susan Alamo Foundation v. Secretary of Labor*,
  471 U.S. 290 (1985)...........................................38, 42, 51, 77
*Torres v. Vitale*,
  954 F.3d 866 (6th Cir. 2020)............................................. 80
*Townsend v. State of California*,
  191 Cal.App.3d 1530 (1987)............................................. 34
*Valladares v. Insomniac, Inc.*,
  2015 WL 12656267 (C.D. Cal. Jan. 29, 2015) ................ 77
*Vaughn v. Phx. House New York, Inc.*,
  2019 WL 568012 (S.D.N.Y. Feb. 12, 2019)...................... 56
*Velarde v. GW GJ, Inc.*,
  914 F.3d 779 (2d Cir. 2019) ........................................54-55
*Verma v. 3001 Castor, Inc.*,
  937 F.3d 221 (3d Cir. 2019) .............................................. 79
*Waldrep v. Texas Employers Ins. Ass'n*,
  21 S.W.3d 692 (Tex. App. 2000)....................................... 34
*Walling v. Portland Terminal Co.*,
  330 U.S. 148 (1947)....................... 42-43, 46, 50, 54-55, 77
*Wang v. Hearst Corp.*,
  877 F.3d 69 (2d Cir. 2017) ............................... 26, 54, 56-57

# TABLE OF AUTHORITIES

PAGE(S)

<u>CASES</u>

*Werner v. Werner,*
  267 F.3d 288 (3d Cir. 2001) ............................................................ 71

*Williams v. Strickland,*
  87 F.3d 1064 (9th Cir. 1996)................................................42, 44, 50

*Wisconsin Central Ltd. v. United States,*
  138 S.Ct. 2067 (2018)..................................................................... 46

*Yamaha Motor Corp., USA v. Calhoun,*
  516 U.S. 199 (1996)........................................................................ 28

*Yi v. Sterling Collision Centers, Inc.,*
  480 F.3d 505 (7th Cir. 2007)........................................................... 69

*Yu v. Hasaki Rest., Inc.,*
  944 F.3d 395 (2d Cir. 2019) ........................................................... 49

<u>Statutes</u>

26 U.S.C. § 501 ............................................................................ 2, 57

28 U.S.C. § 1292 ............................................................ 17-18, 23, 28
        § 1331 ............................................................................ 17
        § 1367 ............................................................................ 17

29 U.S.C. § 201 ................................................................................ 20
        § 203 .............................................................................. 47
        § 206 .............................................................................. 47
        § 207 .............................................................................. 47
        § 216 .............................................................................. 17
        § 218 .............................................................................. 78
        § 255 .............................................................................. 74
        § 259.........................................................27, 67, 69, 71-73, 75

# TABLE OF AUTHORITIES

PAGE(S)

RULES

FED. R. APP. PROC. 5 ........................................................... 17
                26.1 ................................................................ 2
                32 ................................................................. 85

FED. R. CIV. PROC. 8 ........................................................... 21
                11 ................................................................ 62
                12 ................................................................ 22

FED. R. EVID. 201 ............................................................... 22

OTHER AUTHORITIES

BLACK'S LAW DICTIONARY (2nd ed. 1910) ...................................... 47-49
                (3rd ed. 1933) ...................................... 48-49
Carnegie Foundation for the Advancement of Teaching,
  AMERICAN COLLEGE ATHLETICS (1929) ............................................. 72
U.S. Dep't of Labor,
  FIELD OPERATIONS HANDBOOK .................................26-27, 67-68, 70-76
James J. Heckman & Colleen P. Loughlin,
  *Athletes Greatly Benefit from Participation in Sports at the College
  and Secondary Level*, BECKER FRIEDMAN INSTITUTE FOR ECONOMICS
  WORKING PAPER NO 2021-86 (July 2021).......................................... 60
NCAA DIVISION I MANUAL (2021-22) .................................................. 31
OXFORD ENGLISH DICTIONARY (1st ed. 1933) ...................................... 48
RESTATEMENT OF EMPLOYMENT LAW (2015).................................... 42-43

# INTRODUCTION

Six present and former college student athletes are suing their schools and the National Collegiate Athletic Association under the Fair Labor Standards Act and parallel state statutes and common law remedies to collect wages for playing sport. They allege that all defendants are their joint employers and seek to certify classes and collectives on *both* sides of "v." in the caption.

Over 60 years of unbroken state and federal precedents hold that college student athletes are not employees of their schools simply because they play sport, culminating in the Seventh Circuit's ruling in *Berger v. National Collegiate Athletic Ass'n,* 843 F.3d 285 (2016), that "student-athletes are not employees" of the schools they attend "and are not covered by the FLSA" as a matter of law. *Id.* at 288.

This is hardly surprising, as one of the founding purposes of the NCAA is to keep professional athletes out of college sport. The Ninth Circuit recently refused under antitrust law to permit college student athletes to be treated like professionals when it declined to allow them to receive "unlimited payments unrelated to education, akin to salaries seen in professional sports leagues." In re *Nat'l Collegiate Athletic Ass'n*

*Athletic Grant-in-Aid Cap Antitrust Lit.*, 958 F.3d 1239, 1258 (9th Cir. 2020) ("*GIA Cap Antitrust Lit.*"). Last term the Supreme Court affirmed the Ninth, praising its care in crafting a remedy that "*would not blur the distinction between college and professional sports.*" *National Collegiate Athletic Ass'n v. Alston*, 141 S.Ct. 2141, 2164 (2021) (emphasis added).

*Berger*—no less than the Ninth Circuit's antitrust ruling—was crafted to "not blur the distinction between college and professional sports." It remains good law, undisturbed by *Alston*. It merited "most respectful consideration" by the district court. *Colby v. J.C. Penney Co.*, 811 F.2d 1119, 1123 (7th Cir. 1987). It got none. The district court declined to follow it and dismiss this lawsuit, looking to Justice Kavanaugh's solo concurrence in *Alston* as an indication that a (silent) majority of the Supreme Court intended to undermine *Berger*. (*See* 1 Appellants' Appendix ["AA"] 14-15.)

They did not. The *Alston* majority *praised* the Ninth Circuit for respecting the same line drawn by the Seventh in *Berger*—and by state courts for more than half a century.

This Court should agree with the Seventh, reverse the district court, and remand with instructions to dismiss this lawsuit.

# JURISDICTIONAL STATEMENT

Appellees' complaint alleges claims for damages under the Fair Labor Standards Act, 29 U.S.C. § 216(b), which raises a federal question over which the district court has original jurisdiction under 28 U.S.C. § 1331. The complaint also raises state-law statutory and common law wage claims over which the district court has supplemental jurisdiction under 28 U.S.C. § 1367(a).

The district court denied Appellants' motion to dismiss. (1 AA 4-34.) It certified that ruling for interlocutory appeal under 28 U.S.C. § 1292(b) on December 28, 2021. (1 AA 35-50). Appellants petitioned this Circuit for leave to appeal under FED. R. APP. PROC. 5 ten days later, on January 7, 2022. (3d Cir. ECF 1.) This Circuit granted leave to appeal on February 3, 2022. (1 AA 51-52.)

# ISSUE PRESENTED

Whether the Students' first amended complaint (2 AA 57-205) states a claim upon which relief may be granted? (*See* 2 AA 207 [issue raised]; 1 AA 4-34 [ruling]; 1 AA 35-50 [certifying interlocutory appeal under 28 U.S.C. § 1292(b)]; 1 AA 51-52 [granting leave to appeal].)

# RELATED CASES AND PROCEEDINGS

There are no related cases or proceedings.

# COMBINED PROCEDURAL HISTORY AND STATEMENT OF THE CASE

Appellees (the "Students") are six present and former college students who competed in intercollegiate football, baseball, soccer, tennis, swimming and diving.[1] They sue their own schools (the "Attended Schools," or simply "Schools"[2]), the National Collegiate Athletic Association and 20 other universities in this Circuit (the "Non-Attended Schools"[3]) under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.,* Connecticut, New York and Pennsylvania wage

---

[1] The Students are: Alexa Cooke (tennis, Lafayette College); Ralph "Trey" Johnson (football, Villanova University, 2013-17); Stephanie Kerkeles (swimming and diving, Fordham University); Nicholas Labella (baseball, Fordham); Claudia Ruiz (tennis, Sacred Heart University, 2014-18); and Jacob Willebeek-Lemair (soccer, Cornell University, 2017-18).  (2 AA 65-66 [¶¶ 19-24].)

[2] The "Attended Schools" or "Schools" are: Cornell, Fordham, Lafayette College, Sacred Heart, and Villanova.

[3] The Non-Attended Schools are:  Bucknell University; Drexel University; Duquesne University; Farleigh Dickinson University; La Salle University; Lehigh University; Monmouth University; Penn State University; Princeton University; Rider University; Robert Morris University; Rutgers, The State University of New Jersey; Saint Francis University; Saint Joseph's University; Seton Hall University; St. Peter's University; Temple University; University of Delaware; University of Pennsylvania; and University of Pittsburgh. All have been dismissed and are not participating in this appeal. (*See* ED Pa. ECF 64, 65.)

statutes, and the common law of those states, seeking wages for time spent playing sport. They seek certification of an FLSA collective action of all student athletes in all sports in all 350 NCAA Division I schools, state law plaintiff Rule 23 classes, a Rule 23 FLSA defendant class of all 350 Division I schools, and state-law defendant subclasses. (2 AA 149, 172 [¶¶ 256, 360].)

The Students' prolix 126-page, 42-paragraph first amended complaint is the antithesis of "a short and plain statement of the claim." FED. R. CIV. PROC. 8(a)(2). Most of it is given over to legal argument,[4] legislative facts such as NCAA bylaws, monies generated by college football and basketball, federal regulation of work-study programs,[5] and the stuff of Brandeis briefs—mostly press reporting sympathetic to their

---

[4] *See, e.g.*, 2 AA 61, 69-71, 81, 85-86, 92-94, 37, 101-02, 107, 109, 114, 117, 128-29, 133, 135, 139-46, 148-52 (¶¶ 1-2, 5, 39-43, 76, 90-92, 103, 112-14, 131-34, 142, 147, 160-62, 169, 190-93, 209, 218, 232-47, 249-50, 255, 259-60, 266).

[5] *See, e.g.*, 2 AA 61-64, 66-67, 71-73, 75-92, 94-107, 109-10, 113-15, 117-27, 129-39, 144-46, 148-49 (¶¶ 1-3, 7, 14-17, 28-31, 44-55, 59-102, 104-11, 113, 115-41, 143-44, 148-52, 156-59, 163-65, 168, 170-89, 194-208, 210-17, 219-31, 247, 251-54).

cause.[6] *See generally* FED. R. EVID. 201, Advisory Note to Subdivision (a) (distinction between adjudicatory and legislative facts).

The gist of the Students' claim is that all athletes in all sports at all Division I schools are employees entitled to wages solely because they play sport, and that the NCAA and all Division I schools are joint employers of all Division I athletes everywhere. The few adjudicatory facts alleged are limited to the Students' names, schools, sports, years of play, a critical admission they are not paid to play sport under NCAA rules, and an affirmation they "thoroughly enjoy(ed) and deeply value(d) the experience of playing." (2 AA 63, 65-66, 71-74 [¶¶ 8, 19-24, 43, 51-53, 56-58].)

The Attended Schools moved to dismiss the first amended complaint under FED. R. CIV. PROC. 12(b)(1) and (b)(6), arguing that the Students stated no claim under the FLSA, or Connecticut, New York and Pennsylvania wage statutes and common law, because student athletes are not employees solely because they play sport. (*See* 2 AA 206-09; ED Pa. ECF 25-1, 39, 42, 53.) The NCAA and Non-Attended

---

[6] *See, e.g.*, 2 AA 61-62, 67-69, 73, 107-12, 115-17, 147-48 (¶¶ 4, 32-38, 54-55, 145-46, 153-55, 166-67, 248).

Schools separately moved to dismiss, joining in the Attended Schools'
motion, but also arguing that the Students failed to state a claim of any
joint employment relationship among the NCAA or any of the schools.
(*See* 2 AA 210-23; ED Pa. ECF 26, 26-1.) The Students opposed both
motions. (*See* ED Pa. ECF 28, 28-1, 29, 29-1, 29-2, 43, 54 [opposition to
Attended Schools]; 30, 30-1 [opposition to NCAA and Non-Attended
Schools].)

The district court denied the motions of the Attended Schools and
NCAA but granted the motion of the Non-Attended Schools and
dismissed them. (*See* 1 AA 4-34; ED Pa. ECF 64, 65.) The Attended
Schools (joined by the NCAA) sought certification of the order denying
their motion under 28 U.S.C. § 1292(b), which the district court
granted. (1 AA 35-50.)

This Circuit granted leave to appeal. (1 AA 51-52.)

# SUMMARY OF ARGUMENT

The district court's ruling that the Students state a claim for relief is the product of five principal legal errors:[7]

**First**, the district court disregarded the Seventh Circuit's holding that "student-athletes are not employees" of the schools they attend "and are not covered by the FLSA" as a matter of law. *Berger*, 843 F.3d at 288. The Seventh Circuit applied well-established FLSA principles consistent with this Circuit's case law to so hold. *See* § III(A) *infra*.

Chief among those principles is the centrality of a bargain for compensation in some form to the "economic reality" of student athletics. The long-standing rule that professional athletes may not play college sport, and hence that student athletes are not paid to play, forecloses any argument that the FLSA requires the Schools to pay the Students wages for playing sport. *See* § III(B) *infra*.

The district court disregarded the Seventh Circuit in the mistaken belief that the Supreme Court's *Alston* ruling undermined *Berger*. This was error for two reasons: First, *Alston* is inapposite. The question

---

[7] This Circuit reviews *de* novo. *See* § I *infra*.

there—whether the NCAA could limit educational benefits for student athletes under antitrust law—has no bearing on the application of FLSA. Second, *Alston* actually praised the lower courts' care in crafting a remedy that "would not blur the distinction between college and professional sports." *Alston*, 141 S.Ct. at 2164. The Supreme Court has not backed away from its longstanding view that the NCAA plays a "critical role" in ensuring that professional athletes do not play college sport, and courts "should take care when assessing the NCAA's restraints on student-athlete compensation." *National Collegiate Athletic Ass'n v. Board of Regents of the University of Oklahoma*, 468 U.S. 85, 120 (1984) ("critical role"); *Alston*, 141 S.Ct. at 2158 ("should take care . . ."). *See* § II *infra*.

**Second**, the district court erred in applying the Second Circuit's multifactor test for student internships in *Glatt v. Fox Searchlight Pictures, Inc.*, 811 F.3d 528, 538 (2d Cir. 2016). No multifactor test—all of which presume the existence of some sort of employment relationship in the economic reality of the enterprise—adequately captures the economic reality of student athletics. *See* § III(C) *infra*.

**Third**, the district court compounded this error by misapplying the *Glatt* test in several ways: It failed to give proper weight to the conceded non–existence of a compensation bargain, which the Second Circuit views as "crucial." *Wang v. Hearst Corp.*, 877 F.3d 69, 73 (2d Cir. 2017). *See* § III(D)(1) *infra*. It misconstrued the import of the conceded broader educational value of sport. *See* § III(D)(2) *infra*. And it strikingly undervalued the conceded fact that student athletes do not displace the labor of paid workers. *See* III(D)(3) *infra*. Shorn of these errors, five of seven *Glatt* factors point away from employment; the remaining two point towards employment, but only modestly. The district court erred when it weighed *Glatt's* factors on the Students' allegations to favor employment. *See* § III(D)(4) *infra*.

**Fourth**, the district court disregarded the Department of Labor's longstanding interpretive guidance that "interscholastic athletics . . . [is] not work of the kind contemplated by [the FLSA] and do[es] not result in an employer-employee relationship between the student and the school." U.S. Dep't of Labor, FIELD OPERATIONS HANDBOOK, § 10b03(e).[8] Section 10 of the Portal-to-Portal Act of 1947 wrote into the

---

[8] https://www.dol.gov/agencies/whd/field-operations-handbook

FLSA an express statutory defense to liability for defendants that rely on such guidance. 29 U.S.C. § 259. The district court's holding there was no evidence before it that the Schools relied on this guidance was error. Before and during the limitations period on the Students' claims, each of the Schools filed briefs in other litigation asserting such reliance. The district acknowledged these statements exist but erred by denying them the weight they deserved. *See* § III(E) *infra*.

**Fifth**, because the Students' state-law statutory claims follow FLSA standards, and the FLSA preempts their unjust-enrichment claims (which seek a state common-law remedy for FLSA violations), the district court also erred in failing to dismiss them. *See* § IV *infra*.

This Circuit should reverse and remand with instructions to dismiss the action without leave to amend.

# ARGUMENT

## I.

### THIS CIRCUIT REVIEWS *DE NOVO* THE DISTRICT COURT'S RULING THAT THE STUDENTS STATE A CLAIM FOR WAGES FOR PLAYING COLLEGE SPORT.

This appeal reaches all legal issues germane to the district court's ruling that the Students' complaint states a claim against the NCAA and the Schools. It reviews those issues *de novo*.

First, "[i]n reviewing a motion to dismiss," this Circuit "review[s] any legal determinations anew and presume that a complaint's factual allegations are true." *Pennsylvania v. Navient Corp.*, 967 F.3d 273, 283 n.7 (3d Cir. 2020) (reviewing *de novo,* following 28 U.S.C. § 1292[b] certification, a district court's denial of a motion to dismiss for failure to state a claim). But the presumption of truth does not extend to legal and factual conclusions. *See, e.g., Ashcroft v. Iqbal,* 556 U. S. 662, 678 (2009); *James v. City of Wilkes–Barre,* 700 F.3d 675, 679 (3d Cir. 2012).

Second, "[a]s the text of § 1292(b) indicates, appellate jurisdiction applies to the order certified to the court of appeals, and is not tied to the particular question formulated by the district court." *Yamaha Motor Corp., USA v. Calhoun,* 516 U.S. 199, 205 (1996). "The scope of our review . . . is not limited to the question set forth in the certification

motion but, rather, includes any issue fairly included within the certified order." *Barbato v. Greystone All., LLC*, 916 F.3d 260, 264 (3d Cir. 2019).

## II.
### LAST TERM THE SUPREME COURT REAFFIRMED THE CORE PRINCIPLE THAT PROFESSIONAL ATHLETES MAY BE BANNED FROM PLAYING COLLEGE SPORT.

"*Fin de siècle* college football was a rough game. Serious injuries were common, and it was not unheard of for players to be killed during games." *O'Bannon v. National Collegiate Athletic Ass'n*, 802 F.3d 1049, 1053 (9th Cir. 2015). *See also Alston*, 141 S.Ct. at 2148. "Schools were also free to hire nonstudent ringers to compete on their teams or to purchase players away from other schools." *O'Bannon*, 802 F.3d at 1053. "Colleges offered all manner of compensation to talented athletes." *Alston*, 141 S.Ct. at 2148. "The absence of academic residency requirements gave rise to 'tramp athletes' who 'roamed the country making cameo athletic appearances, moving on whenever and wherever the money was better.'" *Id.* (*quoting* Francis X. Dealy, Jr., WIN AT ANY COST: THE SELL OUT OF COLLEGE ATHLETICS 71 [1990].) "By 1905, though, a crisis emerged"—18 players lost their lives. *Id.* Because of "these and other problems" (*O'Bannon*, 802 F.3d at 1053), "President

Theodore Roosevelt responded by convening a meeting between Harvard, Princeton, and Yale" out of which the NCAA was born. *Alston,* 141 S.Ct. at 2148.

The following year, the NCAA's forerunner announced its core ideal of non-professionalism: "No student shall represent a College or University in any intercollegiate game or contest who is paid or receives, directly or indirectly, any money, or financial concession." *Id.* (*quoting* INTERCOLLEGIATE ATHLETIC ASSOCIATION OF THE UNITED STATES CONSTITUTION BY-LAWS, Art. V, § 3).

"In 1948, the NCAA sought to do more than admonish" members to aspire to this ideal. "It adopted the 'Sanity Code'" which authorized members "to pay athlete's tuition," but also "created a new enforcement mechanism" to suspend or expel "proven offenders." *Alston,* 141 S.Ct. at 2149.

In *Board of Regents,* the Supreme Court acknowledged the "critical role" played by the NCAA "in the maintenance" of the non-professional ideal.[9] *Board of Regents,* 468 U.S. at 120. "There can be no

---

[9] The "Principle of Amateurism" in the NCAA's bylaws has long encompassed two parts: A core non-professional ideal—"Student-

question but that it needs ample latitude to play that role, or that the preservation of the student-athlete in higher education adds richness and diversity to intercollegiate athletics . . . ." *Id.* At the same time, the Court invalidated under the Sherman Act restrictions on the broadcast of college sport, holding these restrictions "do not . . . fit into the same mold as do rules defining . . . the eligibility of participants . . ." *Id.* at 117. While *Alston* too rejected the idea "that courts must reflexively reject all challenges to the NCAA's compensation restrictions," it concurred in *Board of Regents'* respect for the non-professional ideal, noting that *Board of Regents* "may suggest that courts should take care when assessing the NCAA's restraints on student-athlete compensation . . . ." *Alston*, 141 S.Ct. at 2158.

---

athletes shall be amateurs in an intercollegiate sport, and their participation should be motivated primarily by education and by the physical, mental and social benefits to be derived." And a peripheral one—aimed at protecting "student-athletes . . . protected from exploitation by professional and commercial enterprises." *See, e.g.,* 2021-22 NCAA Division I Manual § 2.9 (https://web3.ncaa.org/lsdbi/reports/getReport/90008). *Board of Regents* spoke in terms of "amateurism," but it and its progeny (such as *Alston* and *O'Bannon*) reject the proposition that all rules aimed at preventing exploitation are insulated from antitrust scrutiny on account of "amateurism." However, they express consistent respect for the core non-professional ideal.

*Board of Regents* established a principle of affording "ample latitude" (which *Alston* describes as "tak[ing] care") concerning the non-professional ideal, while subjecting other rules to greater scrutiny. This distinction guided the Ninth Circuit's decisions in *O'Bannon* and *GIA Cap Antitrust Lit.* and was affirmed by the Supreme Court last term in *Alston*.

*O'Bannon* and *GIA Cap Antitrust Lit.* invalidated certain limits on athletic scholarships and on students accepting pay for name, image and likeness rights. But both echo *Board of Regents'* respect for the non-professional ideal. *O'Bannon* carefully pointed out that "not paying student-athletes is *precisely what makes them amateurs.*" *O'Bannon, 802 F.3d at 1053* (emphasis in original). *GIA Cap Antitrust Lit.* acknowledged that student athletes do not receive "'unlimited payments *unrelated to education*, akin to salaries seen in professional sports leagues.'" *GIA Cap Antitrust Lit., 958 F.3d at 1258* (*quoting and affirming 375 F.Supp.3d at 1083*) (emphasis added). The Supreme Court praised the latter's care in crafting a remedy that "*would not blur the distinction between college and professional sports*" *Alston, 141*

S.Ct. at 2164 (emphasis added), reaffirming the respect paid by *Board of Regents* to the anti-professional ideal.[10]

*Alston* rejected the proposition that, in the antitrust arena, *Board of Regents'* "ample latitude" somehow "foreclose[s] *any* rule of reason review" of NCAA regulations. *Alston*, 141 S.Ct. at 2158 (emphasis added). But it also acknowledged that *Board of Regents* "may suggest that courts should take care" when conducting such review and praised "not blur[ring] the distinction between college and professional sports." *Id.* at 2158, 2164. Thus, the line of opinions culminating in *Alston* make plain that, regardless of the treatment of other NCAA bylaws, the non-professional ideal still merits "ample latitude" or "care" from courts. *Board of Regents*, 468 U.S. at 120. This case concerns that very ideal: the Students allege that following the rule banning professionals from college sport is unlawful.

The Students' claim is not written on an empty slate. In *Berger*, the Seventh Circuit held that *Board of Regents'* "revered tradition of

---

[10] Only Justice Kavanagh, in a concurrence that no other justice joined, questioned the "ample latitude" or "care" accorded the anti-professional principle in *Board of Regents*. *See Alston*, 141 S.Ct. at 2168-69.

amateurism in college sports' . . . defines the economic reality of the relationship between student-athletes and their schools." *Berger*, 843 F.2d at 291. Accordingly, "student-athletes are not employees" of the schools they attend "and are not covered by the FLSA" as a matter of law. *Id.* at 288. *Berger* is the culmination of 65 years of caselaw broadly rejecting claims that student athletes are employees of their schools solely because they play sport.[11] Those decisions reflect the "ample latitude" or "care" *Board of Regents* called for (and follow the line drawn in its progeny). *Alston* implicitly affirmed them when it reaffirmed

---

[11] *See Dawson v. Nat'l Collegiate Athletic Ass'n*, 250 F. Supp. 3d 401 (N.D. Cal. 2017); *Berger v. National Collegiate Athletic Ass'n*, 162 F. Supp. 3d 845 (S.D. Ind. 2016); *Kavanagh v. Trustees of Boston Univ.*, 440 Mass. 195, 199 (2003); *Korellas v. Ohio State Univ.*, 121 Ohio Misc. 2d 16, 19, (Ohio Ct. Cl. 2002); *Shephard v. Loyola Marymount Univ.*, 102 Cal.App.4th 837, 844–46 (2002); *Waldrep v. Texas Employers Ins. Ass'n*, 21 S.W.3d 692, 701 (Tex. App. 2000); *Townsend v. State of California*, 191 Cal.App.3d 1530, 1537 (1987); *Rensing v. Indiana State Univ. Board of Trustees*, 444 N.E.2d 1170, 1175 (Ind. 1983); *Coleman v. Western Michigan University*, 125 Mich. App. 35, 44 (1983); *State Comp. Ins. Fund v. Industrial Commission*, 135 Colo. 570, 572-74 (1957).

*Livers v. Nat'l Collegiate Athletic Ass'n*, No. CV 17-4271, 2018 WL 2291027 (E.D. Pa. May 17, 2018), declined to dismiss an FLSA claim at the pleading stage, but the district court never reached the employment question because the plaintiff abandoned his action, dismissing it without settlement.

*Board of Regents*. The district court went astray when it drew the opposite conclusion. (*See* 1 AA 14-15.) Concurring with *Berger* and reversing the district court will bring this Circuit into line with the framework established by the Supreme Court in *Board of Regents* and *Alston* that courts should "not blur the distinction between college and professional sports" *Alston*, 141 S.Ct. at 2164.

### III.
### BECAUSE STUDENT ATHLETES ARE NOT *IPSO FACTO* EMPLOYEES UNDER THE FLSA, THE DISTRICT COURT ERRED WHEN IT HELD THE STUDENTS STATE A CLAIM.

The Supreme Court makes clear that "the test of employment" under the FLSA is one of "'economic reality' rather than 'technical concepts.'" *Goldberg v. Whitaker House Coop., Inc.,* 366 U.S. 28, 33 (1961). It also makes clear, in *Board of Regents* and *Alston*, that the NCAA and member schools have "ample latitude" to enforce rules that ban professional athletes from college sport and courts should exercise "care" when scrutinizing those rules. The imperative to "not blur the distinction between college and professional sports" (*Alston*, 141 S.Ct. at 2164) "defines the economic reality of the relationship between student-athletes and their schools." *Berger*, 843 F.3d at 291.

Given these fundamental concepts, it is no surprise that *no* court—state or federal—has ever held that a student who voluntarily participates in college sport must, by that fact alone, be compensated as a school employee. Indeed the Seventh Circuit, in *Berger,* held the opposite: "student-athletes are not employees" of the schools they attend "and are not covered by the FLSA" as a matter of law. *Id.* at 288. *See also Dawson v. Nat'l Collegiate Athletic Ass'n*, 250 F. Supp. 3d 401 (N.D. Cal. 2017) (following *Berger*), *aff'd on other grounds*, 932 F.3d 905 (9th Cir. 2019).

*Berger* is well-reasoned, accords with governing principles handed down by the Supreme Court and this Circuit and follow the long-standing views of the Department of Labor, whose interpretation of the FLSA not only merit deference, but create a statutory defense to liability.  This Circuit should concur with the Seventh and hold that student athletes are not employees of their schools or the NCAA solely because they play sport.

## A.

### THE SEVENTH CIRCUIT, CONSISTENT WITH THIS CIRCUIT'S PRECEDENT, HELD STUDENT ATHLETES ARE NOT EMPLOYEES SOLELY BECAUSE THEY PLAY SPORT. THE DISTRICT COURT ERRED BY DISREGARDING IT.

In *Berger*, two former University of Pennsylvania track-and-field athletes sued their *alma mater*, over 120 Division I schools, and the NCAA itself, alleging, like the Students here, "that student-athletes are employees who are entitled to a minimum wage under the [FLSA]." *Berger*, 843 F.3d at 288. The Southern District of Indiana dismissed their complaint with prejudice under Rule 12, "holding that (1) [plaintiffs] lacked standing to sue any of the [defendants] other than Penn, and (2) [plaintiffs] failed to state a claim against Penn because student-athletes are not employees under the FLSA." *Id.* at 289. The Seventh Circuit affirmed both holdings. While not binding on this Circuit, *Berger*'s analysis is persuasive.

Regarding the athletes' relationship to Penn itself, the Seventh Circuit broadly held that "student-athletes are not employees" of the schools they attend "and are not covered by the FLSA" as a matter of law. *Id.* at 288. *Accord*, *Dawson*, 250 F. Supp. 3d at 403 (following *Berger*).

*Berger* started with the observation that the FLSA defines the employment relationship "in an unhelpful and circular fashion." *Berger*, 843 F.3d at 290. But "the test of employment" under the FLSA is one of "'economic reality' rather than 'technical concepts.'" *Goldberg*, 366 U.S. at 33; *accord Tony & Susan Alamo Foundation v. Secretary of Labor,* 471 U.S. 290, 301 (1985). Thus, *Berger* turned to "economic reality." *Berger*, 843 F.3d at 290.

*Berger* noted that while courts have established various "multifactor tests" to determine whether a particular relationship qualifies as "employment" under the FLSA, it would not apply any them because all "fail to capture the true nature of the relationship' between student-athletes and their schools and [are] not a 'helpful guide.'" *Id.*[12] Instead, noting there "exists a 'revered tradition of amateurism in

---

[12] This Circuit too applies multi-factor tests when appropriate and departs from them when appropriate. *See Enterprise Rent-A-Car Wage & Hour Emp't Practices Litig.,* 683 F.3d 462, 469 (3rd Cir. 2012) (factors "should not be 'blindly applied' . . . whether an employment relationship exists under the FLSA 'does not depend on . . . isolated factors but rather upon the 'circumstances of the whole activity.'") (*quoting Rutherford Food Corp. v. McComb,* 331 U.S. 722, 730 [1947]). *See also Donovan v. DialAmerica Mktg., Inc.,* 757 F.2d 1376, 1382 (3d Cir. 1985) ("Neither the presence nor absence of any particular factor is dispositive."), *cert. denied, DialAmerica Marketing, Inc. v. Brock,* 474 U.S. 919 (1985).

college sports,'" it held "[t]hat long-standing tradition," rather than any multi-factor test, "defines the economic reality of the relationship between student-athletes and their schools." *Id.* (*quoting Board of Regents.*, 468 U.S. at 120).

Citing *O'Bannon*, *Berger* reasoned that "the NCAA and its member universities and colleges have created an elaborate system of eligibility rules" in order to "maintain this tradition of amateurism." *Id.* These rules, *Berger* held, "'define what it means to be an amateur or a student-athlete, and are therefore essential to the very existence of collegiate athletics." *Id.* (*quoting Agnew v. National Collegiate Athletic Ass'n*, 683 F.3d 328, 343 [7th Cir. 2012]).

*Berger* concluded that "[t]he multifactor test proposed by [plaintiffs] simply does not take into account this tradition of amateurism or the reality of the student athlete experience." *Id.* Rather than straining to fit the case into an inappropriate multi-factor test, it turned to the extensive experience of courts and of regulators.

"A majority of courts," *Berger* noted, "have concluded—albeit in different contexts—that student-athletes are not employees." *Id. See also* n.11, *supra*. On the regulatory front, it noted, "[t]he Department of

Labor . . . has also indicated that student-athletes are not employees under the FLSA." *Id.* at 292.

The Seventh Circuit concluded its economic reality analysis by stating definitively that student-athletes cannot be employees as a matter of law because their participation in sport is voluntary and student athletes have participated in sport for more than a century with no expectation of pay:

> "Appellants in this case have not, and quite frankly cannot, allege that the activities they pursued as student-athletes qualify as 'work' sufficient to trigger the minimum wage requirements of the FLSA. Student participation in collegiate athletics is entirely voluntary. Moreover, the long tradition of amateurism in college sports, by definition, shows that student-athletes—like all amateur athletes—participate in their sports for reasons wholly unrelated to immediate compensation. Although we do not doubt that student-athletes spend a tremendous amount of time playing for their respective schools, they do so—and have done so for over a hundred years under the NCAA—without any real expectation of earning an income. Simply put, student-athletic 'play' is not 'work,' at least as the term is used in the FLSA. *We therefore hold, as a matter of law, that student-athletes are not employees and are not entitled to a minimum wage under the FLSA.*" (*Id.* at 293 [emphasis added].)

**B.**

## THE ABSENCE OF A COMPENSATION BARGAIN FOR PLAYING SPORT DOOMS THE STUDENTS' CLAIMS UNDER THE FLSA.

The Students admit—as they must—that "[S]chools just do **not** pay Student Athletes . . . ." (2 AA 61 [¶ 2] [emphasis in original]. They "do **not** have any options to choose any opportunities to play NCAA sports for wages at any NCAA D1 school [and] . . . also do **not** have any option to bargain for such wages with any such school" (2 AA 71 [¶ 43] [emphasis in original].)

These admissions are fatal to the Students' claims. First, *Berger*'s focus on the fact that student athletes play sport "without any real expectation of earning an income"—"and have done so for over a hundred years under the NCAA"—squarely accords with Supreme Court precedent holding that without a compensation bargain there can be no employment relationship under the FLSA. *Berger*, 843 F.3d at 293. Second, that focus is required by the ordinary, contemporary meaning of the text of the FLSA.

### 1. THE SUPREME COURT HAS LONG HELD A COMPENSATION BARGAIN ESSENTIAL TO THE ECONOMIC REALITY OF EMPLOYMENT.

"The test of employment under the [FLSA] is one of 'economic reality.'" *Alamo*, 471 U.S. at 301; *accord Goldberg*, 366 U.S. at 33.

Individuals cannot be "employees" covered by the FLSA unless they are working under an "express or implied compensation agreement." *Walling v. Portland Terminal Co.,* 330 U.S. 148, 152 (1947); *see also Alamo,* 471 U.S. at 300-01; *Williams v. Strickland,* 87 F.3d 1064, 1067 (9th Cir. 1996). When an individual's work "did not contemplate . . . compensation" in the first place, he or she is "outside the sweep of the Act." *Alamo,* 471 U.S. at 295, 300 (omission in original) (quotation marks omitted). Despite the breadth of the FLSA's definition of employment, "it does have its limits. An individual who, 'without promise or expectation of compensation, but solely for his personal purpose or pleasure, work[s] in activities carried on by other persons either for their pleasure or profit,' is outside the sweep of the Act." *Id.* at 295 (quoting *Walling,* 330 U.S. at 152). *Accord* RESTATEMENT OF EMPLOYMENT LAW § 1.02 (2015) ("An individual is a volunteer and not an employee if the individual renders uncoerced services to a principal without being offered a material inducement.")

In *Walling,* for example, the Supreme Court held that railroad trainees were not "employees" because they were functionally similar to students "tak[ing] courses in railroading in a public or private

42

vocational school." 330 U.S. at 152-53. The FLSA's definition of employment, the Court explained, "was obviously not intended to stamp all persons as employees who, without any express or implied compensation agreement, might work for their own advantage on the premises of another." *Id.* at 152. "*Otherwise, all students would be employees of the school or college they attended, and as such entitled to receive minimum wages.*" *Id.* (emphasis added). "[S]uch a construction," the Court held, "would sweep under the Act each person who, without promise or expectation of compensation, but solely for his personal purpose or pleasure, worked in activities carried on by other persons either for their pleasure or profit." *Id.* That would exceed the FLSA's "purpose as to wages," which was simply "to insure that every person whose employment *contemplated compensation* should not be compelled to sell his services for less than the prescribed minimum wage." *Id.* (emphasis added).

Similarly, the Ninth Circuit held in *Williams* that the plaintiff—a participant in a Salvation Army adult rehabilitation center—was not employed by the center, even though he participated full-time in what the center called "work therapy" and the center gave him "food,

clothing, shelter, and a small stipend of seven to twenty dollars per week." *Williams,* 87 F.3d at 1065.  Mr. Williams was not an employee under the FLSA, the Court held, because he "had neither an express nor an implied agreement for compensation." *Id.* at 1067.  Rather, his "relationship with the Salvation Army was solely rehabilitative": His "work therapy was not performed in exchange for in-kind benefits, but rather was performed to give him a sense of self-worth [and] accomplishment," "enabl[ing] him to overcome his drinking problems and reenter the economic marketplace." *Id.*  And the "in-kind benefits" that he received were given to him not to compensate him for his services but "to enable him to pursue his rehabilitation." *Id.*

Following these cases, student athletes are not employees because the anti-professional ideal "defines the economic reality" of their activity. *Berger,* 843 F.3d at 291; *see also Board of Regents,* 468 U.S. at 120; *O'Bannon,* 802 F.3d at 1076.  NCAA "eligibility rules," especially those prohibiting compensation for play, "define what it means to be an amateur or a student-athlete, and are therefore essential to the very existence of . . . college football." *Agnew,* 683 F.3d at 343.  If student-athletes were paid for playing, they would be professionals, and college

44

sport would become the "minor league" version of professional sport that the Supreme Court holds it is not. *O'Bannon*, 802 F.3d at 1074 (*quoting Board of Regents*, 486 U.S. at 101-102).

As *Berger* explained, the importance of anti-professional ideal to college sport forecloses, as a matter of law, any contention that student athletes are employees under the FLSA. *Berger*, 843 F.3d at 291. "[S]tudent athletes—like all amateur athletes—participate in their sports for reasons wholly unrelated to immediate compensation." *Id.* at 293. These reasons include the enjoyment of playing a sport they love, health benefits of being physically active, opportunity to develop personal discipline and leadership skills, camaraderie of joining with teammates in a common endeavor, opportunity (for students with athletic scholarships) to earn a college degree otherwise out of reach, desire to develop their skills and profile in hopes of eventually playing professionally (however unlikely that may be) and so on. Student athletes cannot plausibly claim to have been motivated by an "express or implied compensation agreement" when they entered college (*Walling*, 330 U.S. at 152) given that the economic reality of college

sport has been defined "for over a hundred years" by the prohibition on compensation for playing.  *Berger*, 843 F.3d at 293.

### 2.    THE ORDINARY CONTEMPORARY MEANING OF THE FLSA'S TEXT CONTEMPLATES A COMPENSATION BARGAIN.

The centrality of a compensation bargain to employment is grounded in the ordinary contemporary meaning of the words chosen by Congress when it enacted the FLSA in 1938.

 "[A] 'fundamental canon of statutory construction' [is] that words generally should be 'interpreted as taking their ordinary . . . meaning . . . at the time Congress enacted the statute.'" *Wisconsin Central Ltd. v. United States*, 138 S.Ct. 2067, 2074 (2018).  "After all, if judges could freely invest old statutory terms with new meanings, we would risk amending legislation outside the "single, finely wrought and exhaustively considered, procedure" the Constitution commands." *New Prime Inc. v. Oliveira*, 139 S.Ct. 532, 538 (2019) (*quoting INS v. Chadha*, 462 U.S. 919, 951 [1983]).  "[A] court's proper starting point lies in a careful examination of the ordinary meaning and structure of the law itself." *Food Marketing Institute v. Argus Leader Media*, 139 S.Ct. 2356, 2364 (2019).

The FLSA defines an "employee" as someone "employed by an employer"; an "employer" as someone who acts as an "employer in relation to an employee"; and "employ" as "to suffer or to permit work." *See* 29 U.S.C. §§ 203(d),(e)(1) and (g). It requires "employees" who are "employed in an enterprise" to be paid a minimum "wage." 29 U.S.C. § 206(a). It requires overtime be paid to "employees" as "compensation for [their] employment in excess of [40] hours." 29 U.S.C. § 207(a)(1).

During the period leading to the enactment of the FLSA in 1938, the words "employ" and "employment" as they were commonly understood in the working world entailed a compensation bargain. In 1910, BLACK'S LAW DICTIONARY stated "[e]mploy . . .  when used in respect to a servant or hired laborer . . . is equivalent to hiring, which implies a request and a contract for compensation . . . ." BLACK'S LAW DICTIONARY 421 (2nd ed. 1910).[13] The next edition, published just five years before passage of the FLSA, repeated the very same definition, adding: "and has but this one meaning when used in the ordinary affairs and business of life." BLACK'S LAW DICTIONARY 657 (3rd ed.

---

[13] https://archive.org/details/bub_gb_R2c8AAAAIAAJ_3/page/n5/mode/2up

1933).[14] In the same edition, it defined "employment," when used to describe "[t]he act of hiring" as "implying a request and a contract for compensation." *Id.* at 658.  The synonyms for "employment" listed by the OXFORD ENGLISH DICTIONARY published in the same year included "business," "occupation," "trade or profession." III OXFORD ENGLISH DICTIONARY 130 (1st ed. 1933).[15]

The words "compensation" and "wages" too entailed an agreement to labor for remuneration. In 1910, BLACK's defined "compensation" as "the remuneration or wages given to an employe [*sic.*] or officer," and "wages" as [t]he compensation agreed upon by a master to be paid to a servant, or any other person hired to do work or business for him." BLACK'S LAW DICTIONARY 232, 1215 (2nd ed. 1910). In 1933, it carried over the same definitions, adding "[s]alary, pay or emolument" as synonyms of "compensation" when given to an employee.  BLACK'S LAW DICTIONARY 378 (3rd ed. 1933).

---

[14] https://archive.org/details/blacks-law-dictionary-3rd-edition-1933/mode/2up

[15] https://archive.org/details/in.ernet.dli.2015.147244/page/n1/mode/2up

The Supreme Court—consistent with its frequent holdings that courts interpreting statutes "giv[e] the words used their ordinary meaning" (*Lawson v. FMR LLC*, 571 U.S. 429, 440 [2014])—has explained that the key terms in the FLSA, "employment" and "work," have these normal, everyday meaning, *i.e.*, how they were "commonly used." *Tennessee Coal Co. v. Muscoda Local,* 321 U.S. 590, 598 (1944), *abrogated by statute on* other grounds, *Yu v. Hasaki Rest., Inc.*, 944 F.3d 395, 420 n.6 (2d Cir. 2019). Hence, "when relationships have deviated from the traditional understanding of employment in fundamental ways, the Supreme Court has refused to shoehorn them into the" FLSA. *Steelman v. Hirsch*, 473 F.3d 124, 129 (4th Cir. 2007).

The Students' claim they are "employees" when they play sport is simply not "what the English language tells us . . . to expect." *Lopez v. Gonzales*, 549 U.S. 47, 54 (2006). It would be confusing to say that a student who plays an intercollegiate sport does so as an "employee" of his school—let alone of the NCAA or other Division I schools. The student athlete is not an assistant coach, a trainer, or team administrator, consistent with the everyday sense of the word "employee" in college sports. *See also Berger*, 843 F.3d at 293 ("Simply

put . . . 'play' is not 'work.'").  Common usage—just as much as original contemporary meaning—confirms the correctness of the *Berger*'s ruling.[16]

## C.
### THE SEVENTH CIRCUIT CORRECTLY DISREGARDED MULTI-FACTOR TESTS OF ECONOMIC REALITY IN FAVOR OF A HOLISTIC STANDARD BASED ON THE NON-PROFESSIONAL IDEAL. THE DISTRICT COURT ERRED BY APPLYING INSTEAD THE SECOND CIRCUIT'S TEST FOR STUDENT INTERNSHIPS.

The "'economic reality' standard . . . is not a precise test susceptible to formulaic application." *Ellington v. City of East Cleveland*, 689 F.3d 549, 555 (6th Cir. 2012). "[E]mployment for FLSA purposes [is] a flexible concept to be determined on a case-by-case basis by review of the totality of the circumstances." *Barfield v. N.Y.C. Health & Hospital Corp.*, 537 F.3d 132, 141-42 (2d Cir. 2008).

---

[16] Any argument that "work" means any form of physical or mental exertion would be unavailing. In both *Walling* and *Williams*, the plaintiffs were unquestionably engaged in such exertion. And there is no dispute that college students engage in substantial mental exertion in pursuing their studies. Yet the Supreme Court makes clear such exertion does not *ipso facto* create employment: untethered from the requirement of a compensation bargain, "all students would be employees of the school or college they attended, and as such entitled to receive minimum wages." *Walling*, 330 U.S. at 152.

"[E]conomic reality" tests vary from the holistic to the formulaic. While "[t]here must be some ultimate question to answer, factors to balance, or some combination of the two" (*Solis v. Laurelbrook Sanitarium and Sch., Inc.,* 642 F.3d 518, 522-23 [6th Cir. 2011]), "the broader message of [*Alamo*] is that in evaluating whether a particular person is an 'employee' within the meaning of the FLSA, a holistic approach to the fundamental task of discerning the 'economic reality' of the relationship between the alleged employee and employer may be appropriate and necessary." *Livers,* 2018 WL 2291027, \*14.

Sometimes that analysis requires a multi-factor test tailored to the context. The most well-established tests are tailored to independent contractor classification disputes (*e.g.,* *DialAmerica,* 757 F.2d at 1382), joint employment disputes (*e.g.,* *Enterprise,* 683 F.3d at 468), or student internships (*e.g.,* *Glatt,* 811 F.3d 528; *Benjamin v. B & H Education, Inc.,* 877 F.3d 1139 [9th Cir. 2017]).

But there are two glaring problems with applying any of these multi-factor tests to the Students:

First, the district court's decision to apply a multi-factor test smuggled an *assumed* answer to the very question it posed. Each test is

premised on a norm of ordinary employment within the economic reality of the endeavor to which it is applied and asks whether there are special circumstances that mark a deviation from that norm. *DialAmerica* asks whether plaintiff works sufficiently independently to be considered a contractor rather than a regular employee. *Enterprise* starts with a given that plaintiff is a regular employee of one party and asks whether a second party is an additional employer. *Glatt* asks whether an intern is getting enough learning from their work experience to be considered a trainee rather than a regular employee.

But with student athletes, schools are not commercial entities who pay people to play sport. Professional sport exists outside of the university. The non-professional ideal exists to keep it outside the university.

Second—and for that very reason—none of the multi-factor tests capture the economic reality of the relationship between student athlete and school. *See Berger*, 843 F.3d at 291. None of them accounts for the "revered tradition" that defines the "economic reality" of the relationship between student-athlete and school. *Berger*, 843 F.3d at 293.

## D.
## THE DISTRICT COURT COMPOUNDED ERROR BY MISAPPLYING THE SECOND CIRCUIT TEST.

The district court settled on the Second Circuit's student-intern test. Doing so was error, as just explained. But it compounded error by misapplying the test. Correctly applied, the test indicates student athletes are not employees solely because they play sport.

In *Glatt*, the Second Circuit held that "the proper question is whether the intern or the employer is the primary beneficiary of the relationship" and set forth the following "factors" to be used to answer that question:

> "1. The extent to which the intern and the employer clearly understand that there is no expectation of compensation. Any promise of compensation, express or implied, suggests that the intern is an employee—and vice versa.

> "2. The extent to which the internship provides training that would be similar to that which would be given in an educational environment . . . .

> "3. The extent to which the internship is tied to the intern's formal education program . . . .

> "4. The extent to which the internship accommodates the intern's academic commitments by corresponding to the academic calendar.

> "5. The extent to which the internship's duration is limited to the period in which the internship provides the intern with beneficial

learning.
   "6. The extent to which the intern's work complements, rather than displaces, the work of paid employees while providing significant educational benefits to the intern.
   "7. The extent to which the intern and the employer understand that the internship is conducted without entitlement to a paid job at the conclusion of the internship" (*Id.* at 536-37.)

"[E]very factor need not point in the same direction for the court to conclude that the intern is not an employee entitled to the minimum wage." *Id.* at 537.

While "[n]o one factor is dispositive," they are not all of equal importance. *Glatt*, 811 F.3d at 537. Factors 1 and 7 "are *crucial* to understanding the 'economic reality' of the internship relationship." *Wang*, 877 F.3d at 73 (emphasis added). This is because the purpose of the test is to "[d]istill[] the import of *[Walling]* in the context of interns." *Velarde v. GW GJ, Inc.*, 914 F.3d 779, 784 (2d Cir. 2019). Factors 1 and 7 "are essentially the same as *[Walling's]* consideration[]" that there exist an "express or implied compensation agreement." *Schumann v. Collier Anesthesia, P.A.*, 803 F.3d 1199, 1212 (11th Cir. 2015) ("essentially the same"); *Walling*, 330 U.S. at 152 ("compensation agreement").

And while this list is "non-exhaustive" (*Glatt*, 811 F.3d at 536), that the NCAA or Schools derive some "immediate advantage" because a few sports make money cannot be added to the list to diminish the importance of an expectation of compensation. *See Velarde*, 914 F.3d at 785-88 (affirming ruling that cosmetology student who did supervised work for which school charged customers was not an employee under *Glatt*). Although a factor to be considered, *Walling* "does not imply that FLSA renders any organization that receives some immediate benefit from unpaid labor an 'employer' of the individual from which the benefit is derived." *Velarde*, 914 F.3d at 784-85 (following *Walling*). *See also Schumann*, 803 F.3d at 1211 ("mere fact" that a business benefits from offering internships "cannot, standing alone, render the student interns 'employees' for the purposes of the FLSA.").

### 1. IT GAVE INSUFFICIENT WEIGHT TO "CRUCIAL" FACTORS CONCERNING A COMPENSATION BARGAIN, WHICH POINT STRONGLY AWAY FROM EMPLOYMENT.

Because Factors 1 and 7 "are *crucial* to understanding the 'economic reality' of the internship relationship" (*Wang*, 877 F.3d at 73), their concession "weighs heavily" against finding an employment relationship. *Vaughn v. Phx. House New York, Inc.*, No. 14-CV-3918

(RA), 2019 WL 568012, at *6 (S.D.N.Y. Feb. 12, 2019), *aff'd,* 957 F.3d 141, 146 (2d Cir. 2020). *See also Glatt,* 811 F.3d at 537 ("Any promise of compensation, express or implied, suggests that the intern is an employee—and *vice versa.*")

The Students expressly concede them in the first amended complaint. First, they plead "[s]tudent-athletes do **not** have any options to choose any opportunities to play NCAA sports for wages at any NCAA D1 school [and] . . . also do **not** have any option to bargain for such wages with any such school." (2 AA 71 [¶ 43] [emphasis in original]. *See also* 2 AA 72-73 [¶¶ 51-55] [sanctions for violating NCAA bylaws barring compensation of athletes].) Second, they plead "[n]either student employees in Work Study, **nor** Student Athletes in the NCAA sports program, are entitled to a paid job at their respective NCAA D1 member school after graduation." (2 AA 101 [¶ 132 [emphasis in original].) [17]

---

[17] The Students attempt to allege Factor 7 out of existence by arguing in their amended complaint that it "*only* applies to corporations and similar employers – **not** to colleges, universities or proprietary schools." (2 AA 101 n.9 [¶ 132] [emphasis in original].) Insofar as *Glatt* expressly limited its test to "the context of unpaid internships" with "for-profit employers" (*Glatt,* 811 F.3d at 536 & n.2), the Students

The district court agreed that both Factors 1 and 7 "weigh in favor of finding that the [Students] are not employees." (1 AA 32.) But it did not consider them "crucial," as the Second Circuit intended. *Wang,* 877 F.3d at 73. Rather, the district court dismissed "expectation of compensation" as "just one of seven non-dispositive factors." (1 AA 25 n.10.) This is the district court's first error in applying *Glatt*: Factors 1 and 7 merited weight greater than the district court gave them.

### 2. IT MISCONSTRUED FACTORS CONCERNING THE EDUCATIONAL VALUES OF INTERNSHIP TO CONCLUDE THEY ARE NEUTRAL WHEN APPLIED TO SPORT. BECAUSE THE STUDENTS CONCEDE SPORT'S BROADER EDUCATIONAL VALUE, THESE FACTORS POINT AWAY FROM EMPLOYMENT.

The district court's next error was in finding Factors 2 ("training . . . similar to . . . an educational environment") and 5 ("limited to . . . beneficial learning") "would be neutral" (1 AA 32), when they actually point away from employment.

---

have a point.  The NCAA and Schools are nonprofit 501(c)(3) organizations.  (*See* ED Pa. ECF 24.)

Thus, the Students effectively concede what *Berger* held—*Glatt* is not appropriately applied to student-athletes.  *Berger,* 843 F.3d at 290-91 (declining to apply *Glatt*).  But if *Glatt* is going to be applied to their allegations, the Students do not get to pick and choose which factors they like, and which they do not.

The district court concluded that Factors 2 and 5 were "neutral" because "[t]he Complaint does not contain any factual allegations that specifically pertain to" them. (1 AA 30.) But the Students quote and incorporate by reference discovery in earlier litigation that "[l]earning benefits from participation in NCAA athletics include, but are not limited to: discipline, work ethic, strategic thinking, time management, leadership, goal-setting, and teamwork." (2 AA 78 [¶ 70].) They also quote and incorporate by reference testimony of a former Division 1 quarterback agreeing that playing sport "helps build . . . human values," such as "character" and "perseverance." (2 AA 78 n.7.) And the Students allege these admitted benefits are not "academic" ones. (*Id.*)

The Students' argument about the legal significance of these conceded benefits is afforded no weight. *See, e.g., Garfield v. Shutterfly, Inc.*, 857 Fed. App'x 71, 74 n.4 (3d Cir. 2021). Factors 2 and 5 do not ask about the *academic* character of the internship—Factor 3 addresses academics. Factors 2 and 5 are focused on educational benefits *beyond* classroom learning. Factor 2 specifically references "clinical and other hands-on training," and Factor 5 references "beneficial learning." *Glatt,* 811 F.3d at 537.

The benefits of intercollegiate sport admitted by the Students in their complaint—character, discipline, goal-setting, leadership, perseverance, teamwork, time management, strategic thinking, and work ethic—are widely recognized. "For college students, athletics offers an opportunity to execute leadership skills, learn teamwork, build self-confidence, and perfect self-discipline." *Cohen v. Brown University*, 991 F.2d 888, 891 (1st Cir. 1993). (In high school, too, "sports are part of the school learning experience." *Lilley v. Elk Grove Unified School Dist.*, 68 Cal.App.4th 939, 946 [1998].) "[C]ollege sports provide[] an important opportunity for teaching people about character, motivation, endurance, loyalty, and the attainment of one's personal best—all qualities of great value in citizens. In this sense, competitive athletics were viewed as an extracurricular activity, justified by the university as part of its ideal objective of educating the whole person." *Bloom v. National Collegiate Athletic Ass'n*, 93 P.3d 621, 626 (Colo. App. 2004) (*quoting* James J. Duderstadt, INTERCOLLEGIATE ATHLETICS AND THE AMERICAN UNIVERSITY 70 [2003]).

These 'intangible' benefits carry over into the classroom, and then to life after college. Professor James Heckman, a Nobel Prize-winning

economist at the University of Chicago, recently released research that "demonstrate[s], based on the available data, substantial benefits to athletic participation." He found "intercollegiate varsity athletes are as likely or more likely to earn at least a Bachelor's degree relative to comparable non-athletes" and "positive effects of athletics on initial (mid-20's) wages." James J. Heckman & Colleen P. Loughlin, *Athletes Greatly Benefit from Participation in Sports at the College and Secondary Level*, BECKER FRIEDMAN INSTITUTE FOR ECONOMICS WORKING PAPER NO 2021-86, p. 5 (July 2021).[18]

The district court erred in concluding that Factors 2 and 5 are "neutral." They point away from employment.

### 3. IT CONFUSED THE CONCEDED FACTOR OF WHETHER STUDENT ATHLETES DISPLACE REGULAR EMPLOYEES WITH OTHER FACTORS, ERRONEOUSLY CONCLUDING THE FACTOR POINTS TOWARD EMPLOYMENT WHEN IT ACTUALLY POINTS AWAY.

*Glatt* Factor 6 asks whether student intern work "complements, rather than displaces, the work of paid employees." The district court agreed the Students "do not contend that their participation in

---

[18] https://bfi.uchicago.edu/wp-content/uploads/2021/07/BFI_WP_2021-86.pdf

interscholastic athletics displaces any paid employees." (1 AA 31.) Nevertheless, it found that Factor 6 "weigh[s] in favor of finding that [the Students] are employees." (*Id.*) It reached this finding by confusing Factor 6 with other factors, compounding the errors it made in applying others, especially Factors 2 and 5 (pertaining to the broader educational value of the internship).

Factor 6 points away from an employment relationship. Colleges and universities do not operate professional sports franchises, so student-athletes do not perform work that institutions would otherwise pay someone to perform.  The Students attempt to 'plead around' this issue by alleging that "Student Athlete performance is integral to the billion dollar Big Business of NCAA sports. . . ."  (2 AA 97 [¶ 113].) While it is tautologically true that athletes are integral to sport, the Students do not—and, consistent with FED. R. CIV. PROC. 11, *cannot*—allege that they replace professional athletes paid to play for schools when student athletes are not available.

The district court erred by mixing and matching factors, agreeing that the Students concede this factor, but drawing a contrary conclusion by pointing to *other* factors. It concluded Factor 6 "weigh[s] in favor of a

finding that [the Students] are the employees" because "the Complaint alleges that they gain no educational benefits from being student athletes" (Factors 2 and 5), and "NCAA sports are not tied to the student's formal education program by integrated coursework" (Factor 3). (1 AA 30-31 [*quoting* 2 AA 81 (¶ 76)].) Elsewhere in its ruling, the district court found Factors 2 and 5 "neutral." (1 AA 30.) Citing the same allegations to support the conclusion that Factor 6 points toward employment is simply circular reasoning. And however Factors 2, 3 and 5 point, they are not Factor 6, which points one way on the allegations made by the Students: away from employment.

4.    FIVE OF SEVEN FACTORS—INCLUDING THE "CRUCIAL" ONES—POINT AWAY FROM EMPLOYMENT FOR STUDENT ATHLETES.

The district court correctly found that Factors 3 ("tied to the intern's formal education program") and 4 ("corresponding to the academic calendar") point towards employment. (1 AA 30-31.) The arguably imperfect correspondence between some athletic seasons and the academic calendar calls for additional academic support for some student athletes.  The Students concede this support is provided.  (2 AA 86-87 [¶ 93], 96-97 [¶¶ 110-11] [time devoted to sports is tracked,

reported and managed to avoid conflicts with academics]; 2 AA 94-96 [¶¶ 105-09] [Villanova provides dedicated academic support for student-athletes that provides, among other services, tutoring].) So while Factors 3 and 4 point toward employment, they do so only modestly.

Shorn of the district court's application errors, the clear weight of the *Glatt* factors point away from finding an employment relationship:



The district court should not have applied *Glatt* at all. But when it did, it should have concluded that the Students fail plausibly to allege an employment relationship.

The Ninth Circuit's decision in *Benjamin* shows why *Berger* would still have found student athletes do not state a claim under the FLSA even had it applied *Glatt*.

*Benjamin* involved cosmetology students. The Ninth Circuit recognized that while it had not yet addressed vocational students or interns, it had held in various other contexts that the absence of a "bargained-for compensation relationship" was fatal to a claim of employment. *Benjamin*, 877 F.3d at 1145. After assessing the *Glatt* test, which the Ninth Circuit found most appropriately applied to the context of student employment, and the alternative Department of Labor internship test, the court concluded that under both tests cosmetology students were not employees. *Id.* at 1148. Among other reasons, the court concluded that the "[s]tudents did not displace regular employees," were "not entitled to a job at the end of their clinical experience," and "understood they would not receive compensation." *Id.* These militate against finding student athletes employees under *Glatt*.

*Berger* recognized that the absence of what *Benjamin* called a "bargained-for compensation relationship" (*Benjamin*, 877 F.3d at 1145), is fatal to the claims asserted there (and here): "Although we do not doubt that student-athletes spend a tremendous amount of time playing for their respective schools, they do so—and have done so for

over a hundred years under the NCAA—without any real expectation of earning an income. Simply put, student-athletic 'play' is not 'work,' at least as the term is used in the FLSA." *Berger*, 843 F.3d at 293. While student athletes exert themselves mentally and physically, they do so for their own reasons, and their own benefit. And their schools—which are in the business of education, scholarship, and service—offer athletics as a part of their *educational* mission, not as an end. *See id.* ("Student participation in collegiate athletics is entirely voluntary. Moreover, the long tradition of amateurism in college sports, by definition, shows that student-athletes—like all amateur athletes—participate in their sports for reasons wholly unrelated to immediate compensation.").

Rather than representing an isolated exception to the FLSA, *Berger* draws on the central tenets of FLSA jurisprudence to conclude that student-athletes are not, as a matter of law, *ipso facto* employees of the schools they represent on the playing field. Applying *Glatt* does not change that conclusion.

## E.
### THE DEPARTMENT OF LABOR'S LONGSTANDING VIEW THAT STUDENT-ATHLETES ARE NOT EMPLOYEES NOT ONLY ACCORDS WITH THE CASE LAW—IT PROVIDES A COMPLETE *STATUTORY* DEFENSE TO THIS ACTION.

The Department of Labor has for decades concluded that student athletes are not employees under the FLSA solely because they play sport. Not only is its interpretation entitled to deference under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) (*see* note 24, *infra*), in § 10 of the Portal-to-Portal Act of 1947 Congress wrote into the FLSA an express statutory defense to liability based on the DOL's interpretation. Even were the district court's skepticism about the continuing viability of *Berger* correct, it was still obliged to dismiss this action. On this ground too it erred in declining to do so.

"No employer shall be subject to any liability or punishment" under the FLSA if it relies "on any written administrative . . . interpretation, of the agency" even if the interpretation "is determined by judicial authority to be invalid . . . ." 29 U.S.C. § 259(a). *See also*, *Encino Motorcars, LLC v. Navarro*, 138 S.Ct. 1134, 1147 (2018) (defense applies to "superseded agency guidance"); *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 106 (2015) (defense applies even when agency

changes position on an issue). The DOL FIELD OPERATIONS HANDBOOK is one such "interpretation."  The FLSA specifies that "[t]he agency referred to in subsection (a) shall be[,] . . . in the case the case of the [FLSA] . . . the Administrator of the Wage and Hour Division of the Department of Labor." 29 U.S.C. § 259(b)(1). The FOH is published by the Wage and Hour Division to "provide[ Department] investigators and staff with interpretations of statutory provisions … and general administrative guidance" Berger , 843 F.3d at 292.

The FOH agrees with Berger and Dawson that student athletes fall outside the statute's reach.[19]  It states that "[u]niversity or college students who participate in activities generally recognized as extra-curricular are generally not considered to be employees within the meaning of the Act." FOH § 10b24(a).  FOH § 10b03(e) specifies that student athletics is one such "extra-curricular":

> "As part of their overall educational program, public or private schools and institutions of higher learning may permit or require students to engage in activities in connection with dramatics, student publications, glee clubs, bands, choirs, debating teams, radio stations, intramural and *interscholastic athletics* and

---

[19] Since FOH §§ 10b03(e) and 10b24(a) pre-date Berger  and Dawson, it is more accurate to say that they agree with it.

other similar endeavors.  Activities of students in
such programs, conducted primarily for the
benefit of the participants as a part of the
educational opportunities provided to the
students by the school or institution, are not work
of the kind contemplated by [the FLSA] and do
not result in an employer-employee relationship
between the student and the school or
institution." (Emphasis added).

These provisions leave no doubt about the DOL's view that participants
in "interscholastic athletics" are not "employees" within the meaning of
the FLSA.

Although the DOL was well aware—like the rest of the country—
that colleges and universities do not pay student athletes wages for
playing sport, it has *never* initiated enforcement proceedings against
the NCAA or any schools for FLSA violations against student athletes
as such.  This is significant because, as the Supreme Court has
explained, "while it may be 'possible for an entire industry to be in
violation of the [FLSA] for a long time without the Labor Department
noticing,' the 'more plausible hypothesis' is that the Department did not
think the industry's practice was unlawful." *Christopher v. SmithKline
Beecham Corp.*, 567 U.S. 142, 158 (2012) (alteration in original)

(*quoting Dong Yi v. Sterling Collision Centers, Inc.*, 480 F.3d 505, 510–511 [7th Cir. 2007]).

"The test under section 259 is an objective one." *Hultgren v. Cty. of Lancaster, Neb.*, 913 F.2d 498, 507 (8th Cir. 1990). To meet it, "an employer must 'show it acted in (1) good faith, (2) conformity with, and (3) reliance on the DOL's regulations. . . .'" *Alvarez v. IBP, Inc.*, 339 F.3d 894, 907 (9th Cir. 2003) (*quoting Frank v. McQuigg*, 950 F.2d 590, 598 [9th Cir.1991].) *Accord*, *Hultgren*, 913 F.2d at 507; *Equal Employment Opportunity Comm'n v. Home Ins. Co.*, 672 F.2d 252, 263 (2d Cir. 1982). "The good faith requirement contains both subjective and objective components." *Perry v. Randstad Gen'l Partner (US) LLC*, 876 F.3d 191, 214 (6th Cir. 2017). Subjectively, good faith requires "honesty of intention and no knowledge of circumstances which ought to put him upon inquiry." *Id.* (*quoting Swigart v. Fifth Third Bank*, 870 F. Supp. 2d 500, 510 [S.D. Ohio 2012]). Objectively, "[t]he employer must show that it 'acted as a reasonably prudent man [*sic*.] would have acted under the same or similar circumstances.'" *Id. Accord Alvarez*, 339 F.3d at 907.

The NCAA and the Schools meet this test. Objective good faith and conformity are demonstrated not only by 65 years of unanimity among state and federal courts that student-athletes are not *ipso facto* "employees" of their schools (*see* n.11, *supra*), but also because the "revered tradition of amateurism" in college sports (*Board of Regents,* 468 U.S. at 120) conforms with the plain language in FOH § 10b03(e): "interscholastic athletics . . . [is] not work of the kind contemplated by [the FLSA] and do not result in an employer-employee relationship between the student and the school or institution."  Subjective good faith and reliance are demonstrated by the NCAA and Schools relying on the FOH to defend not paying student athletes in litigation pending throughout the limitations period on the Students' claims.[20] "[C]ourts may take judicial notice of filings or developments in related proceedings." *Werner v. Werner,* 267 F.3d 288, 295 (3d Cir. 2001). The district court should have done so and given them their proper weight.

---

[20] *See, e.g., Berger,* 2016 WL 3438089, *40-50 (7th Cir. June 14, 2016) (Appellee's Brief); *Berger,* 2015 WL 3811730 (S.D. Ind. April 30, 2015) (Motion to Dismiss); *Dawson,* 2017 WL 5632769, *22-26 (9th Cir. Nov. 20, 2017) (Appellee's Brief); *Dawson,* 2017 WL 2492229 (N.D. Cal. Jan. 27, 2017) (Motion to Dismiss); *Livers,* 2017 WL 8232469 (E.D. Pa. Dec. 28, 2017) (Motion to Dismiss).

Instead, the district court rejected the NCAA's and the Schools'
§ 259 defense because "there is nothing in the record . . . upon which we
could determine whether the [Attended Schools] failed to pay minimum
wages to their student athletes in reliance on [the] FOH." (1 AA 17.) It
dismissed the indisputable record of the NCAA's and Schools' stated
reliance on the FOH going back to at least 2016 because "it does not
establish that they relied on [the FOH] *when they made their*
*decisions*." (1 AA 17 n.8 [emphasis added].) The district court
misapplied § 259's reliance requirement.

The district court assumed that the NCAA and Schools may
invoke § 259 only if they relied on the FOH when the Schools first
fielded teams of amateur student athletes. For many of the Schools,
that happened before the FLSA was enacted in 1938,[21] making it
impossible to ever satisfy the requirement as the district court applied
it. No decision construes § 259 to create this sort of 'Catch-22.'

---

[21] *See, e.g.*, Carnegie Foundation for the Advancement of
Teaching, AMERICAN COLLEGE ATHLETICS 83, 85, 100, 118, 264 (1929)
(http://archive.carnegiefoundation.org/publications/pdfs/elibrary/American_College_Athletics.pdf) (referencing intercollegiate sport at Cornell,
Fordham and Lafayette College).

To the contrary, § 259 contains important textual clues that Congress intended to apply § 259's requirements to the claim itself, not the policy which gives rise to the claim. Section 259 expressly applies to "any action or proceeding based on any act or omission on or after May 14, 1947." It insulates an employer from liability if it "proves that the *act or omission complained of* was in . . . reliance on" the FOH. With a longstanding policy, the "act or omission complained of" or on which an "action or proceeding [is] based" is not the creation of a policy in the distant past. It is the application of the policy to a plaintiff within the limitations period. An action cannot be "based on" an "act or omission" outside the limitation period, because the action would be time-barred. *Cf. Palardy v. Hornerm*, 711 F.Supp. 667, 673 (D. Mass. 1989) (applying § 259 requirements to the limitations period of the claim).

For example, Mr. Willebeek-Lemair's claim against Cornell is based on its 'omission' to pay him when he played soccer in 2017; not when Cornell fielded teams of unpaid students in intercollegiate athletic events in the late Nineteenth Century.[22] Section 259 looks to

---

[22] *See* https://cornellbigred.com/sports/2007/7/11/History.aspx (history of Cornell athletics).

whether Cornell continued its policy of not paying student athletes in reliance on the FOH when Mr. Willebeek-Lemair played soccer there.

Accordingly, an employer "must establish" that "its policies . . . were promulgated *or continued* in reliance" on an agency's interpretation to make out a § 259 defense. *Figas v. Horsehead Corp.*, No. CIV. A. 06-1344, 2008 WL 4170043, at *21 (W.D. Pa., Sept. 3, 2008) (emphasis added). Where—as here—there is no contrary DOL guidance, reliance on later interpretations in continuing a policy satisfies § 259. *See, e.g., Henry v. Quicken Loans Inc.*, No. 2:04-CV-40346, 2009 WL 3270768, at *15 (E.D. Mich., July 16, 2009), *report and recommendation adopted*, 2009 WL 3199788 (E.D. Mich., Sept. 30, 2009); *Quinn v. New York State Electric and Gas Corp.,* 621 F. Supp. 1086, 1091 (N.D. N.Y. 1985).[23]

---

[23] District courts have declined to find reliance on later changes in DOL guidance when the employer's policy was contrary to contemporary guidance when the policy was first formed. *See, e.g., Lewis v. Huntington Nat'l Bank*, 838 F.Supp.2d 703, 717 (S.D. Ohio 2012); In re C*argill Meat Solutions Wage and Hour Litig.,* 632 F.Supp.2d 368, 392 (M.D. Pa. 2008); *Figas*, 2008 WL 4170043, at *22. The reasoning in these cases is that since the policy was established *in defiance* of DOL guidance, the employer could not have relied on later guidance approving the policy. That is not the case here.

The district court thus erred when it disregarded the Schools "reliance on [the] FOH . . . in defending lawsuits alleging they violated the FLSA." (1 AA 18 n.8.) The Schools' position in litigation predating the limitations period applicable to their claim shows requisite reliance. The Students sued in November 2019. (ED Pa. ECF 1.) Giving them the benefit of the extension for "willful" violations provided in 29 U.S.C. § 255(a), the action is "based on" "act[s] or omission[s]" on and after November 2016. By then, the NCAA and Schools had already filed briefs in *Berger* asserting reliance on the FOH. And they continued to do so on other cases in subsequent years. Throughout the entire limitations period, the NCAA and Schools have publicly pointed out their reliance on the FOH. *See* n.20, *supra*.

The unequivocal language in FOH § 10b03(e) that "interscholastic athletics . . . [is] not work of the kind contemplated by [the FLSA] and do[es] not result in an employer-employee relationship between the student and the school or institution," establishes a complete statutory defense[24] to the Students' claims. Before the beginning of the

---

[24] Even if 29 U.S.C. § 259(a) did not provide a statutory defense based on the FOH, under *Skidmore* courts should "defer to an agency's

limitations period on the Students' claims, the Schools publicly stated

their reliance on the FOH, and the Seventh Circuit held that their

reliance was reasonable. *Berger*, 843 F.2d at 292-94. Even were

*Berger's* interpretation of the FLSA reversed, the FOH would still

provide a complete statutory defense. As long as the DOL leaves

pertinent sections of the FOH unchanged, neither the Schools, nor the

NCAA, are liable under the FLSA as a matter of law.

---

interpretation of its regulations . . . unless the interpretation is plainly erroneous or inconsistent with the regulations or there is any other reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question." *AT & T Corp. v. Core Commc'ns, Inc.*, 806 F.3d 715, 725 (3d Cir. 2015) (citations omitted).

This Circuit affords *Skidmore* deference to the FOH. *See, e.g., Friedrich,* et al. *v. U.S. Comput. Services*, 974 F.2d 409, 417-18 (3rd Cir. 1992) (consulting the FOH for interpretative guidance) (*superseded by statute as stated in McMaster v. Eastern Armored Services, Inc.*, 780 F.3d 167, 171 [3rd Cir. 2015]).  So do the First, Second, Fifth, Seventh, Eighth and Ninth. *See, e.g., Marsh v. J. Alexander's LLC*, 905 F.3d 610, 618 (9th Cir. 2018); *Hill v. Delaware North Cos. Sportservice, Inc.*, 838 F.3d 281, 295 (2d Cir. 2016); *Berger*, 843 F.3d at 293 ("[w]e find the FOH's interpretation of the student-athlete experience to be persuasive."); *Newman v. Advanced Tech. Innovation Corp.*, 749 F.3d 33, 37 (1st Cir. 2014); *Fast v. Applebee's Int'l, Inc.* , 638 F.3d 872, 878-79 (8th Cir. 2011); *Gagnon v. United Technisource, Inc.*, 607 F.3d 1036, 1041 n.6 (5th Cir. 2010).

**F.**

**THE STUDENTS SEEK TO REWRITE THE FLSA TO SUIT THEIR POLICY PREFERENCES. THAT ARGUMENT IS FOR CONGRESS, NOT THE COURTS.**

The Students' argument boils down to a plea they deserve to share in the revenues generated by (a few) college sports. That argument should be directed to Congress, not the courts. That a few (but not most) schools generate television revenues from a few (but not most) sports has nothing to do with the *legal* question of whether student athletes are *ipso facto* "employees" within the meaning of the FLSA.

For good reason: The FLSA applies to "commercial activities conducted by . . . nonprofit organizations" just as it does to for-profit businesses. *Alamo*, 471 U.S. at 296-297. What matters is not whether the activity generates any revenue or profit, but whether its economic reality "contemplate[s] compensation." *Walling,* 330 U.S. at 152; *see also Alamo*, 471 U.S. at 301; *Ortega v. Denver Institute LLC*, No. 14-cv-01351-MEH, 2015 WL 4576976, at *12-13 (D. Colo. July 30, 2015) (discussing decisions declining to treat cosmetology students as employees notwithstanding that cosmetology schools earned profits from the trainees' labor); *Valladares v. Insomniac, Inc.*, No. EDCV 14-00706-VAP (DTBx), 2015 WL 12656267, at *10 (C.D. Cal. Jan. 29, 2015)

("Plaintiff argues it is inequitable to allow [her employer] to use [an FLSA] exemption when its 'revenue is in the millions of dollars.' If Congress agrees with Plaintiff, it may amend the FLSA.  Until then, a defendant's revenue is irrelevant to whether the [statutory] exemption applies.") (citation and paragraph break omitted).

The Students' argument thus has nothing to do with what the FLSA requires, only what they think it *should* require.  That is not a sound basis for courts to depart from the statute's plain meaning. As the Supreme Court pointed out in *Sandoz Inc. v. Amgen Inc.*, 137 S.Ct. 1664 (2017), even if this Circuit "were persuaded" the Students "had the better of the policy arguments, those arguments could not overcome the statute's plain language, which is our 'primary guide' to Congress' preferred policy." *Id.* at 1678.

## IV.
### THE DISTRICT COURT ERRED WHEN IT HELD THE STUDENTS STATED A CLAIM UNDER STATE LAW. THEIR STATE LAW CLAIMS FAIL AS A MATTER OF LAW ALONG WITH THEIR FLSA CLAIM.

The FLSA includes a "savings clause" that permits states and municipalities to "establish[] a minimum wage higher," or "a maximum work week lower," than that set by the FLSA. 29 U.S.C. § 218(a). The "savings clause" "undermines any suggestion that Congress intended to

occupy the field of wage and hour regulation." *Knepper v. Rite Aid Corp.*, 675 F.3d 249, 262 (3d Cir. 2012). Even so, the Student's Pennsylvania, New York and Connecticut statutory and common-law claims fail as a matter of law once this Circuit holds that the Students do not state a claim under the FLSA. Accordingly, it should reverse and remand with instructions that the district court dismiss this action in its entirety.

First, the Students' state statutory wage claims are all analyzed under the same standards as their FLSA claim. If they do not state a claim under the FLSA, they state no claim under state wage statutes. *See, e.g.*, *Razak v. Uber Technologies, Inc.,* 951 F.3d 137, 142 (3d Cir. 2020) ("Pennsylvania state courts have looked to federal law regarding the FLSA for guidance in applying the PMWA"); *Verma v. 3001 Castor, Inc.*, 937 F.3d 221, 229 (3d Cir. 2019) (same); *Sethi v. Narod*, 974 F. Supp. 2d 162, 188 (E.D.N.Y. 2013) (courts in the Second Circuit "have interpreted the definition of 'employer' under the New York Labor Law coextensively with the definition used by the FLSA.") (internal citations and quotations omitted); *Dixon v. Zabka*, No. 3:11-CV-982 MPS, 2014 WL 6084351, at *17 (D. Conn. Nov. 13, 2014) (federal precedent

interpreting the FLSA applies to parallel provisions defining "employee," "employer," and "employ" under the Connecticut Minimum Wage Act) (citations omitted).

Second, this Circuit has "noted approvingly" the Fourth Circuit's decision in *Anderson v. Sara Lee Corp.*, 508 F.3d 181 (4th Cir. 2007), where the Fourth "sensibly declined to allow the plaintiffs to use state non-labor laws to enforce the substantive provisions of the FLSA." *Knepper*, 675 F.3d at 263 ("sensibly declined"); *Formica v. US Environmental Inc.*, No. CV 18-459, 2018 WL 3374764, at *2 (E.D. Pa., July 11, 2018) ("noted approvingly"). *See also Aldridge v. Mississippi Dept. of Corrections*, 990 F.3d 868, 871 (5th Cir. 2021) ("[D]oes the [FLSA] preempt redundant state law tort claims . . . ? We join the Fourth Circuit in answering 'yes.'"); *Torres v. Vitale*, 954 F.3d 866, 875 (6th Cir. 2020) (RICO claim seeking unpaid minimum overtime wages preempted by FLSA; following *Anderson*).[25] Under *Anderson*, the

---

[25] Following *Knepper*, district courts in this Circuit have followed the rule in *Anderson. See, e.g., Formica*, 2018 WL 3374764; *Szczachor v. All Granite & Marble Corp.,* No. CIV.A. 13-395 SRC, 2014 WL 7365780, at *2 (D.N.J., Dec. 19, 2014); *Gutwirth v. Woodford Cedar Run Wildlife Refuge*, 38 F.Supp.3d 485, 491 (D.N.J. 2014); *Kronick v. bebe Stores,*

Student's unjust enrichment remedies for an alleged violation of the FLSA are subject to conflict preemption notwithstanding the FLSA's savings clause.

*Anderson* involved wage claims under state contract, tort and unfair trade practices laws for time spent donning and doffing sanitary uniforms by workers at an industrial bakery. *Anderson*, 508 F.3d at 182-83. The Fourth Circuit held that plaintiffs' contract and tort claims (negligence and fraud) were conflict-preempted by the FLSA. *Id.* at 191-94. While "[t]here is a strong presumption" against preemption, especially given the FLSA's "savings clause," the *Anderson* plaintiffs "rely on the FLSA for their rights, and they invoke state law only as a source of remedies." *Id.* at 193. Doing so "'stands as an obstacle to the accomplishment of the full purposes and objectives' of federal law" because, first, the FLSA's enforcement scheme is "unusually elaborate" and, second, "the FLSA does not explicitly authorize states to create alternative remedies for FLSA violations." *Id.* at 193-93.

--------

Inc., 2008 WL 4509610, at *1 (D.N.J. Sept. 29, 2008); *Moeck v. Gray Supply Corp.*, 2006 WL 42368, at *2 (D.N.J. Jan. 5, 2006).

"*Crucially,*" the Fourth Circuit noted, the contract and tort claims at issue "all depend on establishing [defendant] violated the FLSA," pointing to allegations in their complaint that defendant either "carelessly" or "willfully failed and refused to pay." *Id.* at 193 (quoting operative complaint). The Students' unjust enrichment claims also depend on an FLSA violation. They incorporate their FLSA allegations by reference and allege that the NCAA and the Schools, "[c]ontrary to all good faith and fair dealing . . . induced [the Students] . . . to perform work while failing to properly compensate them for all hours worked *as required by law.*" (2 AA 178, 181-82, 184 [¶¶ 382, 385, 403, 406, 416, 419] [emphasis added].) No less than the claims the Fourth Circuit "sensibly declined" to permit, the Students' state-law unjust enrichment claims seek to graft a state-common-law equitable remedy onto FLSA claims and are thus preempted. *Knepper,* 675 F.3d at 263.

# CONCLUSION

Appellants respectfully request this Circuit reverse the district court and remand with instructions to dismiss this action in its entirety.

Dated: May 31, 2021

CONSTANGY, BROOKS, SMITH & PROPHETE LLP

By: _____

Steven B. Katz
  skatz@constangy.com
2029 Century Park East, Suite 1100
Los Angeles, CA 90067
Tel: (310) 909-7775
Fax: (424) 465-6630

John E. MacDonald
  jmacdonald@constangy.com
989 Lenox Drive
Suite 206 (2nd Floor)
Lawrenceville, New Jersey 08648
Telephone: (609) 454-0096
Facsimile: (609) 844-1102

Donald S. Prophete
  dprophete@constangy.com
Dean Kpere-Daibo
  dkdaibo@constangy.com
2600 Grand Boulevard, Suite 750
Kansas City, Missouri 64108-4600
Telephone: (816) 472-6400
Facsimile: (816) 472-6401

Counsel for Appellants National
Collegiate Athletic Association,
Cornell University, Fordham
University, Lafayette College,
Sacred Heart University and
Villanova University

# Combined Certifications Of Compliance

1.    The attorney who signed and filed this brief is admitted in the Third Circuit.

2.    This brief complies with the type-volume limitation of Fed. R. App. Proc. 32(a)(7)(B) because this brief contains fewer than 13,000 words, excluding the parts exempted by Fed. R. App. Proc. 32(f), as counted using Microsoft Word 365.

3.    This brief complies with the typeface requirements of Fed. R. App. Proc. 32(a)(5)(A) because this brief has been prepared in 14-point, proportionally spaced, Century font.

4.    The electronic submission of this brief is an exact copy of the paper one, has been scanned using the Kaspersky Threat Intelligence Portal (opentip.kaspersky.com), and is free of viruses.

By: _____

Counsel for Appellants

# CERTIFICATE OF SERVICE

I certify that on May 31, 2022, the foregoing document was transmitted to the Clerk of the United States Court of Appeals for the Third Circuit, via the Court's CM/ECF Document Filing System, and electronically served via email to the following counsel of record for Plaintiffs-Respondents:

Michael J. Willemin (MWillemin@wigdorlaw.com)

Renan F. Varghese (RVarghese@wigdorlaw.com)

Taylor Crabill (TCrabill@wigdorlaw.com)

Paul McDonald (paul@plmcdonaldlaw.com)

By: _____
COUNSEL FOR APPELLANTS