# United States Court of Appeals

*for the*

# Third Circuit

---

Case No. 22-1223

RALPH TREY JOHNSON; CLAUDIA RUIZ; JACOB WILLEBEEK-LEMAIR; NICHOLAS LABELLA; ALEXA COOKE, STEPHANIE KERKELES; RHESA FOSTER; ESTEBAN SUAREZ; ZACHARY HARRIS; LAURA HAMILTON; MATTHEW SCHMIDT; LIAM WALSH; GINA SNYDER; TAMARA SCHOEN, Individually and on Behalf of All Persons Similarly Situated,

*Appellees,*

– v. –

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, also known as the NCAA, and the Following NCAA Division I Member Schools as Representatives of a Defendant Class of All Private and Semi-Public NCAA Division I Member Schedules; DREXEL UNIVERSITY; LAFAYETTE COLLEGE; VILLANOVA UNIVERSITY; UNIVERSITY OF PENNSYLVANIA; CORNELL UNIVERSITY; SACRED HEART UNIVERSITY; FORDHAM UNIVERSITY; UNIVERSITY OF OREGON; TULANE UNIVERSITY; UNIVERSITY OF ARIZONA; PURDUE UNIVERSITY; DUKE UNIVERSITY; MARIST COLLEGE National Collegiate Athletic Association; Cornell University; Fordham University; Lafayette College; Sacred Heart University; Villanova University,

*Appellants.*

---

ON APPEAL FROM AN ORDER OF THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

## BRIEF FOR APPELLEES

PAUL L. MCDONALD, ESQ.
1800 John F. Kennedy Boulevard,
    Suite 300
Philadelphia, Pennsylvania 19103
(267) 238-383
paul@plmcdonaldlaw.com

MICHAEL J. WILLEMIN
RENAN VARGHESE
WIGDOR LLP
85 Fifth Avenue, 5th Floor
New York, New York 10003
(212) 257-6800
mwillemin@wigdorlaw.com
rvarghese@wigdorlaw.com

*Attorneys for Appellees*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................... iii

PRELIMINARY STATEMENT ..................................................................1

STATEMENT OF ISSUES .........................................................................2

STATEMENT OF THE CASE......................................................................2

I.    FACTUAL BACKGROUND................................................................2

II.   PROCEDURAL BACKGROUND AND THE DECISION BELOW...........3

SUMMARY OF THE ARGUMENT ..........................................................5

STANDARD OF REVIEW ........................................................................10

ARGUMENT ............................................................................................10

I.    LEGAL STANDARD .......................................................................10

II.   THE DISTRICT COURT CORRECTLY FOUND THERE WAS NO
      BASIS TO HOLD THAT APPELLANTS ARE *IPSO FACTO* NOT
      EMPLOYERS UNDER THE FLSA ...........................................................11

      A.    The District Court Properly Rejected Appellants' Contention that
            They are Exempt From Any Multifactor Test....................................13

      B.    Appellants' Attempts to Distinguish Alston Fail...............................17

      C.    Alston Persuasively Described the Changes in Economic
            Conditions that Are Relevant to the Determination of "Economic
            Reality" Here ..................................................................................23

III.  THE COURT SHOULD NOT CONSIDER APPELLANTS'
      REMAINING ARGUMENTS ON AN INTERLOCUTORY BASIS...........24

IV.    THE DISTRICT COURT CORRECTLY APPLIED THE
       MULTIFACTORIAL ECONOMIC REALITY TEST ..................................27

       A.    The Absence of a Compensation Bargain Is Not Dispositive.............27

       B.    The Language Used in the FLSA Does Not Require a
             Compensation Bargain for Employment.............................................32

       C.    The District Court Correctly Decided it Should Apply a
             Multifactorial Test—Just as Courts Do in All Other Wage Cases .....35

       D.    The <u>Glatt</u> Test Does Not Weigh Any Factor More Heavily than
             Any Other, But Guides a Flexible Analysis of Economic Realities,
             and the District Court Applied it Correctly.........................................36

       E.    The District Court Correctly Concluded that the Complaint Stated
             a Claim Under the FLSA Based on the <u>Glatt</u> Factors .........................40

             1.    The Court Correctly Found At Least Three Factors Weigh in
                   Favor of an Employment Relationship ......................................40

             2.    Even as to the Factors that the Court Found Neutral, there is
                   Good Reason to Believe that Discovery Would Tilt Them in
                   Favor of Appellees ....................................................................45

V.     THE DISTRICT COURT CORRECTLY DECLINED TO DISMISS THE
       COMPLAINT BASED ON APPELLANTS' AFFIRMATIVE DEFENSE
       THAT IT RELIED ON DEPARTMENT OF LABOR REGULATIONS......48

       A.    There Are No Allegations in the Complaint to Support Appellants'
             Position that They Relied on the DOL Regulations in Not Paying
             Appellees a Minimum Wage.................................................................48

       B.    Appellants Misread the DOL Regulation in Any Case.......................52

VI.    APPELLANTS WAIVED THEIR APPEAL WITH REGARDS TO THE
       CLAIMS UNDER THE LAW ........................................................................54

CONCLUSION ......................................................................................................55

# TABLE OF AUTHORITIES

Page(s)

Cases

Ashcroft v. Iqbal,
   556 U.S. 662 (2009) ...........................................................................10

Ballehr v. Centers, Inc.,
   No. 08 Civ. 261 (OC) (GRJ), 2009 WL 10670050 (M.D. Fla. Nov. 10, 2009)...51

Bd. of Trustees of Bricklayers & Allied Craftsmen Loc. 6 of New Jersey Welfare
   Fund v. Wettlin Assocs., Inc.,
   237 F.3d 270, 272 (3d Cir. 2001) ........................................................10

Benjamin v. B & H Educ., Inc.,
   877 F.3d 1139 (9th Cir. 2017) ............................................... 35, 37, 44

Berger v. Nat'l Collegiate Athletic Ass'n,
   843 F.3d 285 (7th Cir. 2016) ........................................................ *passim*

Brooklyn Sav. Bank v. O'Neil,
   324 U.S. 697 (1945) ...........................................................................33

DIRECTV Inc. v. Seijas,
   508 F.3d 123 ......................................................................................54

Dole v. Odd Fellows Home Endowment Bd.,
   912 F.2d 689 (4th Cir. 1990) .............................................................51

Donovan v. DialAmerica Marketing, Inc.,
   757 F.2d 1376 (3d Cir. 1985) ................................................ 12, 27, 36

Farrell v. FedEx Ground Package Sys., Inc.,
   478 F. Supp. 3d 536 (D.N.J. 2020).....................................................34

Glatt v. Fox Searchlight Pictures, Inc.,
   811 F.3d 528 (2d Cir. 2016) ........................................................ *passim*

Hollins v. Regency Corp.,
   867 F.3d 830 (7th Cir. 2017) .............................................................37

IBP, Inc. v. Alvarez,
    546 U.S. 21 (2005) ..............................................................................34

In re Adams Golf, Inc. Sec. Litig.,
    381 F.3d 267 (3d Cir. 2004) ...............................................................49

In re Enterprise Rent-A-Car Wage & Hour Employment Practices Litig.,
    683 F.3d 462 (3dCir. 2012) ........................................................... 11, 12

In re National Collegiate Athletic Association Athletic Grant-in-Aid Cap Antitrust
    Lit.,
    958 F.3d 1239 (9th Cir. 2020) ........................................................ 20, 21

John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.,
    119 F.3d 1070 ......................................................................................52

Koken v. Pension Benefit Guar. Corp.,
    381 F. Supp. 2d 437 (E.D. Pa. 2005)............................................. 25, 26

Livers v. Nat'l Collegiate Athletic Ass'n,
    No. Civ. 17-4271, 2018 WL 2291027 (E.D. Pa. May 17, 2018) ................... 7, 14

Malbrough v. Crown Equip. Corp.,
    392 F.3d 135 (5th Cir. 2004) ........................................................ 24, 25

Martinez v. UPMC Susquehanna,
    986 F.3d 261 (3d Cir. 2021) ...............................................................11

Nat'l Collegiate Athletic Ass'n v. Alston,
    141 S. Ct. 2141 (2021) .................................................................. *passim*

Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma,
    468 U.S. 85 (1984) .................................................................. 3, 16, 17

O'Bannon v. National Collegiate Athletic Ass'n,
    802 F.3d 1049 (9th Cir. 2015) .............................................................20

O'Bannon v. Nat'l Collegiate Athletic Ass'n,
    7 F. Supp. 3d 955 (N.D. Cal. 2014)......................................................22

Pennsylvania Dep't of Hum. Servs. v. United States,
  897 F.3d 497 (3d Cir. 2018) ............................................................... 51, 52

Pennsylvania v. Navient Corp.,
  967 F.3d 273 ..............................................................................................10

Safarian v. Am. DG Energy Inc.,
  622 F. App'x 149 (3d Cir. 2015) ................................................... 12, 35

Schumann v. Collier Anesthesia, P.A.,
  803 F.3d 1199 (11th Cir. 2015) .............................................................37

Shell Petroleum, Inc. v. United States,
  182 F.3d 212 (3d Cir.1999) ...................................................................54

Skidmore v. Swift & Co.,
  323 U.S. 134 (1944) .................................................................................54

Steelman v. Hirsch,
  473 F.3d 124 (4th Cir. 2007) .................................................................12

Tennessee Coal, Iron & R. Co. v. Muscoda Loc. No. 123,
  321 U.S. 590 (1944) .................................................................. 12, 33, 34

Tony & Susan Alamo Found. v. Sec'y of Labor,
  471 U.S. 290 (1985) ................................................................... 28, 30, 31

Tourscher v. McCullough,
  184 F.3d 236 (3d Cir. 1999) ..................................................................14

Vanskike v. Peters,
  974 F.2d 806 (7th Cir. 1992) ...................................................... *passim*

Verma v. 3001 Castor, Inc.,
  937 F.3d 221 (3d Cir. 2019) ........................................................ 26, 33

Walling v. Portland Terminal Co.,
  330 U.S. 148 (1947) ..................................................................... *passim*

Wang v. Hearst Corp.,
   877 F.3d 69 (2d Cir. 2017) ...................................................................39

Wilkerson v. Samuels,
   524 F. App'x 776 (3d Cir. 2013)..........................................................14

Williams v. Strickland,
   87 F.3d 1064 (9th Cir. 1996) ......................................................... 30, 31

Other Authorities

28 U.S.C. § 1292(b) ........................................................................ 24, 25

29 U.S.C. § 203(e)(4),(5) ......................................................................32

29 U.S.C. § 203(g) ...............................................................................32

29 U.S.C. § 252(a) ...............................................................................34

29 U.S.C. § 259 ........................................................................... *passim*

Federal Rule of Civil Procedure 12(b)(6) .............................................10

## <u>PRELIMINARY STATEMENT</u>

The decision from which Appellants appeal was in no way extraordinary. The District Court merely held that Appellants—just like every other business and organization in America, with the exception of prisons—are subject to ordinary scrutiny under the Fair Labor Standard Act's ("FLSA") well-established legal principles; namely, here, the application of a multifactor test to determine whether Appellees are employees of Appellants. Accordingly, the District Court held, after conducting a fact-intensive analysis, that the factual allegations pled in the Amended Complaint (the "Complaint") were sufficient to state a claim under the FLSA and analogous state laws. The District Court did not hold that Appellees are Appellants' employees—that is a decision for a later day—it held only that Appellants are not above the law and must engage in discovery.

Make no mistake about it: what Appellants seek is a determination by this Court that they are above the law when it comes to their treatment of student-athletes. This position is untenable on its face, and was made entirely indefensible following the Supreme Court's decision in <u>Nat'l Collegiate Athletic Ass'n v. Alston</u>, 141 S. Ct. 2141 (2021), which held that Appellants—just like every other business—are subject to ordinary legal scrutiny when it comes to their adherence to statutory law. Accordingly, for the reasons set forth herein, the District Court's decision should be affirmed.

**STATEMENT OF ISSUES**

I.    Whether the lower court erred in finding that Appellants' designation of

Appellees as "amateurs" was itself sufficient under the law to provide them

blanket immunity from the FLSA. 1 AA 13-15.

**STATEMENT OF THE CASE**

I.    **FACTUAL BACKGROUND**

Appellees are present and former student-athletes of various NCAA Division

I ("D1") college sports teams, who participated on college sports teams owned and

operated by the Appellants.  2 AA 65.  Appellants comprise the Division I colleges

that Appellees attended.  2 AA 71.

Student-athletes receive no pay for their work as athletes even though

Appellants entirely control the work they perform and participation in athletics

bears absolutely no relationship to their academic programs, is not integrated into

coursework, provides no course credit and furnishes no educational benefit

analogous to classroom learning.  2 AA 70-101.

Indeed, Appellants require a total commitment to the athletic program.  If

Appellees fail to report for duty on their teams, they can be disciplined, up to and

including being suspended from the team, just like any employee who misses work.

2 AA 88.  To make matters worse, during the relevant time period, Appellants

imposed non-compete restrictions that prevented student-athletes from transferring

2

to another D1 institution without sitting out of athletics for a year.  2 AA 114-117, 131.  And, like many employees in the American workforce, Appellees sign timesheets and work for 32 to 42 hours per week.  2 AA 88-90.  Unsurprisingly, they are unable to schedule their desired classes, are unable to keep up with their coursework and are often blocked from pursuing the major of their choice.  2 AA 85-97.  Extracting maximum effort from their student-athletes, Appellants have built a multi-billion-dollar sports and entertainment business.  2 AA 97-101.

## II.  <u>PROCEDURAL BACKGROUND AND THE DECISION BELOW</u>

On November 6, 2019, Appellees filed their initial complaint, asserting that their work for Appellants entitled them to the minimum-wage protections of state and federal law, as well as a common-law remedy action for unjust enrichment, and subsequently filed the Complaint on December 12, 2019.  2 AA 57-186. Appellants filed a motion to dismiss Appellees' federal and state minimum wage claims on March 9, 2020.  2 AA 206-209.  In their motion, Appellants argued that they were not "employers" under the FLSA, claiming that the "revered tradition of amateurism," supposedly established by <u>Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma</u>, 468 U.S. 85 (1984), required a finding that Appellees were *per se* not employees under the law, and that none of the multifactor tests used by courts to determine the existence of an employment relationship should even be applied in this case.  <u>Johnson, et al. v. NCAA, et al.</u>, 19

Civ. 5230 (JP), Dkt. No. 25-1 at p. 6 (E.D. Pa.).  They also claimed that they had an

affirmative defense to liability, in that they could have relied on Department of

Labor ("DOL") regulations in deciding not to pay student-athletes.  Id. at pp. 27-

29.

The District Court denied Appellants' motion to dismiss.  Noting that the

term "employer" under the FLSA is defined "expansively" and with "striking

breadth," 1 AA 26, it rejected Appellants' contention that their inconsistent and

self-serving definition of "amateurism" could insulate them from the ordinary

application of legal principles.  Specifically, it noted a recent shift in case law,

culminating in Alston, in which the Supreme Court agreed that the concept of

"amateurism" was insufficient to overcome the application of ordinary legal

principles.  1 AA 15.  As a result, the District Court applied a multifactor test—the

"primary beneficiaries" test established by the Second Circuit in Glatt v. Fox

Searchlight Pictures, Inc., 811 F.3d 528 (2d Cir. 2016)—and found that Appellees

alleged sufficient facts to warrant discovery as to whether Appellants are

employers under the law.  1 AA 32-33.  It also held that there was insufficient

evidence in the pleadings to raise an affirmative defense that Appellants had acted

in reliance on DOL regulations, pointing out that there was nothing in the record to

indicate whether they had so relied in deciding not to pay student-athletes the

minimum wage (as opposed to relying on them years later, in litigation, in an attempt to fend off challenges to this unlawful decision). 1 AA 17.

Appellants moved the District Court for leave to file an interlocutory appeal, which the District Court granted on December 28, 2021, solely as to the following narrow question: "Whether NCAA Division I student-athletes can be employees of the colleges and universities they attend for purposes of the Fair Labor Standards Act solely by virtue of their participation in interscholastic athletics." 1 AA 35.

## SUMMARY OF THE ARGUMENT

Appellants (and their amici[1]) advance faulty legal and policy arguments that ultimately seek to place them above the law. However, it is important at the outset to note what issue Appellants are appealing in this case. The District Court did not find that Appellees are necessarily entitled to the minimum wage, or that they are even employees under the law at all. Instead, the District Court correctly found that Appellees' Complaint alleged sufficient facts to warrant discovery before a determination could be made as to whether they could establish an employee-employer relationship with Appellants under the law. The District Court's holding

---

[1]     It should be noted that both sets of *amici* on behalf of Appellants—the American Council on Education ("ACE") and related organizations, as well as the Southeastern Conference—are groups of schools, many of whom are members of the NCAA and "administer sports competitions between teams of student-athletes at its member institutions." Johnson, et al. v. NCAA, et al., No. 22-1223, Dkt. No. 33 at p. 1 (3d Cir.). Thus, far from being unbiased parties, they have a substantial interest in this appeal.

is consistent with the precedent in this Circuit and others that the existence of an employment relationship is an intensely factual analysis that turns on the application of multifactor tests that can only be resolved after discovery.  In reaching its holding, the District Court rejected Appellants' argument that the supposed "tradition of amateurism"—which is not a legal principle, but rather Appellees own self-serving construct—is sufficient, on its own, to prohibit the application of any such multifactor tests.  In other words, the District Court rejected Appellants' contention that they, alone (with the exception of prisons) are immune from the requirements of wage and hour laws.

To the extent that there was any doubt about whether Appellants' compensation practices can be challenged under ordinary legal tests, the Supreme Court firmly resolved that doubt last year in Alston, 141 S. Ct. 2141 (2021).  In Alston, the Court explicitly rejected the NCAA's argument that "courts must reflexively reject all challenges to the NCAA's compensation restrictions" based on the NCAA's circular reference to student-athletes as "amateurs."  Id. at 2157-58.  According to the Supreme Court, any purported "revered tradition of amateurism," to the extent it even exists, does not provide a basis to eschew the ordinary application of legal principals, including the ordinary tests and rules applicable to statutory law.  As Alston makes clear, Appellants' argument in this case, namely, that a court cannot analyze their compensation practices *via* a

multifactor test, as it would with any other defendant, does not withstand legal scrutiny.

The logical conclusion of Appellants' argument exposes its absurdity. According to Appellants, they could require student-athletes to participate in collegiate athletics 20 hours a day, seven days a week, forbid them from attending classes or even graduating, and still they would not have to comply with the FLSA so long as they referred to them as "amateurs." This is not the law, despite Appellants' sole purported legal support; namely, the non-binding decision in Berger v. Nat'l Collegiate Athletic Ass'n, 843 F.3d 285 (7th Cir. 2016). Berger, which held that the NCAA is immune from scrutiny under the FLSA when it comes to student-athletes, was wrongly decided. This is only confirmed by more recent case law, including a case from this Circuit (Livers v. Nat'l Collegiate Athletic Ass'n, No. Civ. 17-4271, 2018 WL 2291027 (E.D. Pa. May 17, 2018)) (rejecting Berger)) and, more importantly, the Supreme Court's decision in Alston, which fatally undermines the reasoning in Berger, and, consequently, Appellants' arguments in this case.

To begin, Berger's conclusion that no multifactor test should be applied to student-athletes erroneously relied almost exclusively on a previous Seventh Circuit decision; namely, Vanskike v. Peters, 974 F.2d 806 (7th Cir. 1992). This reliance was in error (as has been acknowledged now by two district courts in this

Circuit) because there is no relevant comparison that can be made between the plaintiffs in <u>Vanskike</u>, who were prisoners contesting unpaid prison labor, and Appellees.  To that end, <u>Vanskike</u> involved the application of an exception to the Thirteenth Amendment's prohibition on involuntary servitude for work performed by jailed prisoners.  Effectively, <u>Vanskike</u> held that the Thirteenth Amendment's allowance for unpaid prison labor preempted the FLSA's minimum wage requirements.  Of course, there is no constitutional amendment, or even a statute, that exempts the NCAA from the minimum wage laws, nor did <u>Berger</u> rely on any. Instead, <u>Berger</u> essentially equated the non-statutory "revered tradition of amateurism" with the Thirteenth Amendment by holding that the concept of "amateurism" was sufficient to remove student-athletes from the general population of people whose employment status is determined through the application of a multifactor test.  However, <u>Alston</u> subsequently made clear that any "revered tradition of amateurism" does not suffice to provide immunity from ordinary scrutiny.

Faced with this clear and unambiguous refutation of their arguments, Appellants' next argue that this Court should, prior to discovery, reevaluate and reverse the District Court's fact-intensive determination that the allegations in the Complaint state a claim for relief when evaluated under the appropriate multifactor test.  As explained below, this is simply not an appropriate area of inquiry for an

interlocutory appeal, which is designed to address only pure questions of law. To that end, the District Court's decision to certify this appeal explicitly states that its evaluation of the pleadings against the appropriate multifactor test is not ripe for interlocutory appeal.

In any event, the allegations in the Complaint are plainly sufficient to state a claim under the FLSA. Appellants' arguments otherwise rely on their contention that collegiate athletics is primarily beneficial to the student-athlete, and provide the student-athlete with significant educational benefits. However, this contention is not contained within the four corners of the Complaint. Instead, both Appellants and the *amici* resort to a host of opinion articles and commentary that, of course, also do not appear anywhere in the Complaint and are, in fact, contradicted by the allegations in the Complaint. As the District Court properly found, Appellants will have an opportunity to prove their assertions about the nature of college sports following discovery. Such conclusory assertions cannot form the basis for a motion to dismiss.

Finally, Appellants argue that the DOL's regulations provide them with an affirmative defense to all liability. As the District Court properly noted, the Complaint does not plead that Appellants relied on any DOL regulation when they made the decision not to pay Appellees. Moreover, as the District Court held, reliance on the DOL regulations to defend against legal proceedings has no

bearing: "the ASD's reliance on FOH § 10b03(e) in defending lawsuits . . . does not establish that they relied on § 10b03(e) when they made their decisions not to pay student-athletes minimum wages."  1 AA 18.

For the foregoing reasons, and for the reasons explained below, the District Court's decision should be affirmed in its entirety and the case should be remanded for further proceedings.

## STANDARD OF REVIEW

This Court "exercise[s] plenary review when examining the grant of a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) . . . accept[ing] the allegations of the complaint as true and draw[ing] all reasonable inferences in the light most favorable to the plaintiff"  Bd. of Trustees of Bricklayers & Allied Craftsmen Loc. 6 of New Jersey Welfare Fund v. Wettlin Assocs., Inc., 237 F.3d 270, 272 (3d Cir. 2001).

## ARGUMENT

## I.    LEGAL STANDARD

In reviewing the District Court's legal determinations, the Court "presume[s] that [the] complaint's factual allegations are true."  Pennsylvania v. Navient Corp., 967 F.3d 273, 283 n. 7 (3d Cir. 2020).  The Court then considers whether these factual allegations "allow[] [it] to draw the reasonable inference that the defendant is liable."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  At the motion to dismiss

phase, such an "inference" may be "imperfect," and yet still be "enough to get to

discovery." <u>Martinez v. UPMC Susquehanna</u>, 986 F.3d 261, 267 (3d Cir. 2021).

## II. THE DISTRICT COURT CORRECTLY FOUND THERE WAS NO BASIS TO HOLD THAT APPELLANTS ARE *IPSO FACTO* NOT EMPLOYERS UNDER THE FLSA

In framing their argument to overturn the District Court, Appellants argue it

erred in finding that student-athletes are employees solely because they play a

sport. However, this misstates the issue at the heart of this case. Appellees have

never argued, nor did the District Court find, that they are employees merely

because they play collegiate sports. Rather, it was Appellants who made the

inverse argument—namely, that they are *ipso facto* not employers solely because

they label student-athletes as amateurs. <u>Johnson, et al. v. NCAA, et al.</u>, 19 Civ.

5230 (JP), Dkt. No. 25-1 at p. 6 (E.D. Pa.). According to Appellants, their own

non-statutory and self-created designation requires the Court to place Appellants

above the law and reject the application of a multifactor test. This is simply

wrong.

At the outset, it is important to note that the FLSA's definition of

"employer" is "the broadest definition that has ever been included in any one act."[2]

1 AA 26 (the District Court quoting <u>In re Enterprise Rent-A-Car Wage & Hour</u>

---

[2]    It is for this reason that the SEC's attempted analogies to Title VII are without merit. As this Court has explained, the definition of employment under the FLSA is broader than in any other statute, including Title VII.

Employment Practices Litig., 683 F.3d 462, 467-68 (3d Cir. 2012)).[3]  These

definitions have long been held to apply ***notwithstanding any "prior custom or***

***contract . . .  not to compensate employees for certain portions of their work.***"

Tennessee Coal, Iron & R. Co. v. Muscoda Loc. No. 123, 321 U.S. 590, 602

(1944) (emphasis added).

In determining whether an individual is an employee under the FLSA, this

Court has explained that "economic reality rather than technical concepts is to be

the test of employment."  Enter. Rent-A-Car, 683 F.3d 462 at 467-68 (internal

citations omitted).  To adjudicate this "economic reality," courts almost universally

apply a multifactor test.[4]  See Safarian v. Am. DG Energy Inc., 622 F. App'x 149,

152 (3d Cir. 2015) (remanding to the district court for application of a multifactor

test of "economic reality").  Here, the District Court correctly chose to apply such

a test, and found that Appellees had adequately alleged that the economic reality of

---

[3]     Nor is this a case that "deviate[s] from the traditional understanding of
employment in fundamental ways," such as the romantic relationship described in
Steelman v. Hirsch, 473 F.3d 124, 129 (4th Cir. 2007).  It resembles employment
in all meaningful ways, though it may have previously been the custom not to treat
it as such—two very different concepts.

[4]     Though Appellants claim that this Court "applies multifactor tests when
appropriate and departs from them when appropriate," they have not cited any case
in which this Court has refused to apply a multifactor test.  App. Br. at p. 38, n.12.
To the contrary, Enter. Rent-A-Car, 683 F. 3d at 469, and Donovan v. DialAmerica
Marketing, Inc., 757 F.2d 1376, 1382 (3d Cir. 1985), both cited by Appellants,
involved the application of a multifactor test.

student-athletes was one of employment, warranting discovery. Appellants'

arguments to the contrary are unavailing.

### A.    The District Court Properly Rejected Appellants' Contention that Special Circumstances Exempt Them from Any Multifactor Test

In arguing that they should be exempt from the application of a multifactor

test, Appellants cite to the Seventh Circuit's Decision in <u>Berger</u>.  According to

Appellants, <u>Berger</u> refused to apply a multifactor test because no such test would

"capture the true nature of the relationship between" the NCAA and its student-

athletes.  Appellants' Brief ("App. Br.") at p. 38 (citing <u>Berger</u>, 843 F.3d at 291).

However, what Appellants notably omit from their argument is <u>Berger</u>'s

legal basis for finding that the FLSA permits a court to reject the application of a

multifactor test.  Appellants' intentional omission is undoubtedly because they

understand that the legal basis for <u>Berger</u>'s opinion is untenable, as another court

in this Circuit has already held.  The Seventh Circuit's sole legal authority for its

holding was its previous decision in <u>Vanskike v. Peters</u>, 974 F.2d 806 (7th Cir.

1992), a case about whether *prisoners* should be considered "employees" of their

jails under the FLSA.  <u>Id.</u> at 806-807.  In <u>Vanskike</u>, the only special circumstance

that warranted the rejection of a multifactor test was the Thirteenth Amendment's

allowance of involuntary servitude as criminal punishment.  <u>Id.</u> at 809-810.

<u>Vanskike</u>'s refusal to apply a multifactor test can be seen as a preemption

decision—that the FLSA's requirement that all employees be paid a minimum

wage is preempted by the Thirteenth Amendment, negating any need for further analysis of the economic reality of the relationships between prisoners and their jails:

> [T]he Thirteenth Amendment's specific exclusion of prisoner labor supports the idea that a prisoner performing required work for the prison is actually engaged in involuntary servitude, not employment . . .

Id. (emphasis added).

It is for precisely this reason that the only other court to consider Berger and its progeny in this Circuit soundly rejected them for relying heavily on Vanskike. See Livers v. Nat'l Collegiate Athletic Ass'n, No. Civ. 17-4271, 2018 WL 2291027, at *15 (E.D. Pa. May 17, 2018). ("Both Berger and Dawson [v. NCAA] relied heavily on Vanskike v. Peters, 974 F.2d 806 (7th Cir. 1992) as precedent for, and an example of, the rejection of a multifactor test to evaluate the 'economic reality' of alleged employment relationships in special circumstances. . . The [Vanskike] court observed that the **_Thirteenth Amendment_** excludes convicted criminals from the prohibition of involuntary servitude, so prisoners may be required to work. . . **Vanskike is not controlling on this Court**.") (emphasis added). Similarly, this Court has only relied on Vanskike to dismiss the wage claims of _prisoners_. See, e.g., Tourscher v. McCullough, 184 F.3d 236 (3d Cir. 1999); Wilkerson v. Samuels, 524 F. App'x 776 (3d Cir. 2013).

While intentionally omitting any reference to <u>Vanskike</u> here, below Appellants argued that the holding in <u>Vanskike</u> did not turn on the application of the Thirteenth Amendment, but was instead based on the supposed lack of a "compensation bargain." <u>See</u> <u>Johnson, et al. v. NCAA, et al.</u>, 19 Civ. 05230, Dkt. 39.1 at p. 3 (E.D. Pa). The Seventh Circuit's language completely undercuts Appellants' position:

> ***But the Bonnette factors fail to capture the true nature of the relationship for essentially they presuppose a <u>free labor situation.</u>*** Put simply, the DOC's "control" over Vanskike does not stem from any remunerative relationship or bargained-for exchange of labor for consideration, ***<u>but from incarceration itself.</u>*** . . Indeed, ***the Thirteenth Amendment's specific exclusion of prisoner labor supports the idea that <u>a prisoner performing required work for the prison is actually engaged in involuntary servitude,</u> not employment.***

<u>Vanskike</u>, 974 F.2d at 809-810 (emphasis added).

Of course, there is no law or penal process that compels student-athletes to play sports for their schools such that the economic reality of their relationship can be deemed "involuntary servitude." Rather, as Appellants concede, student-athletes are performing within a "free labor situation;" a situation that <u>Vanskike</u> itself found is amenable to analysis through multifactor tests.[5]

---

[5]     That student-athletes are engaged in free labor makes Appellants' (and the amici's) repeated reliance on the fact that participation in collegiate sports is "voluntary" both misleading and irrelevant. Participation in virtually ***all*** work is voluntary. Outside of the prison context, no organization, or employer, has the

There is also *no* law, let alone a constitutional amendment, that would define the economic relationship between the parties herein such that a multifactor test would be *per se* inapplicable, nor does <u>Berger</u> cite to one.  Instead, <u>Berger</u> relied on the NCAA's self-defined principle of a "revered tradition of amateurism," supposedly blessed by the Supreme Court in <u>Bd. of Regents,</u> as the basis for rejecting the application of any multifactor test, stating that this "long-standing tradition defines the economic reality of the relationship between student-athletes and their schools."  <u>Berger</u>, 843 F.3d at 291.

However, if it was not already obvious that the NCAA cannot escape the law simply by calling student-athletes amateurs, the Supreme Court's decision in <u>Alston</u> fatally undermines any argument that the "revered tradition of amateurism" upon which <u>Berger</u> (and Appellants) relied has any precedential value here.  In <u>Alston</u>, the Supreme Court upheld the District Court's decision to subject the NCAA's compensation practices to a rule of reason analysis—a legal test—in the antitrust context.  <u>Alston</u>, 141 S. Ct. at 2158.  There, the NCAA argued, as it does here, that collegiate athletic compensation is *per se* exempt from any kind of judicial scrutiny—including the rule of reason analysis—because it defines

---

power to force an individual to perform work for it.  If the mere fact that an individual voluntarily decides to engage in work was sufficient to take them outside the protections of the wage and hour laws, such laws would be rendered a nullity.

student-athletes as amateurs.  The Supreme Court emphatically rejected this

argument:

> Board of Regents may suggest that courts should take care
> when assessing the NCAA's restraints on student-athlete
> compensation, sensitive to their procompetitive
> possibilities. But these remarks do not suggest that courts
> must reflexively reject all challenges to the NCAA's
> compensation restrictions. Student-athlete compensation
> rules were not even at issue in Board of Regents.

Alston, 141 S. Ct. at 2158.

Appellants concede, as they must, that Alston rejected the idea that the

NCAA's concept of amateurism requires courts to reject all challenges to its

compensation rules.  App. Br. at p. 31.  Nevertheless, just as the NCAA did in

Alston, Appellants ask this Court to do just that and "reflexively" reject the

application of the appropriate legal principal—i.e., a multifactor test.  However,

Alston clearly forecloses the type of blanket protection from multifactor tests that

Appellants seek here.  Put simply, as the District Court held, ordinary legal

analysis must be conducted.

## B.    Appellants' Attempts To Distinguish Alston Fail

Appellants offer two arguments in an effort to conduct an end-run around

Alston.  Neither have any merit.

First, Appellants claim that Alston supports their position that courts should

show deference to the NCAA's compensation scheme by refusing to apply

ordinary legal principles.  Not true.  <u>Alston</u> squarely rejected the NCAA's

argument that "amateurism" provided a basis to depart from ordinary legal

analysis.  Indeed, <u>Alston</u> explicitly held that the concept of "amateurism" does not

place the NCAA or its member schools above the law.  It further noted that the

NCAA had "not adopted any consistent definition" of amateurism and

acknowledged that "the NCAA's rules and restrictions on compensation have

shifted markedly over time," which further undermined the NCAA's reliance on

the concept.  <u>Id.</u> at 2163.  The District Court here notes the same: Appellants

"engage in the circular reasoning that they should not be required to pay

[Appellees] a minimum wage under the FLSA because [Appellees] are amateurs,

and that [Appellees] are amateurs because [Appellants] and the other NCAA

member schools have a long history of not paying student-athletes."  1 AA 14-15.

Though merely cumulative as it relates to this appeal, Justice Kavanaugh's

concurrence in <u>Alston</u> underscores the fact that there is no defense for the NCAA's

compensation rules under any rational legal framework.  As Justice Kavanaugh

explained:

> the NCAA says that colleges may decline to pay student-
> athletes because the defining feature of college sports,
> according to the NCAA, is that the student-athletes are not
> paid.   In my view, that argument is circular and
> unpersuasive. The NCAA couches its arguments for not
> paying student-athletes in innocuous labels. But the labels
> cannot disguise the reality: **The NCAA's business model**

**would be flatly illegal in almost any other industry in America**

Id. at 2167-68 (emphasis added) (Kavanaugh, J., concurring).

Second, Appellants argue that Alston was limited to educational benefits and is therefore inapplicable to their failure to pay a minimum wage.  However, the student-athletes in Alston did not appeal the adverse finding of the district court that the schools could continue to withhold cash compensation unrelated to education.  Thus, the Supreme Court emphasized that it was constrained by the posture of the appeal before it.

> For our part, though, we can only agree with the Ninth Circuit: "'The national debate about amateurism in college sports is important. But our task as appellate judges is not to resolve it. Nor could we. Our task is simply to review the District Court judgment through the appropriate lens of antitrust law.'" That review persuades us the District Court acted within the law's bounds.

Alston, 141 S. Ct. at 2166; id. at 2166 (Kavanaugh, J., concurring) ("The rest of the NCAA's compensation rules are not at issue here and therefore remain on the books").  Accordingly, it is fallacious for Appellants to write that "the Supreme Court reaffirmed the core principle that professional athletes may be banned from playing college sports."  App. Br. at p. 29.  Because the student-athletes did not argue for non-education related compensation before the Supreme Court, there is no legal basis to say that Alston upheld restrictions on compensation; the only such

restrictions that remain on the books were not at issue in <u>Alston</u>.  <u>Alston</u> did clearly

hold, by contrast, that "amateurism" does not insulate the compensation policies of

the NCAA from all legal challenge, and the same logic must apply to the

compensation challenge at issue here.

More to the point, it must be emphasized that allowing minimum wage

compensation to student-athletes would not challenge the core antitrust holdings of

<u>Alston</u>, <u>O'Bannon v. National Collegiate Athletic Ass'n</u>, 802 F.3d 1049 (9th Cir.

2015), or <u>In re National Collegiate Athletic Association Athletic Grant-in-Aid Cap

Antitrust Lit.</u>, 958 F.3d 1239 (9th Cir. 2020) ("GIA Cap Antitrust Lit."); and the

District Court did not draw "the opposite conclusion" to these cases. [6]  App. Br. at

p. 35.  If Appellees do ultimately succeed in establishing their entitlement to

minimum wage, the NCAA would retain "ample latitude" to regulate student-

athlete amateurism.  <u>Id.</u> at p. 31.  As Appellants themselves concede, <u>Alston</u>

"praised" <u>GIA Cap Antitrust Lit.</u>'s holding that the NCAA's rules prohibit

"***unlimited*** payments unrelated to education, akin to salaries seen in professional

sports leagues," as it could have procompetitive effects.  <u>Id.</u> at p. 32 (quoting <u>GIA

---

[6]    In fact, the District Court's decision to apply a multifactor test to determine
whether Appellants are employers under the FLSA is in keeping with <u>Alston</u>'s
reference to the "care" that courts should take in assessing the NCAA's
compensation practices.  <u>Alston</u> at 2158. Such rigorous legal analysis requires that
courts carefully consider all of the issues attendant to the NCAA's compensation
decision in a way that the NCAA's proposal for a blanket immunity from the
FLSA does not.

Cap Antitrust Lit. at 1258).  Appellees are not seeking any such "unlimited payments" or the type of "professional-level cash payments" that they have sought to prove have anticompetitive effects.  Even should Appellees prevail, colleges would remain free to limit compensation to the minimum wage.  Appellants will call this a fatal blow to the ideal of amateurism.  In reality, their compensation practices are a significant monopolistic restriction that "would be flatly illegal in almost any other industry in America."  Alston, 141 S. Ct. at 2167 (Kavanaugh, J., concurring).

In any event, if Appellants were worried that an adverse finding in this case would ruin college sports, then the solution is not to place the NCAA above the law.  Rather, it is for the NCAA to change its rules such that Appellants do not exercise sufficient control over student-athletes to make them employees under the relevant multifactor tests.  If Appellants did not, *inter alia*, enforce rules that require student-athletes to prioritize training and competition at the expense of their chosen classes and majors, then they would no longer qualify as employers, any more than a Little League team is considered the employer of its players.[7]  See infra at pp. 40-47.

---

[7]     It is for this reason that ACE's argument in its amicus that an adverse ruling in this case would lead to students playing instruments in an orchestra would be deemed employees is a strawman.  No one is arguing that a student orchestra exercises the level of control over its members to qualify as employers.

In fact, the NCAA has shown that even *it* does not believe in "amateurism" as an "economic reality."  By way of example only, for decades the NCAA contended that students could not receive any compensation for the use of their name, image and likeness ("NIL"), because doing so would violate its "tradition of amateurism in college sports."  <u>O'Bannon v. Nat'l Collegiate Athletic Ass'n</u>, 7 F. Supp. 3d 955, 973 (N.D. Cal. 2014), <u>aff'd in part, vacated in part,</u> 802 F.3d 1049 (9th Cir. 2015).  The NCAA further contended:

> [T]he NCAA asserts that its restrictions on student-athlete compensation are necessary to preserve the amateur tradition and identity of college sports.  It contends that this tradition and identity contribute to the popularity of college sports and help distinguish them from professional sports and other forms of entertainment in the marketplace.

<u>O'Bannon</u>, 7 F. Supp. 3d at 999.

Then, in an about-face, several years ago "the NCAA's top governing board voted to permit students participating in athletics to benefit from the use of their name, image and likeness."  "Board of Governors Starts Process to Enhance Name, Image and Likeness Opportunities," NCAA.org, (Oct. 29, 2019), http://www.ncaa.org/about/resources/media-center/news/board-governors-starts-process-enhance-name-image-and-likeness-opportunities (last visited July 13, 2022).

After decades of insisting that the definition of "amateur" was irreconcilable with student-athletes receiving *any* payment, the NCAA has decided that it has no issue with them getting paid, so long as those payments come from a third party. Put another way, the NCAA has changed its definition of an amateur from: (i) a student-athlete who is not getting paid; to (ii) a student-athlete who is getting paid, so long as the money is not coming from Appellants directly.

### C.     <u>Alston</u> Persuasively Described the Changes in Economic Conditions that Are Relevant to Determining the "Economic Reality" Here

Even putting aside that it was the most persuasive of the legal authorities available to the District Court, <u>Alston</u> is persuasive in the minimum-wage context for its analysis that "market realities have changed significantly since 1984." <u>Alston</u>, 141 S. Ct. at 2158.  Because the FLSA, too, looks to economic "realities," the District Court was right to follow this reasoning.  By contrast, Appellants remain wedded to a nostalgic, wistful history of amateur athletics with no bearing on modern economic circumstances.  At the time, these were patrician institutions whose students would have had no need or expectation of earning money, and student athletics was nowhere near a multi-billion-dollar industry.

As the majority in <u>Alston</u> pointed out, the NCAA has exploded in the scale of its business operations, generating over a billion dollars a year.  <u>Alston</u>, 141 S. Ct. at 2158 (citations omitted).  In short, college sports have gone from pastime to

major entertainment industry.  If anything defines the "economic reality" of student athletics, it is the fact that it is a big business that would not exist without the efforts of student-athletes.  Although Appellants and ACE, in its *amicus*, repeatedly emphasize that many college sports are not profitable, this is simply not relevant to the instant analysis.  There is no requirement that an employer make money, let alone turn a profit, before the law mandates that it pays its employees.  Importantly, <u>Alston</u> itself was not limited to revenue-generating sports.

Given <u>Alston</u>'s persuasive *tour d'horizon* of the NCAA's business, and given the NCAA's own admissions, the District Court was correct to find that the Complaint adequately alleged an "economic reality" of employment.

## III.    THE COURT SHOULD NOT CONSIDER APPELLANTS' <u>REMAINING ARGUMENTS ON AN INTERLOCUTORY BASIS</u>

Under the interlocutory appeal procedure Appellants have used here, the Court's review is properly limited to a "controlling question of law," 28 U.S.C. § 1292(b); in this case, whether the concept of "amateurism" completely insulates Appellants from the minimum wage laws.  The Court should exercise its discretion and decline to review the District Court's underlying factual analysis of "economic reality," under the <u>Glatt</u> test, as well as Appellants' affirmative defense premised on the supposed reliance on DOL regulations, as these are better viewed as questions of fact that must be resolved after discovery.  <u>See</u>, <u>e.g.</u>, <u>Malbrough v. Crown Equip. Corp.</u>, 392 F.3d 135, 136 (5th Cir. 2004) ("As such, although the

district court's order granted Crown general permission to 'appeal the denial of ... summary judgment', our review is limited to the narrow question of statutory interpretation raised by Crown in both its brief before us and its memorandum in support of the motion for summary judgment.").

Indeed, in certifying this appeal, the District Court noted that:

> [O]ur analysis of the ASD's [i.e. the university Appellants] arguments in their Motion to Dismiss that Plaintiffs cannot be the employees of the colleges and universities they attend and for which they compete in NCAA Division I athletics simply because they are amateurs did not involves mixed questions of law in fact.

1 AA 40.  By contrast, the District Court noted that:

> [T]he ASD also argued in their Motion to Dismiss that Plaintiffs could not be their employees . . . because the Complaint does not plausibly allege that Plaintiffs are employees pursuant to a multi-factor test used to determine whether individuals are employees.  Our analysis of these arguments in connection with our Order and Memorandum denying the ASD's Motion to Dismiss required through consideration of the factual allegations of the complaint.

1 AA 40.  The District Court thus found only the issue of "amateurism" to be a "controlling question of law" appropriate for interlocutory appeal.  That is because the determination of the "economic reality" here will require an adjudication of questions of fact or mixed questions of law and fact that are simply not appropriate for an interlocutory appeal.  See, e.g., Koken v. Pension Benefit Guar. Corp., 381 F. Supp. 2d 437, 442 (E.D. Pa. 2005) ("The antithesis of a proper § 1292(b) appeal

is one that turns on ... whether the District Court properly applied settled law to the facts or evidence.") (internal quotation omitted).  These questions can only be determined by the District Court, and ultimately a jury, in the first instance after the development a full factual record.  Accordingly, if the Court agrees that the concept of "amateurism" does not preclude application of a multifactor test, it should decline to review the District Court's factual analysis concerning the parties' "economic reality."

Similarly, Appellants' argument that the DOL regulations foreclose any finding that they can be held liable for failure to pay Appellees' a minimum wage is also not a pure question of law, as the District Court explained: "Our analysis of [Appellants' defense] in connection with our Order and Memorandum denying the ASD's Motion to Dismiss required thorough consideration of the factual allegations of the Complaint."  1 AA 48.

Finally, this analysis is simply not ripe for adjudication prior to the development of a factual record during discovery, and when the court's duty on a motion to dismiss is simply to assess the factual allegations for a plausible inference of liability.  See, e.g., Verma v. 3001 Castor, Inc., 937 F.3d 221, 232 (3d Cir. 2019) (emphasizing the district court's need to apply a "fact-intensive" multifactor test *at trial* to determine the existence of an employment relationship).  Consideration of the facts after discovery hardly "smuggles an assumed answer to

the very question . . . posed." App. Br. at p. 51. To the contrary, it defers

judgment until an accurate and objective analysis can be made on the record. This

is a remarkable argument for Appellants to make at all, given that they want to end

the entire inquiry into economic reality before it even begins.

## IV. THE DISTRICT COURT CORRECTLY APPLIED THE MULTIFACTORIAL ECONOMIC REALITY TEST

### A. The Absence of a Compensation Bargain Is Not Dispositive

Even if this Court does review the District Court's application of the Glatt

test to determine the existence of an employment relationship, it is clear that the

District Court applied that test correctly at the pleading stage.

As an initial matter, Appellants here repeat their arguments that a

"compensation bargain" is essential to any employment relationship under the

FLSA. These arguments are as unconvincing now as they were in the proceedings

below.

As the District Court explained, the existence of a compensation bargain is

not dispositive in determining the existence of an employer/employee relationship.

1 AA 25-26. Rather, it is one of many factors that some courts consider in

determining whether an individual is an employee. Id. Indeed, this Court's

employment test under the FLSA, outlined in Donovan v. DialAmerica Marketing,

Inc., 757 F.2d at 1382, does not even include the existence of a compensation

bargain as a factor to be considered in determining whether an individual is an employee.

This Court's refusal to consider the lack of a compensation bargain as a factor in determining the existence of an employment relationship under the FLSA is in accord with the precedent cited by Appellants.  Specifically, Appellants cite to Tony & Susan Alamo Found. v. Sec'y of Labor, 471 U.S. 290 (1985) for the proposition that the broad definition of employment under the FLSA "ha[s] its limits" and purportedly does not cover individuals "who work without promise or expectation of compensation."  App. Br. at p. 42 (quoting Tony & Susan Alamo at 295).

However, Tony & Susan Alamo explicitly rejected the argument that the lack of a compensation bargain forecloses employment status under the FLSA.  In Tony & Susan Alamo, a nonprofit religious organization characterized associates as FLSA-exempt "volunteers" who therefore "expected no compensation for their labors," and one of the associates specifically disclaimed any desire for compensation at all.  Id. at 300.  Despite this evidence, the Supreme Court (*after discovery*), affirmed the district court's finding that an employer-employee relationship existed within the meaning of the FLSA, explaining that: "Nevertheless, these protestations, however sincere, cannot be dispositive. The test of employment under the Act is one of 'economic reality.'"  Id. at 301.

Appellants' argument, that an individual could not be an employee if she does not expect to receive compensation, would create a loophole so big as to eviscerate the FLSA's protections. As the Supreme Court explained, "if an exception to the Act were carved out for employees willing to testify that they performed work 'voluntarily,' employers might be able to use superior bargaining power to coerce employees to make such assertions, or to waive their protections under the Act." Id. at 302. This is *precisely* what the NCAA seeks to do in the instant case. 2 AA 71. As the Supreme Court has made clear, however, Appellants' efforts to circumvent the clear precepts of the FLSA are unavailing.

Moreover, it is no longer even true that there is no compensation bargain. That is one clear effect of the holding of <u>Alston</u>: the Supreme Court has recognized that compensation is indeed part of the economic reality of student athletics. Student-athletes now receive numerous education-related benefits, not to mention scholarships, and they make decisions about offering their services based on whether a school offers benefits comparable to other schools. Similarly, in light of the changes to the NIL rules, students can receive payments directly related to their participation in collegiate sports. While these payments ostensibly come from third parties, much has been written about how schools themselves are directly involved in arranging the payments. <u>See</u> Bromberg, Lila, "In the NIL Arms Race, Some Schools Are Going the Extra Mile to Help Their Athletes," Sports

Illustrated, (July 1, 2021) https://www.si.com/college/2021/07/01/name-image-likeness-programs-schools-ncaa ("Out of the 65 Power 5 universities, 53 have already announced some sort of NIL-related initiative") (last visited July 13, 2022). Whatever the reality was in the past, post-Alston, student-athletes are now bargaining for money payments and the member schools are directly involved in same.

Second, the cases cited by the Appellants, including Tony & Susan Alamo, Williams v. Strickland, 87 F.3d 1064 (9th Cir. 1996) and Walling v. Portland Terminal Co., 330 U.S. 148 (1947) turn on who benefits from the work performed rather than the existence of a compensation bargain. In Tony & Susan Alamo, the plaintiffs were working for the commercial arm of a religious non-profit entity, and were thus held to be employees. Tony & Susan Alamo, 471 U.S. at 290. In Williams, individuals who were enrolled in a drug and alcohol rehabilitation program were found not to be employees where work therapy was required to "gain the necessary work skills to reenter the marketplace." Williams, 87 F.3d at 1065, 1068. Similarly, in Walling, where the plaintiffs were participants in a one-week training program that was required before they could receive a job offer, plaintiffs were not considered employees. Walling, 330 U.S. at 149-150.

Taken together, it is clear that this line of cases stands for the proposition that an individual will be an employee when the employer is the primary

beneficiary of her work.  Thus, in <u>Tony & Susan Alamo</u>, the primary purpose of

the employer was providing religious services and the work done by the plaintiffs

was for the "ordinary commercial activities of religious organizations."  <u>Tony &

Susan Alamo</u>, 471 U.S. at 302 (internal quotations omitted).  In contrast, in

<u>Walling</u> and <u>Williams</u>, the employer was not benefiting at all from the plaintiff's

work.  Instead, the benefit inured to the plaintiffs themselves.  <u>See Walling</u>, 330

U.S. at 149 ("the applicant's work does not expedite the company business, but

may, and sometimes does, actually impede and retard it").

This determination of who primarily benefits from the work the individual

performs is precisely what the District Court determined when it applied the

Second Circuit's "primary beneficiary test."  1 AA 27 ("the proper question is

whether the intern or the employer is the primary beneficiary of the relationship")

(quoting <u>Glatt</u>, 811 F.3d at 536).  Thus, far from demonstrating that the District

Court erred in applying a multifactor test, the line of cases cited by Appellants

merely reinforces the fact that the District Court appropriately analyzed the

pleadings using the <u>Glatt</u> test.  In applying this test, the District Court correctly

found that Appellants are the primary beneficiary of the work done by Appellees.

Finally, the Supreme Court's decision in <u>Tony & Susan Alamo</u> and the

Ninth Circuit's decision in <u>Williams</u> are distinguishable from the instant case

because they both turn on the issue of whether individuals are considered

*volunteers* under the FLSA.  Because the FLSA and the DOL's guidelines specifically exempt volunteers from the legal definition of employee, they are not entitled to the minimum wage.  <u>See</u> 29 U.S.C. § 203(e)(4),(5); DOL Field Operations Handbook ("FOH") §§ 10b03(c) and (d).  Critically, as alleged in the Complaint, student-athletes do not meet the criteria for volunteer status under the FLSA or the DOL Regulations, and there is no carve out or exemption for "amateurs" in either.  2 AA 139.  Accordingly, even if a lack of an expectation of compensation could somehow render Appellees "amateurs" under the NCAA's self-serving, and shifting, definitions, it does not regulate them to the class of volunteers who are exempt from the minimum wage requirements of the FLSA.

> **B.    The Language Used in the FLSA Does Not Require a Compensation Bargain for Employment**

Appellants have worked up a law office history that purports to show that the FLSA passage of the minimum wage law in 1938 adopted prior understandings of "employment" that imply a "compensation bargain."  The problem for Appellants is that the 1910 version of Black's Law dictionary—the primary source cited—contains a common-law definition of employment specifically abrogated by Congress in 1938.

That is exactly why the FLSA definition of "employ" "includes to suffer or to permit work," 29 U.S.C. § 203(g), rather than to "contract for compensation." App. Br. at p. 47 (quoting Black's Law Dictionary 421 (2d Ed. 1910)).  Even this

plain language, using the open-ended verbs "suffer" and "permit," indicates that an employment relationship may not be a deliberate act of contract, and can include activities falling outside a compensation bargain.  For that reason, as early as 1945, the Supreme Court wrote:

> The statute was a recognition of the fact that due to the unequal bargaining power as between employer and employee, certain segments of the population required federal compulsory legislation to prevent private contracts on their part which endangered national health and efficiency.

Brooklyn Sav. Bank v. O'Neil, 324 U.S. 697, 706–07 (1945); Verma v. 3001 Castor, Inc., 937 F.3d 221, 229 (3d Cir. 2019) (quoting the above and explaining "the whole point of the FLSA and the PMWA is to protect workers by overriding contractual relations through statute").  Quoting dictionaries from 1910 is sleight-of-hand historical analysis, when it is clear that Congress intended to modify those prior meanings.

Appellants' case, Tennessee Coal, 321 U.S. 590 (1944), actually illustrates these points and supports Appellees' arguments, especially when read in conjunction with subsequent legislative responses.  In that case, the Supreme Court held that time spent traveling underground in ore mines is work and it is irrelevant that in the mining industry there had been

> a prior custom or contract not to consider certain work within the compass of the workweek or not to compensate employees for certain portions of their work. The Fair

> Labor Standards Act was not designed to codify or perpetuate those customs and contracts which allow an employer to claim all of an employee's time while compensating him for only a part of it.

Tennessee Coal, 321 U.S. at 602.  Tennessee Coal is still followed for its broad reading of the concept of "work" in the FLSA.  See, e.g., Farrell v. FedEx Ground Package Sys., Inc., 478 F. Supp. 3d 536, 543 (D.N.J. 2020) (citing Tennessee Coal, holding that pre- and post-shift security screenings were compensable as work under the FLSA).

Congress overturned Tennessee Coal in non-pertinent part and in a specific way that clearly demonstrates that prior customs have no bearing on the modern interpretation of the FLSA.  Because decisions like Tennessee Coal had "create[ed] wholly unexpected liabilities, immense in amount and retroactive in operation," IBP, Inc. v. Alvarez, 546 U.S. 21, 26 (2005) (quoting 61 Stat. 84), Congress eliminated liability for unpaid minimum wage before May 14, 1947, unless the work was compensable under contract or under a "custom or practice" of compensation.  29 U.S.C. § 252(a).  In other words, unless it was customary to pay the employee for such work before 1947, or unless there was an employment contract, the employee could not sue under the FLSA.

But, "[w]ith respect to 'future claims,' the Act preserved potential liability for working time not made compensable by contract or custom," Alvarez, 546 U.S. at 27, except for certain kinds of commuting time.  The fact that Congress had to

34

create a specific, statutory carve-out for "custom or practice" for pre-1947 claims and declined to create the same carve-out for post-1947 claims, shows that "custom and practice" has no standing and receives no deference under the expansive definitions of the FLSA. Because Appellees seek no compensation for work prior to 1947, Appellants' point about prior custom is irrelevant.

### C.    The District Court Correctly Decided it Should Apply a Multifactorial Test—Just as Courts Do in All Other Wage Cases

Based on the foregoing, it is apparent that Appellants' objection to the District Court's application of a multifactor test to determine whether Appellees are employees is without merit. As already discussed, whether a particular individual is an employee under the FLSA is a complicated question that turns on a host of facts concerning the economic reality of their relationship. See Safarian, 622 F. App'x at 152 (remanding to the District Court to conduct a multifactorial test). Berger, upon which Appellants' argument that no multifactor test for college athletics is based, relied entirely on Vanskike in reaching its decision. See supra at pp. 13-15. However, it should be obvious that there is no comparison between student-athletes and prisoners working in jails and labor camps. Id. Similarly, however Appellants choose to characterize Benjamin v. B & H Educ., Inc., 877 F.3d 1139, 1147 (9th Cir. 2017), it did not depend upon a snap judgment about the "compensation bargain," it turned on the application of the same Glatt test the District Court used here to determine that cosmetologists who received on-the-job

clinical training were students rather than employees because, quite unlike student-athletes, their work corresponded to their academic commitments.

**D. The <u>Glatt</u> Test Does Not Weigh Any Factor More Heavily than Any Other, But Guides a Flexible Analysis of Economic Realities, and the District Court Applied it Correctly**

Accordingly, the District Court applied the <u>Glatt</u> test, originally formulated to determine whether an unpaid intern should be treated and compensated as an employee.[8] <u>Glatt</u>, 811 F.3d at 535 (explaining and formulating the test). That test acknowledges that "economic reality" cannot be restrained by prior custom or contract, while respecting prior Supreme Court holdings that the FLSA "cannot be interpreted so as to make a person whose work serves ***only*** his own interest an employee of another person who gives him aid and instruction." <u>Walling</u>, 330 U.S. at 152 (emphasis added).

As the Second Circuit explained,

> The purpose of a bona-fide internship is to integrate classroom learning with practical skill development in a real-world setting, and, unlike the brakemen at issue in *Portland Terminal*, all of the plaintiffs were enrolled in or had recently completed a formal course of post-secondary education. By focusing on the educational aspects of the internship, our approach better reflects the role of internships in today's economy than the DOL factors, which were derived from a 68-year old Supreme Court

---

[8]    Although the District Court applied the <u>Glatt</u> test, Appellees' allegations are sufficient to establish the existence of an employment relationship under this Circuit's test in <u>Donovan v. DialAmerica Marketing, Inc.</u> 2 AA 102-117.

> decision that dealt with a single training course offered to prospective railroad brakemen.

Glatt, 811 F.3d at 537-38.

The weight of Circuit authority is that the "primary beneficiary" test of Glatt is best suited for differentiating between academic/educational experience and compensable work.  See, e.g., Schumann v. Collier Anesthesia, P.A., 803 F.3d 1199, 1211-1212 (11th Cir. 2015) (using the Glatt test to vacate *summary judgment* against the defendant where the plaintiffs were former nursing students who had attended a master's degree program the defendant school); Benjamin, 877 F.3d at 1147 (explaining that "the primary beneficiary test best captures the Supreme Court's economic realities test in the student/employee context and that it is therefore ***the most appropriate test for deciding whether students should be regarded as employees under the FLSA***") (emphasis added).  The test's purpose is to ensure that employers are not unfairly gaining business benefits from unpaid student employees, and it therefore "focuses on the benefits the student receives, while . . . considering whether the employer is receiving some unfair advantage or otherwise abusing the relationship."  Hollins v. Regency Corp., 867 F.3d 830, 836 (7th Cir. 2017).

The Glatt test evaluates seven factors to determine the existence of an employment relationship between students and potential employers:

i.      The extent to which the student and the employer clearly understand that there is no expectation of compensation;

ii.     The extent to which the position provides training that would be similar to that which would be given in an educational environment;

iii.    The extent to which the position is tied to the student's formal education program by integrated coursework or the receipt of academic credit;

iv.     The extent to which the position accommodates the student's academic commitments by corresponding to the academic calendar [or does **not** interfere with scheduled classes or the pursuit of academic degrees];

v.      The extent to which the position's duration is limited to the period in which the position provides the student with beneficial learning;

vi.     The extent to which the student's work complements, rather than displaces, the work of paid employees while providing significant educational benefits to the student [or to which the alleged employer is the primary beneficiary]; and

vii.    The extent to which the student and the employer understand that the assignment is conducted without entitlement to a paid job at the conclusion of the assignment.

Id. at 536-37.

These factors are not relevant for their own sake, but only to the extent that they bear on the overarching issue (first identified in Walling): "whether the intern or the employer is the primary beneficiary of the relationship." Glatt, 811 F.3d at 536-537.

As an initial matter, Appellants argue that the factors are "not all of equal importance" and that the first and seventh <u>Glatt</u> factors are should take primacy. App. Br. at p. 54 (citing <u>Wang v. Hearst Corp.</u>, 877 F.3d 69, 73 (2d Cir. 2017)). This is no more than a misreading of <u>Glatt</u> and accordant case law. While the Second Circuit did use the word "crucial" in discussing these factors in <u>Wang</u>, the court did so to refute an argument by the appellant in that case that factors one and seven should not be considered at all. When it called these factors "crucial," the Second Circuit meant only that each individual factor in the <u>Glatt</u> test is "crucial," not that the first and seventh factors were any more "crucial" than the others. <u>See</u> <u>Wang</u>, 877 F.3d at 73 ("They argue, however, that these factors bear little weight because FLSA rights cannot be waived . . . . These factors are crucial.").

Appellees, unlike the appellants in <u>Wang</u>, do not dispute that the first and seventh factors should be considered under the <u>Glatt</u> test. But the Second Circuit (writing just the year before <u>Wang</u>) could not have written more clearly that "[n]o one factor is dispositive and every factor need not point in the same direction." <u>Glatt</u>, 811 F.3d at 537. The test is not supposed to tilt the scale in any predetermined direction. To the contrary, it is supposed to lend the court "flexibility to examine the economic reality" of a relationship. <u>Glatt</u>, 811 F.3d at 536. To accord extra weight to factors one and seven would essentially place a presumption in favor of employers who withhold compensation (factor one) or fail

to offer a paid job at the end of the internship (factor seven).  Neither Congress in the FLSA, nor the Supreme Court in <u>Walling</u>, ever expressed an intent that the economic reality test would be subject to any such presumption in favor of employers.  Quite the contrary, the FLSA is supposed to provide the broadest possible protections to employees.

The argument in favor of treating these factors as more important than the others is a rhetorical ploy by Appellants to make dispositive those factors that they claim support a finding that Appellees are not employees.  They are essentially proposing a revision of the <u>Glatt</u> test as a back-door to their initial argument, that the absence of a compensation bargain means that the FLSA does not apply.  For the same reasons as stated above, the argument fails here, too.

### E.   The District Court Correctly Concluded that the Complaint Stated a Claim Under the FLSA Based on the Glatt Factors

#### 1.   The Court Correctly Found At Least Three Factors Weigh in Favor of an Employment Relationship

The Court did indeed find that factors one, 1 AA 29, and seven, 1 AA 32, weighed against Appellees, simply because Appellees were neither paid nor promised employment by Appellants.  Of course, its judgment about factor one may be open to revision in the wake of <u>Alston</u>, since students now do receive cash compensation.  Nevertheless, because the court found the third, fourth, and sixth

factors in Appellees' favor, and the second and fifth factors neutral,[9] it held that the

Complaint stated a claim that the Appellees were employees under the FLSA per

the Glatt test.  1 AA 32-33.  Because its reasoning about the second through sixth

factors was sound, and because the first and seventh factors do not deserve special

weight, the District Court came to the correct conclusion.

As the District Court held, an analysis of the Glatt factors demonstrates a

business reality in the relationship between athletes and schools, wherein the

schools, not the students, are the primary beneficiaries of the work performed by

student-athletes.  1 AA 32-33.  Three of these factors look at the day-to-day reality

of the activity to determine whether it is continuous with coursework and part of an

educational program, or whether it is more like a separate employment activity,

and it was an analysis of these factors that convinced the District Court to deny

dismissal.

The District Court correctly found every one of these factors in favor of an

employment relationship.  The third factor in the Glatt test asks "[t]he extent to

which the position is tied to the student's formal education program by integrated

coursework or the receipt of academic credit."  Glatt, 811 F. 3d at 537.  In other

litigation, Appellants have conceded that college athletics are disconnected from

any academic coursework, and the District Court treated this fact as dispositive of

---

[9]       But see infra at pp. 45-47.

the third factor.  1 AA 30 (citing 2 AA 81).  For similar reasons, the District Court

agreed that factor four weighed in favor of Appellees.  1 AA 31.  As the Complaint

alleges, student-athletes are *obligated* to schedule classes around required athletic

activities and can be disciplined for failing to attend these activities.  2 AA 84-92.

As a result of their various obligations, some student-athletes are expected to spend

in excess of 40 hours a week just on activities related to athletics.  2 AA 86-90.

Thus, many student-athletes are simply not permitted to participate in their

preferred major and/or coursework.  2 AA 85-92.

    The sixth factor looks to whether "the student's work complements, rather

than displaces, the work of paid employees while providing significant educational

benefits to the student."  Glatt, 811 F. 3d at 537.  To satisfy this factor, the activity

must provide "significant educational benefits."  Put another way, all labor is

plausibly "educational;" a student working in the campus dining hall would

presumably learn about "teamwork," just as a basketball coach making millions of

dollars would plausibly learn about "leadership."  If such vague benefits were

sufficient to satisfy this factor, it would be reduced to a nullity.  Instead, this factor

requires the court to look instead to tangible realities and inquire whether

"education" is really being used as a cover to displace paid employment.  But, as a

threshold matter, the activity must actually provide a *significant* educational

benefit, or else any colorable benefit (like improved ability to run a dining hall)

would suffice to prove an employer's case. That is exactly what the District Court found when it analyzed the relationship between schools and student-athletes. Not only do student athletics provide no educational benefit whatsoever, they actively interfere with education in the same way having a job would force an employee in the workforce to take night classes if they wanted to pursue an education. Nor, put another way, do the student-athletes "complement" Appellants' business. Student-athletes *are* the business, without whom the NCAA's athletic competitions would cease entirely. 2 AA 99-100.

On appeal, Appellants contend the sixth factor should weigh against a finding of employment, arguing that "student-athletes do not perform work that institutions would otherwise pay someone to perform," App. Br. at p. 61, because the Appellants do not pay student-athletes. This argument is circular, arguing that the schools should not pay athletes because they do not pay athletes. This is, once again, an attempt to focus the analysis solely on the compensation bargain. It also ignores the requirement that participation in sports must provide a *significant* educational benefit, which simply cannot be established based on the allegations in the Complaint. Interestingly, Appellants' own historical briefing shows up the fallacy. They write that colleges once "offered all manner of compensation to talented athletes," before those colleges deliberately dismantled the market for talented student-athletes. App. Br. at p. 29 (quoting <u>Alston</u>, 141 S. Ct. at 2148).

The history shows exactly why the Court should look to the existence of a "significant educational benefit" when weighing this factor. If educational institutions act deliberately, they can *completely* replace paid workers with unpaid students in one generation, then claim there is no displacement in the next generation. They would be able to fully staff janitorial, IT, and administrative roles with students, and, as long as they did so *completely* and kept their staffs filled by students at all times, they could always argue that they had not displaced any paid labor. This is an absurd outcome that the economic reality test wisely avoids.

In sum, student-athletes must prioritize athletics over all other commitments, just as any job-holder must prioritize work over all other commitments. This is not a program of training or enrichment for the students' benefit, it is not an externship program where student-athletes shadow professional athletes, and it is not a practical course for applying classroom lessons to the real-world. It is a discrete commitment of time and energy to an institution with no logical connection to academic coursework. Contrast these facts with the Ninth Circuit case cited by Appellants, Benjamin, 877 F.3d at 1147 (9th Cir. 2017), where students received academic credit for their work and had schedules that accommodated academic commitments. The District Court correctly found that the pleadings pointed to an economic reality of employment.

2.      Even as to the Factors that the Court Found Neutral, Discovery
Would Likely Tilt Them in Favor of Appellees

The District Court found the second and fifth <u>Glatt</u> factors to be neutral,

because the Complaint did not contain specific allegations addressing them, but

there is every reason to believe that discovery would tilt these factors in favor of

Appellees.

The second <u>Glatt</u> factors queries "[t]he extent to which the position provides

training that would be similar to that which would be given in an educational

environment." <u>Glatt</u>, 811 F. 3d at 537.  Appellees argued in their original

opposition that the rules for athletic programs when compared with rules for Work

Study programs, which are required to provide educational training with tangible

benefits *and* pay the student, show that student-athletes are employees.  2 AA 76-

77.  In spite of these allegations, the District Court found that the Complaint did

not speak specifically enough to student-athletic programs for it to draw a

conclusion and found the factor neutral.  1 AA 30.  Likewise, the fifth factor asks

"the extent to which the position's duration is limited to the period in which the

position provides the student with beneficial learning," <u>id.</u>, and Appellees argued

that their athletic schedules were set without regard to their academic schedules.

22 AA 83-92.  Again, the Court found that it did not have enough information in

the allegations to draw a conclusion.  1 AA 30.

But, based on the foregoing, there is good reason to believe these factors would ultimately tilt in favor of Appellees after discovery. Given that schools make no effort to integrate student athletics with their academic programs, it is unlikely that discovery would show that athletic training is "similar" to anything that would arise in an educational environment. And, based on the total separation of athletic schedules from school schedules, as already discussed, it appears unlikely that discovery would show that athletics are limited to periods of education; athletic programs have nothing to do with academic coursework and completely ignore academic schedules. Given the pleadings, the District Court should have held that both factors favor Appellees. At worst, these factors should be treated as neutral, for now, until discovery can establish one way or the other how they should be treated.

Appellants' arguments that these factors favor them are without merit. Appellants attempt to foist into the record "discovery in earlier litigation," arguing that this earlier discovery shows that athletic training fosters "discipline, work ethic, strategic thinking, time management, leadership, goal-setting and teamwork." App. Br. at p. 58. However, on their own terms, these are exactly the sort of vague, unquantifiable "character" factors that are too trivial to credit as "educational benefits" under factor two of the Glatt test. All work builds "work ethic," "leadership" and the like. Almost any of these vague phrases could be used

to tout the benefit of almost any kind of work, from gardening to ticket-taking to working in a lab.  Appellants have not demonstrated that these traits are specifically built in an educational environment or to what extent, if any, these traits are built playing sports.[10]  If this factor was analyzed in the way Appellants propose—simply crediting any trivial explanation of an activity's character-building benefits—it would always weigh in favor of employers.  More to the point, for an internship to validly resemble an educational environment, it needs to correspond to real academic pursuits—working as an assistant to the CEO to learn business administration, volunteering to help a math professor to learn mathematics or mixing paints in a studio to learn art.  All of the potential mentors in these examples would be able to provide training similar to what students received in real university courses, and students in all of those settings would expect such specific training.

While Appellants claim to make an argument on appeal about the fifth factor, which addresses the overlap between athletic and educational calendars,

---

[10]    Similarly, in its amicus brief, the ACE cites to studies and articles about the supposed benefits that participation in sports provides to student-athletes.  Johnson, et al. v. NCAA, et al., No. 22-1223, Dkt. No. 31 at pp. 8-16 (3d Cir.).  However, none of the studies or articles cited by ACE are part of the Complaint, and they are not evidence that should be considered at the motion to dismiss stage.  During discovery, both parties will be afforded the opportunity to adduce evidence concerning the educational benefits, if any, provided by collegiate athletics and the extent to which they are secondary to the benefits to Appellants.  ACE's arguments are premature and irrelevant to the instant appeal.

their brief really contains no information and no arguments about this factor, an apparent concession that the District Court was justified in treating the factor as neutral, at very least. There is simply no record on point, and the parties will need to engage in discovery to establish exactly how the academic calendars worked.

Because the District Court properly analyzed the economic reality of the Appellants' $14 billion business, its decision should be affirmed, and this case should proceed to discovery.

## V. THE DISTRICT COURT CORRECTLY DECLINED TO DISMISS THE COMPLAINT BASED ON APPELLANTS' AFFIRMATIVE DEFENSE THAT IT RELIED ON DEPARTMENT OF LABOR REGULATIONS

### A. There Are No Allegations in the Complaint to Support Appellants' Position that They Relied on the DOL Regulations in Not Paying Appellees a Minimum Wage

Appellants renew their request to have the Court rule on their affirmative defense under 29 U.S.C. § 259(a), which provides that "no employer shall be subject to any liability" under the FLSA if it "pleads and proves that the act or omission complained of was in good faith in conformity with and in reliance on any written administrative regulation" of an agency, including the DOL. As explained above, the District Court properly found that this is not a proper subject for interlocutory review given that it involved substantial factual analysis of the allegations in the Complaint. See supra at p. 26.

However, even if the Court were to consider this argument, it fails on the merits.  Appellants argue that they relied on DOL regulations in deciding not to pay student-athletes, because, at the time of Appellees' Complaint, DOL regulations provided as follows

> As part of their overall educational program, public or private schools and institutions of higher learning may permit or require students to engage in activities in connection with dramatics, student publications, glee clubs, bands, choirs, debating teams, radio stations, intramurals and interscholastic athletics and other similar endeavors.  Activities of students in such programs, **conducted primarily for the benefit of the participants as part of the educational opportunities provided to the students** by the school or institution, are not work of the kind contemplated by section 3(g) of the Act and do not result in an employer-employee relationship between the student and the school of institution.

FOH § 10b03(e) (emphasis added).

But the District Court was undoubtedly correct to deny the motion, because "an affirmative defense may not be used to dismiss a plaintiff's complaint under Rule 12(b)(6)."  <u>In re Adams Golf, Inc. Sec. Litig.</u>, 381 F.3d 267, 277 (3d Cir. 2004).  Moreover, because "there [was] nothing on the record of [the] Motion to Dismiss" upon which to base a reliance defense, 1 AA 17, and no way to determine whether the schools actually relied on the regulation, for instance based on the advice of counsel, it would have been legal error to dismiss on these grounds.

Appellants now object erroneously that "[t]he District Court assumed that the NCAA and Schools may invoke § 259 only if they relied on the FOH when the Schools first fielded teams of amateur student-athletes," App. Br. at p. 71, suggesting that the District Court focused its analysis on the moment student athletics came into being (hypothetically, sometime over a hundred years ago). But this is a strawman argument; the District Court did not say anything like this. To the contrary, it decided that there was "nothing on the limited record before us . . . that sheds light, one way or another, on whether the ASD relied on FOH § 10b03(e) *in not paying* minimum wages to their student-athletes." 1 AA 18 (emphasis added). This holding was not addressing "the creation of a policy in the distant past," or "in the late Nineteenth Century." App. Br. at p. 72. The District Court's use of the phrase "in not paying" demonstrates instead that it was properly considering all of the relevant acts of payment involving Appellees up to and through the present.

Moreover, Appellants believe they can "plead and prove" their defense as a matter of law (i) because the DOL has never sued for student-athletes' minimum wage, App. Br. at p. 68, and (ii) because Appellants argued their reliance on §10b03 in several prior lawsuits. Id. at p. 70.

First, neither here nor before the District Court have Appellants explained why the DOL's non-enforcement matters in the context of a reliance defense. In

fact, § 259 requires that the employer rely on a "written administrative regulation" or "any administrative practice or enforcement policy." This does not mean Appellants were permitted to infer their desired outcome from the DOL's silence. Courts to rule on this question have found that a litigant's vague assertion of "non-enforcement" is inadequate to establish a § 259 defense, unless the litigant can show that the DOL took "'affirmative action'" to "adopt[] . . . an enforcement policy" and the employer actually relied on that "affirmative action" of non-enforcement. Dole v. Odd Fellows Home Endowment Bd., 912 F.2d 689, 696 (4th Cir. 1990); accord Ballehr v. Centers, Inc., No. 08 Civ. 261 (OC) (GRJ), 2009 WL 10670050, at *9 (M.D. Fla. Nov. 10, 2009) ("silence does not equate to a showing of the "affirmative action" required to evidence adoption of an enforcement policy.") Here, nothing in the record suggests that the DOL affirmatively adopted a policy of non-enforcement as to student-athletes.[11]

Second, the Court reviews the District Court's decision "not to take judicial notice" of evidence for "abuse of discretion." Pennsylvania Dep't of

---

[11]    Indeed, post-Alston, governmental agencies have taken a fresh look at the NCAA's compensation practices and found them unlawful. Most recently, the National Labor Relations Board's (the "NLRB") general counsel issued a memo explaining that college athletes are employees of their schools under the National Labor Relations Act: "That law *fully supports a finding that scholarship football players at Division I FBS private colleges and universities, and other similarly situated Players at Academic Institutions, are employees under the NLRA*." (available at https://apps.nlrb.gov/link/document.aspx/09031d458356ec26) (emphasis added).

Hum. Servs. v. United States, 897 F.3d 497, 514 (3d Cir. 2018).  The District Court properly exercised its discretion when it declined to take judicial notice of other litigation involving Appellants, because Appellants, again, failed to demonstrate even a threshold entitlement to the reliance defense.  That is because nothing in § 259 permitted Appellants to rely on their own "position in litigation," which amount to legal arguments by their attorneys without actual evidence.  App. Br. at p. 74.  If it were otherwise, the reliance factor would be satisfied in any case in which the defense was asserted, rendering it moot.  Appellants must demonstrate that they relied on the regulation in making their compensation decisions, not in defending against similar lawsuits.  Based on Appellants' own arguments, the District Court properly concluded that judicial notice of the prior litigation would be futile.  This was the best possible way to exercise its discretion.

**B.    Appellants Misread the DOL Regulation in Any Case**

In a footnote to page 74 of their brief, Appellants argue that the District Court should in any case have deferred to the text of §10b03, even if it did not accept Appellants' reliance defense.  However, this footnote merely cites the law and concludes that it supports Appellants' position.  Such an "argument[] raised in passing (such as, in a footnote), but not squarely argued" is properly "considered waived."  John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp., 119 F.3d 1070, 1076 n. 6 (3d Cir. 1997).

The District Court, after extensive briefing by the parties, devoted seven pages to the reasons it disagreed with this position, holding that "NCAA D1 interscholastic athletics are not the types of activities listed in FOH § 10b03(e) that 'do not result in an employer-employee relationship.'"  1 AA 22 (citing FOH § 10b03(e)).  It makes little sense to disturb this holding based on an argument on appeal "raised in passing . . . in a footnote."

Nevertheless, to address the point briefly, the District Court properly held that NCAA sports were not conducted "primarily for the benefit of the participants as part of the educational opportunities provided to the students."  In this respect, the FOH simply recapitulates the "primary beneficiary" test of <u>Walling</u> and <u>Glatt</u>, which the District Court applied thoroughly, and lists activities (such as "glee clubs," "choirs" and "dramatics") that are never conducted as a business in contrast to NCAA D1 sports.  There is simply no reason to read the regulation as carving out an exception for Appellants' sports and entertainment business, which is nothing like a "glee club" or student drama club, but instead requires a discrete commitment of time and energy from student-athletes, and has absolutely nothing to do with classroom learning.

Finally, even if the regulation could be read to include D1 sports, it would "not [be] controlling upon the courts," and would not preclude any of the District

Court's correct findings about the economic reality of student athletics. <u>Skidmore v. Swift & Co.</u>, 323 U.S. 134, 140 (1944).

## VI. APPELLANTS WAIVED THEIR APPEAL WITH REGARDS TO THE CLAIMS UNDER STATE LAW

Appellants argue that the Complaint's state law claims should be dismissed. But Appellants waived these arguments by failing to "unequivocally put [their] position before the trial court at a point and in a manner that permits the court to consider its merits." <u>Shell Petroleum, Inc. v. United States</u>, 182 F.3d 212, 218 (3d Cir.1999). Their arguments are thus "waived on appeal." <u>DIRECTV Inc. v. Seijas</u>, 508 F.3d 123, 125 n. 1 (3d Cir.2007). This is particularly true with respect to Appellees' unjust enrichment claims, which Appellants never even moved to dismiss in the first instance. This was their strategy to pursue, and they cannot now ask the Court on appeal to help them fix the omission.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should affirm the judgment below and

remand this case for discovery.

Dated: July 14, 2022
     New York, New York          Respectfully submitted,

**WIGDOR LLP**

By: ___/s/ Michael J. Willemin_____
     Michael J. Willemin
     Renan F. Varghese

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
mwillemin@wigdorlaw.com
rvarghese@wigdorlaw.com

AND

**P L McDonald Law LLC**

Paul L. McDonald
1800 JFK Boulevard, Suite 300
Philadelphia, PA   19103
Tel:    (267) 238-3835
Fax:    (267) 238-3801
paul@plmcdonaldlaw.com

*Attorneys for Plaintiffs-Appellees*

55

## <u>CERTIFICATION OF ADMISSION TO BAR</u>

I, Michael J. Willemin, certify as follows:

1.        I am a member in good standing of the bar of the United States Court of

Appeals for the Third Circuit.

2.        Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the

foregoing is true and correct.

Dated: July 14, 2022
            New York, New York                        Respectfully submitted,

                                                                    **WIGDOR LLP**


                                                                    By:    /s/ Michael J. Willemin
                                                                            Michael J. Willemin

## CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF APPELLATE PROCEDURE 32(a) AND LOCAL RULE 31.1

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify the following:

This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because this brief contains 12,991 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii) of the Federal Rules of Appellate Procedure.

This brief complies with the typeface requirements of Rule 32(a)(5) of the Federal Rules of Appellate Procedure and the type style requirements of Rule 32(a)(6) of the Federal Rules of Appellate Procedure because this brief has been prepared in a proportionally spaced typeface using the 2008 version of Microsoft Word in 14 point Times New Roman font.

This brief complies with the electronic filing requirements of Local Rule 31.1(c) because the text of this electronic brief is identical to the text of the paper copies, and the Vipre Virus Protection, version 3.1 has been run on the file containing the electronic version of this brief and no viruses have been detected.

Dated: July 14, 2022

/s/ Michael J. Willemin
Michael J. Willemin

## CERTIFICATE OF FILING AND SERVICE

I, Noel Reyes, hereby certify pursuant to Fed. R. App. P. 25(d) that, on

July 14, 2022 the foregoing Brief for Appellees was filed through the CM/ECF

system and served electronically.

Unless otherwise noted, seven copies will be filed with the Court within the time

provided in the Court's rules via Express Mail.

/s/ Noel Reyes
   Noel Reyes