No. 22-1223

# In the United States Court of Appeals for the Third Circuit

RALPH "TREY" JOHNSON, ET AL.,
Plaintiffs-Appellees

v.

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, A/K/A THE NCAA, ET AL.,
Defendants-Appellants

On appeal by permission from the United States District Court
for the Eastern District of Pennsylvania
Case No. 2:19-cv-05230-JP
Hon. John R. Padova, Presiding

## BRIEF OF PROFESSOR MICHAEL H. LeROY
## AS AMICUS CURIAE
## IN SUPPORT OF PLAINTIFFS-APPELLEES

Dated:    July 14, 2022

CHIMICLES SCHWARTZ KRINER
& DONALDSON-SMITH LLP
Benjamin F. Johns
361 W. Lancaster Avenue
Haverford, PA  19041
bfj@chimicles.com
Tel:  610-642-8500

Attorney of Record for *Amicus Curiae*
Professor Michael H. LeRoy

## CORPORATE DISCLOSURE STATEMENT

Under FED. R. APP. PROC. 26.1 and 3RD CIR. R 26.1, I certify that I represent only my views as a professor who publishes research on legal aspects of athletic labor and teaches a professional degree course, "Collective Bargaining in Sports and Entertainment." I am employed as a full professor with an endowed chair appointment (LER Alumni Professor) by the University of Illinois at Urbana-Champaign, with a 100% appointment in the School of Labor and Employment Relations, and an affiliated appointment in the College of Law. I have no ownership interest in a company that is before this Court.

By: _____

Prof. Michael H. LeRoy

Amicus for Plaintiffs-Appellees

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................... 1

ARGUMENT ............................................................................................ 5

I.    COLLEGE ATHLETES ENGAGE IN "WORK"
AND "EMPLOYMENT" UNDER THE FAIR LABOR
STANDARDS ACT .......................................................................... 5

II.    COLLEGE ATHLETES ARE EMPLOYEES USING THE
SIX FACTOR TEST IN *DIALAMERICA, MARKETING, INC.,*
757 F.2D 1376, 1382 (3RD CIR. 1985) ......................................... 10

III.    FLSA IMPLICATIONS OF
CONFERENCE CONSOLIDATION ............................................ 23

IV.    CONCLUSION .............................................................................. 27

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Mt. Clemens Pottery Co.*,
    328 U.S. 680 (1946) ................................................................ 5

*Armour & Co. v. Wantock*,
    323 U.S. 126 (1944) ......................................................... 5, 7, 2

*Bartels v. Birmingham*,
    332 U.S. 126 (1947) .............................................................. 18

*Brock v. Richardson*,
    812 F.2d 121 (3rd Cir. 1987) ............................................... 11

*Cherichetti v. PJ Endicott Co.*,
    906 F.Supp.2d 312 (D. Del. 2012) ...................................... 14

*De Asencio v. Tyson Foods, Inc.*,
    500 F.3d 361 (3rd Cir. 2007) ................................................. 6

*Donovan v. DialAmerica Marketing, Inc.*,
    757 F.2d 1376 (3rd Cir. 1985) .............................. 5, 10, 11, 19

*E.E.O.C. v. Zippo Mfg. Co.*,
    713 F.2d 32 (3rd Cir. 1983) ........................................... 11, 18

*In re Enterprise Rent-A-Car*,
    683 F.3d 462 (3rd Cir. 2012) ............................................... 11

*IBP v. Alvarez*,
    546 U.S. 21 (2005) ..................................................... 5, 6, 7, 9

*Jimenez v. Best Behavioral Healthcare, Inc.*,
    391 F.Supp.3d at 391 ........................................................... 14

*Martin v. Selker Bros., Inc.*,
    949 F.2d 1286 (3rd Cir. 1991) ....................................... 11, 17

*Messmer v. Colors In Bloom, Inc.*,
    67 Fed.Appx. 719 (3rd Cir. 2003) ....................................... 11

*Moon v. Breathless Inc.*,
  868 F.3d 209 (3rd Cir. 2017) ..........................................................11

*National Collegiate Athletic Ass'n v. Alston*,
  141 S.Ct. 2141 (2021) ...................................................................... 2

*National Collegiate Athletic Ass'n v. Board of Regents of the
  University of Oklahoma*,
  468 U.S. 85 (1984) .................................................................. 2, 6, 7

*Razak v. Uber Technologies, Inc.*,
  951 F.3d 137 (3rd Cir. 2020) ..................................................... 11, 13

*Rutherford Food Corp. v. McComb*,
  331 U.S. 722 (1947) ......................................................................... 5

*Safarian v. American DG Energy Inc.*,
  622 Fed.Appx. 149 (3rd Cir. 2015) ........................................... 10, 11

*Secretary of U.S. Dep't of Labor v. American Future
  Systems, Inc.*,
  873 F.3d 420 (3rd Cir. 2017) ...................................................... 6, 11

*Steiner v. Mitchell*,
  350 U.S. 247 (1956) ......................................................................... 6

*Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123*,
  321 U. S. 590 (1944) ................................................................ 4, 5, 8

*Tyger v. Precision Drilling Corp.*,
  832 Fed.Appx. 108 (3rd Cir. 2020) .................................................. 6

*Zygowski v. Erie Morning Telegram, Inc.*,
  298 F.2d 639 (3rd Cir. 1962) ..........................................................11

## STATUTES

29 U.S.C. §§ 201 *et seq.* ........................................................... 2, 5

29 U.S.C. § 203(g) of the FLSA ................................................. 8, 7

New Jersey, S.B. 971 (2021) ........................................................... 15, 16

Pennsylvania, S.B. 381 (2021) ...................................................... 15, 16


## OTHER AUTHORITIES

29 C.F.R. § 785.14 to 785.17.............................................................. 2

29 C.F.R. § 785.16(b) ........................................................................ 2

2021 Reg. Sess. (N.J. 2021),
    https://legiscan.com/NJ/text/S971/id/2209738 ................................ 15

2021 Reg. Sess. (Penn. 2021) .......................................................... 15

2021 Reg. Sess. (Penn. 2021) .......................................................... 16

Gabe Angieri, *Penn State's White Out by the Numbers,*
    Onward State  (Sept. 15, 2021) ....................................................... 29

Walter Byers, Unsportsmanlike Conduct: Exploiting
    College Athletes (1995) ................................................................. 1

Dave Caldwell, *'People Just Sent Money In': What Happened
    After St Peter's Basketball Fairytale?* ........................................ 16, 22

*Employment Relationship*, 2017 Univ. of Chi. Legal Forum
    327 (2017).................................................................................. 4

Fordham University Athletics, Athletic Department's
    Mission, Philosophy, and Objectives............................................. 22

Kevin Kelly, *Future Sites Set for Army-Navy Game through
    2022*, FBSchedules................................................................... 6

Michael H. LeRoy, *Bare Minimum: Stripping Pay for Independent
    Contractors in the Share Economy,* 23 Wm. & Mary J. of Women and
    the Law 249 (2017)................................................................... 3

Mike McDaniel, *Seton Hall Hires Saint Peter's Coach
    Shaheen Holloway,* SI (March 30, 2022) .................................... 20

NCAA, 2021-2022 NCAA Division I Manual at 28........... 7, 12, 14, 15, 18

NCAA, Financial Aid Agreement .......................................................... 3

*USC and UCLA Will Join the Big Ten in 2024*, Wash. Post
(June 30, 2022)......................................................................................... 23

## INTRODUCTION

Speaking to the Intercollegiate Athletic Association of the United States in 1907, Captain Palmer E. Pierce of the Military Academy at West Point summarized newspaper stories that exposed sham amateurism in college athletics:

> "It was related in detail under what disguise money returns were given. For instance, one prominent player was said to have derived hundreds of dollars from the privilege of furnishing programs at games; another received the profit from a special brand of cigarettes named after him; a third was the ostensible head of an eating club, while others were in the employ of rich college graduates." PROCEEDINGS OF THE SECOND ANNUAL CONVENTION OF THE INTERCOLLEGIATE ATHLETIC ASSOCIATION OF THE UNITED STATES (DEC. 28, 1907), at 27, PDF 39, https://babel.hathitrust.org/cgi/pt?id=mdp.39015039707107&view=1up&seq=39&q1=professional.

The college athletics amateurism model has thrived as a sham for more than a century. The NCAA's executive director from 1951-1988 published a shocking expose in 1995 that characterized the NCAA as an "economic camouflage for monopoly practice ... that operat[es] an air-tight racket of supplying cheap athletic labor." WALTER BYERS, UNSPORTSMANLIKE CONDUCT: EXPLOITING COLLEGE ATHLETES (1995), at 73. Using similarly blunt language, Justice Brett Kavanaugh wrote a

[concurring opinion](#) in the landmark decision, *National Collegiate Athletic Ass'n v. Alston,* 141 S.Ct. 2141, 2168 (2021):

> "The bottom line is that the NCAA and its member colleges are suppressing the pay of student athletes who collectively generate *billions* of dollars in revenues for colleges every year. Those enormous sums of money flow to seemingly everyone except the student athletes."

Ralph (Trey) Johnson's complaint seeks wages for his time playing football for Villanova University under the Fair Labor Standards Act, Pub. L. No. 52 Stat. 1060 (1938), codified as amended at 29 U.S.C. §§ 201 *et seq.*, and Pennsylvania's wage and hour law. In Defendants'-Appellants' Opening Brief, the NCAA re-treads its traction-less paeans to collegiate amateurism— tributes that skid past the hard work performed by athletes to financially benefit their schools.  Quoting in its Brief from *National Collegiate Athletic Ass'n v. Board of Regents of the University of Oklahoma*, 468 U.S. 85, 120 (1984), the NCAA says that college athletics must continue to operate on its "revered tradition of amateurism." But who *reveres* this wageless amateurism, other than the NCAA and its member institutions?

Since 1907, the NCAA has never deviated from its fossilized view of college athletics. To begin with, the NCAA, its various conferences, and its approximately 1,100 university and colleges, misclassify college

athletes as amateurs. In Points 3(a) and 3(b) of its "Athletic Financial Aid Agreement," the NCAA stipulates that financial aid will be reduced or cancelled for an athlete who "(s)igns a professional sports contract for this sport," or "(a)ccepts money for playing in an athletic contest that causes him/her to exceed the cost of a full grant." NCAA, FINANCIAL AID AGREEMENT,

https://ncaaorg.s3.amazonaws.com/about/d2/ed_res/D2Ed_SampFinAid Agreement.pdf (undated documented visited on NCAA website, June 12, 2022). This situation is no different from an employer who fires an employee for breaking a cardinal rule.

Strip clubs use this heavy-handed approach by requiring dancers to sign independent contractor agreements authorizing pay deductions for violating non-negotiable work regulations. Michael H. LeRoy, *Bare Minimum: Stripping Pay for Independent Contractors in the Share Economy*, 23 WM. & MARY J. OF WOMEN AND THE LAW 249, 256, 264 (2017). Wage-theft has become widespread: employers have misclassified workers as independent contractors in 20 of the 22 major occupation categories defined by the U.S. Department of Labor. Michael H. LeRoy, *Misclassification under the Fair Labor Standards Act: Court Rulings and*

*Erosion of the Employment Relationship*, 2017 Univ. of Chi. Legal Forum 327, 337 (2017) (Fact Finding 1). The NCAA misclassifies its athletes as "amateurs," a tautological evasion of the employment relationship, just because the NCAA says so.

To resolve the issues certified for appeal, this Court must answer two basic legal questions.

First, what is the definition of "work" and "employment" under the Fair Labor Standards Act? These quotes draw from *Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123*, 321 U. S. 590 (1944), where the Supreme Court used Webster's Dictionary to describe "work or employment" (*id.* at 591) under the FLSA as "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business." *Id.* at 598. NCAA's rules that meticulously cover the time and activities of college players are clearly work rules— not amateur rules— and therefore, college athletes "work" in the course of "employment" under the FLSA.

Second, how do the six factors for the FLSA's "economic realities" test apply to athletic labor performed for the NCAA? These factors, which

*Donovan v. DialAmerica Marketing, Inc.*, 757 F.2d 1376, 1382 (3rd Cir. 1985) traces to *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947), show that the NCAA misclassifies college athletes as amateurs. As a result of NCAA's rules that apply to mostly 18–21-year-olds, these powerless athletes perform labor in a wageless employment relationship, where receipt of a single dollar for their athletic performance could permanently disqualify them.

## ARGUMENT

### I. COLLEGE ATHLETES ENGAGE IN "WORK" AND "EMPLOYMENT" UNDER THE FAIR LABOR STANDARDS ACT

The FLSA, 29 U.S.C. § 201 *et seq.*, requires employers to pay a minimum wage to their employees without defining "work" or "workweek." *IBP v. Alvarez*, 546 U.S. 21, 24 (2005). The Supreme Court has broadly defined these core terms. *Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123*, 321 U.S. 590 (1944) (travel time to remote work area is compensable); *Armour & Co. v. Wantock*, 323 U.S. 126, 132 (1944) ("work" does not necessarily require an employee to engage in "exertion"); *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 690-691 (1946) ("the statutory workweek" includes "all time during which an employee is necessarily required to be on the employer's premises, on duty or at a

prescribed workplace"); *Steiner v. Mitchell*, 350 U.S. 247, 248-249 (1956) (postliminary compensable time includes safety-related showering on premises); and *IBP*, 546 U.S. at 35 ("donning and doffing of protective gear are compensable activities").

The Third Circuit has consistently applied these precedents with respect to the FLSA's coverage. *Secretary of U.S. Dep't of Labor v. American Future Systems, Inc.*, 873 F.3d 420, 425 (3rd Cir. 2017) (FLSA requires compensation for rest periods of short duration); *Tyger v. Precision Drilling Corp.*, 832 Fed.Appx. 108, 113 (3rd Cir. 2020) (donning and doffing for basic personal protective equipment is compensable under the FLSA); and *De Asencio v. Tyson Foods, Inc.*, 500 F.3d 361, 373 (3rd Cir. 2007) ("donning and doffing activity in this case constitutes 'work' as a matter of law" under the FLSA).

NCAA rules use language that overlaps with terminology from the FLSA and caselaw. For example, one rule defines how a weight coach directs an athlete's exertion:

> "11.7.4.1.1 Weight or Strength Coach. [FBS] A weight (strength and conditioning) coach may conduct *flexibility, warm-up and physical conditioning activities prior to any game and prior to or during any practice or other organized activities* without being included in the limitations on

number of coaches (emphasis added)." *NCAA, 2021-2022 NCAA Division I Manual* at 37.

This verbiage combines elements of work, including words for "exertion" in *Wantock* at 132, and preliminary activities that are indispensably related to a principal activity in *IBP* at 35.

The NCAA Rules, in Fig. 14.1 ("Initial Eligibility: How NCAA Legislation (Bylaw 14.3) Affects Student-Athletes During Their Initial Year of College Attendance"), allow for "*work*out apparel" in connection with a "conditioning program." *NCAA, 2021-2022 NCAA Division I Manual* at 189. This language literally uses the root word "work" in a way that conveys the essence of FLSA coverage in *Armour & Co. v. Wantock*, 323 U.S. at 132.

Similarly, Article 17.02.15 ("Student-Athlete Discretionary Time. [FBS/FCS]") contains FLSA's terminology related to "work":

> "Student-athlete discretionary time is time during which a student-athlete may only participate in athletics activities at the student-athlete's discretion. There shall be no required *workouts* and institutions are not permitted to recommend that student-athletes engage in weight-training or conditioning activities; however, if the student-athlete opts to *work out*, the strength and conditioning coach may monitor the facility in use for health and safety purposes (emphasis added). *NCAA, 2021-2022 NCAA Division I Manual* at 238.

The first part of this regulation recognizes that a portion of a college player's activities involve "required *workouts*" (emphasis added), while the second part relates to an athlete's discretionary time "to *work out*" (emphasis added). The plain text of this regulation is consistent with caselaw that defines "work" performed under 29 U.S.C. § 203(g) of the FLSA ("'Employ' includes to suffer or permit to work.").

Article 17.1.7.2.1.1 ("Exception— Championship Subdivision Football. [FCS]") specifically relates to Trey Johnson's participation on the Villanova University football team:

> "In championship subdivision football, countable coaches who are certified *strength and conditioning* coaches may design and conduct specific *workout* programs for student-athletes, provided such *workouts* are voluntary and conducted at the request of the student-athlete (emphasis added)." *NCAA, 2021-2022 NCAA Division I Manual* at 241.

The labeling of coaches as certified strength and conditioning professionals shows that college athletes engage in "exertion" for the benefit of their schools, consistent with *Tennessee Coal*, at 321 U. S. 591. This work is performed by employees under the direction of supervisors.

Article 17.2.6.2 ("Vacation-Period and Summer Workout Exception") suggests that college athletes are employed throughout the calendar year by their universities or colleges.

"17.2.6.2. Vacation-Period and Summer Workout Exception. A coach may participate in individual *workout* sessions with student-athletes from the coach's team during any institutional vacation period and/or the summer, provided the request for the assistance is initiated by the student-athlete (emphasis added)." *NCAA, 2021-2022 NCAA Division I Manual* at 251.

In addition, Article 12.5.4 ("Use of Commercial Trademarks or Logos on Equipment, Uniforms and Apparel") shows that the NCAA closely regulates an athlete's use of sports equipment with the same detail that appears in *IBP*, 546 at 521-522 (describing employee donning and doffing of "hardhats, hairnets, earplugs, gloves, sleeves, aprons, leggings, and boots").

While Article 12.5.4's enumeration of equipment rules suggests that in some sports— for example, football, hockey, lacrosse, and skiing— athletes don and doff gear in locker rooms much like meatpacking employees in *IBP* don and doff safety gear in in FLSA-covered preliminary and postliminary work. Article 12.5.4 states, in pertinent part:

"A student-athlete may use athletics equipment or wear athletics apparel that bears the trademark or logo of an athletics equipment or apparel manufacturer or distributor in athletics competition and *pre-* and *post*game activities (e.g., celebrations on the court, *pre-* or *post*game press conferences), provided the following criteria are met.

…

Athletics equipment (e.g., shoes, helmets, baseball bats and gloves, batting or golf gloves, hockey and lacrosse sticks, goggles and skis) shall bear only the manufacturer's normal label or trademark, as it is used on all such items for sale to the general public…. *NCAA, 2021-2022 NCAA Division I Manual* at 61.

In sum, the only obstacle to finding that college athletes "work" and engage in "exertion" under the FLSA is the NCAA's definitional wizardry in mischaracterizing collegiate athletic labor as amateur.

## II. COLLEGE ATHLETES ARE EMPLOYEES USING THE SIX FACTOR TEST IN *DIALAMERICA, MARKETING, INC.*, 757 F.2D 1376, 1382 (3RD CIR. 1985)

*Donovan v. DialAmerica Marketing, Inc.*, 757 F.2d 1376, 1382 (3rd Cir. 1985) set forth six factors to determine whether work should be classified as employment under the Fair Labor Standards Act:

"(1) the degree of the alleged employer's right to control the manner in which the work is to be performed; (2) the alleged employee's opportunity for profit or loss depending upon his managerial skill; (3) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers; (4) whether the service rendered requires a special skill; (5) the degree of permanence of the working relationship; and (6) whether the service rendered is an integral part of the alleged employer's business."

This Court has consistently applied the six-factor FLSA test. *Safarian v. American DG Energy Inc.*, 622 Fed.Appx. 149, 152 (3rd Cir. 2015); *Donovan v. DialAmerica Marketing, Inc.*, 757 F.2d 1376, 1382 (3rd

Cir. 1985); *Zygowski v. Erie Morning Telegram, Inc.*, 298 F.2d 639, 641 (3rd Cir. 1962); *Razak v. Uber Technologies, Inc.*, 951 F.3d 137, 143 (3rd Cir. 2020); *Secretary U.S. Dep't. of Labor v. American Future Systems, Inc.*, 873 F.3d 420, 426, (3rd Cir. 2017); *Moon v. Breathless Inc.*, 868 F.3d 209, 218 (3rd Cir. 2017); *In re Enterprise Rent-A-Car*, 683 F.3d 462, 467 (3rd Cir. 2012); *Messmer v. Colors In Bloom, Inc.*, 67 Fed.Appx. 719, 722 (3rd Cir. 2003); *Martin v. Selker Bros., Inc.*, 949 F.2d 1286, 1293 (3rd Cir. 1991); *Brock v. Richardson*, 812 F.2d 121, 124 (3rd Cir. 1987); and *E.E.O.C. v. Zippo Mfg. Co.*, 713 F.2d 32, 36 (3rd Cir. 1983).

*Safarian v. American DG Energy Inc.*, 622 Fed.Appx at 152, explained that the "fundamental point here is that courts must look to the economic realities, not the structure, of the relationship between the workers and the businesses." *Donovan v. DialAmerica Marketing, Inc.*, 757 F.2d at 1383 instructed judges that "neither the presence nor absence of any particular factor is dispositive and that courts should examine the 'circumstances of the whole activity,'" (quoting *Donovan v. Sureway Cleaners,* 656 F.2d 1368, 1370 (9th Cir. 1981).

Rules in the NCAA's 2021-2022 NCAA DIVISION I MANUAL offers direct evidence that schools are employers when applying all six factors.

Case 22-1223

**Degree of Control**: NCAA rules expressly limit activities and countable hours for college athletes to be under the control and direction of coaches and trainers. Coaches and trainers control college athletes up to these maximums.

To begin with, Article 17 ("Playing and Practice Seasons") indicates periods for controlling the practice and competition activities of athletes. *NCAA, 2021-2022 NCAA Division I Manual* at 236.

More specifically, Article 17.02.1 ("Countable Athletically Related Activities") shows the essential feature of work performed by athletes under the supervision of coaches and managers:

> "Countable athletically related activities include any required activity with an athletics purpose involving student-athletes and *at the direction of, or supervised by, one or more of an institution's coaching staff* (including strength and conditioning coaches) and must be counted within the *weekly and daily limitations* under Bylaws 17.1.7.1 and 17.1.7.2." *NCAA, 2021-2022 NCAA Division I Manual* at 236.

Article 17.1.7.1 ("Daily and Weekly Hour Limitations— Playing Season") provides specific evidence of an institution's control of athletes, stating:

> "A student-athlete's participation in countable athletically related activities (see Bylaw 17.02.1) shall be limited to a maximum of four hours per day and 20 hours per week." *NCAA, 2021-2022 NCAA Division I Manual* at 236.

These rules equate to a half-time job relative to a full-time job that is scheduled for 40 hours per week.

Article 17.1.7.2(a) "Weekly Hour Limitations— Outside of the Playing Season (Sports Other Than Football)" states:

> "Outside of the playing season … only a student-athlete's participation in required weight training, conditioning and skill-related instruction … shall be permitted. A student-athlete's participation in such activities per Bylaw 17.02.1 shall be limited to a maximum of eight hours per week with not more than four hours per week spent on skill-related workouts." NCAA, 2021-2022 NCAA Division I Manual at 240.

This rule shows that college athletes are under the continuous supervision and control of coaches, trainers, and managers for most weeks during the academic year.

*Razak v. Uber Technologies, Inc.*, 951 F.3d 137, 145 (3d. Cir. 2020), demonstrates the legal relevance of NCAA rules that regulate the supervision athletes: "Actual control of the manner of work is not essential; rather, it is the right to control which is determinative (citing *Drexel v. Union Prescription Ctrs.*, 582 F.2d 781, 785 (3d Cir. 1978))."

**<u>Skill and Initiative</u>**: While college athletes are talented, their athletic skills do not remove them from FLSA coverage as employees. This is because "(r)outine work which requires industry and efficiency is

not indicative of independence and nonemployee status." *Cherichetti v. PJ Endicott Co.*, 906 F.Supp.2d 312, 317 (D. Del. 2012).

A skilled therapist in *Jimenez v. Best Behavioral Healthcare*, Inc., 391 F.Supp.3d 380 (E.D. Pa. 2109) sued a mental health provider under the FLSA and Pennsylvania Wage Payment Collection Law, alleging that he was never paid for the time he provided services. The court denied a motion to dismiss. Like talented college athletes, psychotherapists have a special skill. However, the court reasoned that "an employee's training carries less weight where … the company 'controlled the terms and conditions of the employment relationship.'" *Jimenez v. Best Behavioral Healthcare, Inc.*, 391 F.Supp.3d at 391.

NCAA rules regulate an institution's employment and use of coaches, beginning with Art 11.01.2 ("Coach, Head or Assistant"), defining this person as a "head or assistant coach … who is designated by the institution's athletics department to perform coaching duties and who serves in that capacity on a volunteer or paid basis." *NCAA, 2021-2022 NCAA Division I Manual* at 28.

NCAA rules also regulate the number and type of coaches by sports. Article 11.7.4 ("Bowl Subdivision Football") provides: "There shall be a

limit of one head coach, 10 assistant coaches and four graduate assistant coaches who may be employed by an institution in bowl subdivision football." *NCAA, 2021-2022 NCAA Division I Manual* at 37.

These rules clearly indicate the importance of providing instruction and direction to college athletes, thereby minimizing an athlete's independent reliance on his or her skill and initiative to excel in NCAA competitions.

**Opportunities for Profit and Loss Depending on Managerial Skill**: College athletes have not been able to profit from their athletic labor until the recent enactment of state NIL laws. New Jersey, S.B. 971, 2021 Reg. Sess. (N.J. 2021), https://legiscan.com/NJ/text/S971/id/2209738, and Pennsylvania, S.B. 381, 2021 Reg. Sess. (Penn. 2021), at https://legiscan.com/PA/text/SB381/id/2420743 offer two examples. While these laws grant economic rights for college athletes, they defer to the NCAA's amateur athletics model by prohibiting NIL deals that pay for athletic performance.

For example, the New Jersey Fair Play Act limits a college athlete's ability to profit from his or her NIL. Section 4(c) allows an athlete to use "the athlete's name, image, or likeness for a commercial purpose *when*

*the athlete is not engaged in official team activities* (emphasis added)."
New Jersey, S.B. 971. Section 4(d) provides that an institutional team
may use an athlete's name, image, or likeness for its own purposes
without paying the athlete. *Id.*

Similarly, Pennsylvania's NIL law in Section 2006-k(B) forbids
college athletes a school's institutional intellectual property for his or her
own NIL compensation. Pennsylvania, S.B. 381, 2021 Reg. Sess. (Penn.
2021).

In short, these laws afford college athletes new economic rights but
disassociate opportunities for profit or loss from athletic
accomplishments and team achievements.

The astounding success of St. Peter's men's basketball team in the
2022 NCAA's March Madness tournament shows how NCAA schools
continue to profit from team success. In March 2021, the New Jersey
school received 149 gifts totaling $475,000; a year later, the school's
Cinderella run in the tournament yielded 414 gifts in the same period,
totaling $2.3 million. Dave Caldwell, *'People Just Sent Money In': What
Happened After St Peter's Basketball Fairytale?* THE GUARDIAN (Apr.

26, 2022), at https://www.theguardian.com/sport/2022/apr/26/people-just-sent-money-in-what-happened-after-st-peters-basketball-fairytale.

St. Peter's financial windfall demonstrates that NCAA rules for amateur athletics, in combination with New Jersey's NIL, limit a college athlete's opportunity to profit from their own managerial skill. NIL deals can only be a side-job for athletes, akin to the pay arrangement in *Martin v. Selker Bros., Inc.*, 949 F.2d 1286, 1294 (3d. Cir. 1991) (commissioned service station operators were employees under FLSA because "the predominant money-making activity of the stations was the sale of gasoline").

**Investment in Equipment and Facilities**: NCAA schools pay for player equipment and uniforms. The Penn State University 2021 NCAA Financial Report reveals how much a major sports program pays for these essential items. Line 29 reports expenditures of $3,247,919. Penn State University NCAA Membership Financial Reporting System, "Sports Equipment, Uniforms and Supplies", PDF 55, https://s3.amazonaws.com/gopsusports.com/documents/2022/2/7/2020_21_NCAA_Report_Final.pdf). Football equipment, uniforms, and supplies alone cost the Penn State football team $523,724 in 2021. *Id.*

NCAA rules also demonstrate that institutions furnish facilities for college athletes. Article 13.02.3 ("Competition Site"), defines a "competition site" as "the facility in which athletics competition is actually conducted, including any dressing room or meeting facility used in conjunction with the competition." *NCAA, 2021-2022 NCAA Division I Manual* at 78.

At Trey Johnson's university, Villanova recently announced that its athletic director, Mark Jackson, raised $18 million for the Andrew J. Talley Athletic Center and $65 million for the Finneran Pavilion renovation. *Villanova University Names Director of Athletics Mark Jackson to Position of Vice President*, (Jan. 13, 2020), https://villanova.com/news/2020/1/13/general-villanova-university-names-director-of-athletics-mark-jackson-to-position-of-vice-president.aspx.

The facilities element that counts toward an employment relationship is easily met by examples from NCAA schools, large and small. *E.E.O.C. v. Zippo Mfg. Co.*, 713 F.2d 32, 36 (3d Cir. 1983) traces the origins of this factor to *Bartels v. Birmingham*, 332 U.S. 126, 130 (1947) (applying an "economic realities" test, "courts will find that

degrees of control, opportunities for profit or loss, investment in facilities, permanency of relation and skill required in the claimed independent operation are important for decision. No one is controlling nor is the list complete."). In short, NCAA competitions are usually held in buildings and fields that schools own, maintain, control, and use to sell tickets

.

**Permanency of Relationship**: The permanency test for employment is met even where a work arrangement is short-term or part-time. The test is whether a person "transfer their services from place to place, as do independent contractors." *Donovan v. DialAmerica Marketing*, at 1385. The NCAA says that the "ultimate goal of the college experience is graduation," and to this end it "has devoted attention to researching student-athlete graduation rates for more than two decades." NCAA, GRADUATION RATES (Nov. 19, 2013), available in https://www.ncaa.org/sports/2013/11/19/graduation-rates.aspx. Recently, the NCAA reported that the graduation rate for Division I athletes increased from 74 percent in 2002 to 90 percent in 2021. NCAA, CROSSING THE FINISH LINE, (Dec. 2, 2021), at https://www.ncaa.org/news/2021/12/2/general-college-athletes-continue-

to-graduate-at-record-highs.aspx. These rates demonstrate that athletes have enough of a connection to school to meet hours-earned requirements for a degree.

Universities have employment contracts for similar years, even when they hire a coveted coach. When Seton Hall University recently hired Shaheen Holloway— St. Peter's head coach— to be its men's basketball coach, the school entered into a six-year contract. Mike McDaniel, *Seton Hall Hires Saint Peter's Coach Shaheen Holloway*, SI (March 30, 2022), https://www.si.com/college/2022/03/30/seton-hall-hires-saint-peters-coach-shaheen-holloway. This arrangement is far from permanent but undeniably an employment relationship.

**The Service Rendered Is an Integral Part of the Alleged Employer's Business**: Even at the smaller institutions named in the First Amended Complaint, athletics play an integral role in a school's identity.

Lafayette College's main website advertises:

**"RIVALRY WEEK**

No football game is more anticipated than the one against Lehigh, the most-played football rivalry in the nation. The game always sells out months in advance and has inspired a book and a documentary narrated by the late Harry Kalas. Activities often include a pep rally, class spirit competitions, concerts, and the Midnight Breakfast." Lafayette College, Traditions- Campus Life,

https://campuslife.lafayette.edu/traditions/

This announcement shows a football bleacher packed with people against a backdrop of handsome, three-story press box:



Cornell University prominently displays its football marching band. CORNELL UNIVERSITY, LIFE AT CORNELL: SOMETHING FOR EVERYONE, https://www.cornell.edu/life-at-cornell/



At Fordham University, the athletic department's mission statement shows its integral relationship to the school's academic enterprise: "The ultimate objective of Fordham University's Department

of Intercollegiate Athletics is to integrate academic and athletic experiences successfully in the Jesuit tradition. Student-athletes are expected to benefit from the educational, professional, and cultural advantages of a university located in New York City." FORDHAM UNIVERSITY ATHLETICS, ATHLETIC DEPARTMENT'S MISSION, PHILOSOPHY, AND OBJECTIVES, https://fordhamsports.com/.

Dreams of a Cinderella team fill small NCAA schools with hope for a unique opportunity to market themselves. As a result of St. Peter's nationally televised wins in the March Madness tournament over Kentucky, Murray State, and Purdue, and its loss to North Carolina, the school reaped a bonanza of "free media" valued at $125 - $150 million. Dave Caldwell, *'People Just Sent Money In': What Happened After St Peter's Basketball Fairytale?* THE GUARDIAN (Apr. 26, 2022), at https://www.theguardian.com/sport/2022/apr/26/people-just-sent-money-in-what-happened-after-st-peters-basketball-fairytale.

In sum, NCAA athletics require "work" and "exertion" that constitute employment.

## III.   FLSA Implications of Conference Consolidation

In late June, the Big Ten announced the addition of USC and UCLA to the conference in 2024. Chuck Culpepper and Glynn A. Hill, *USC and UCLA Will Join the Big Ten in 2024*, Wash. Post (June 30, 2022). This conference expansion will directly affect two schools in the Third Circuit, Penn State and Rutgers, by requiring their athletes to travel Los Angeles and back.

The Big Ten's transcontinental conference exposes the hypocrisy surrounding the NCAA's amateur athletics model. This coast-to-coast business model is wholly unsuited for educating college students who are pursuing a baccalaureate degree. This will create more hardships for students in science majors that intensively require lab or field work in chemistry, biology, agronomy, physics, and other STEM fields, as well as for students in speech and hearing, psychology, education, and fine arts such as dance, music, and theater. Going forward, Big Ten athletes will think twice about choosing a major based on their intellectual interests, while gravitating to portable degree programs.

Big Ten athletes are far from alone in being road warriors. Villanova— a named defendant in this matter— subjected its men's

basketball team to a fatiguing road schedule in the 2021-2022 season with long-distance games at UCLA (2,713 miles), Baylor (1,563 miles), Creighton (1,213 miles), Marquette (849 miles), DePaul (763 miles), Purdue (709 miles), Butler (643 miles), Tennessee (625 miles), Xavier (569 miles)—and then NCAA tournament trips to Pittsburgh (305 miles), San Antonio (1,741 miles), and New Orleans (1,225 miles). These college athletes traveled a staggering 12,918 miles (one way), and 25,836 miles (roundtrip). To pretend that this type of exhausting travel schedule over five short months is part-and-parcel of a student's educational experience ignores reality.

Even the NCAA's own research shows that college athletes want more time away from their sport. In a self-study involving athletes, coaches, and administrators across all Division I schools, athletes already feel that they spend too much time traveling to and from competitions. This survey, conducted in 2016, included responses from 44,058 Division I student-athletes. The study reported:

> Travel During a Day Off
> A majority of student-athletes do not feel that the current rule permitting travel on a day off to be appropriate, while a large majority of coaches are comfortable with the current rule (emphasis added).

> Student-athletes indicated a preference that an off-day not
> involve any form of travel, even if travel spans a two-day
> period (arriving after midnight) (emphasis added).
>
> …
>
> A quarter to a third of student-athletes would prefer to allow
> the institution to count the latter day as a day off provided
> that student-athletes have 24 consecutive hours of time off,
> and administrators strongly prefer this approach as well.
> However, a majority of coaches would prefer to maintain the
> current rule allowing return travel to count as a day off
> (emphasis added). NCAA, Div. I Research, Time Demands
> Study Summary of Findings (April 1, 2016), unnumbered
> pages 3-4,
> https://ncaaorg.s3.amazonaws.com/research/d1/2016D1RES_
> TimeDemandsSummary.pdf?fbclid=IwAR3VAt_ATzuVSzLM
> Dw8lPJjqHLC_VQv2Oqz9MBUkn5R3ukbRUrJL1xFY4r8.

The dichotomy in responses from athletes and coaches recalls the

reason that Congress and President Franklin D. Roosevelt enacted the

FLSA: Workers wanted time off; managers wanted to maximize

productivity; and Congress wanted to penalize employers who scheduled

employees beyond 40 hours a week by requiring payment at a time-and-

a-half rate. Decades later, the FLSA protects workers "from the evil of

'overwork' as well as 'underpay.'" Barrentine v. Arkansas Best Freight

System, Inc., 450 U.S. 728, 739 (1981).

The FLSA's remedial purpose comes into sharp focus for college

athletes who spend long hours traveling to away games and waiting for

a game or competition to start. The Supreme Court addressed this type of situation when it ruled than an employee who is "engaged to wait" and must be compensated when he is unable to use the time for personal use. Skidmore v. Swift & Co., 323 U.S. 134, 138 (1944); Armour & Co. v. Wantock, 323 U.S. at 133 (1944) ("Of course an employer, if he chooses, may hire a man to do nothing, or to do nothing but wait for something to happen. Refraining from other activity often is a factor of instant readiness to serve, and idleness plays a part in all employments in a stand-by capacity.").

The "engaged to wait" doctrine is codified in 29 C.F.R. § 785.14 to 785.17. NCAA athletes who travel long distances and then wait for a game to occur are comparable to truck drivers in 29 C.F.R. § 785.16(b): "A truck driver who has to wait at or near the job site for goods to be loaded is working during the loading period."

Finally, even smaller schools impose fatiguing schedules on their athletes. Bucknell University, another Defendant, is located in rural Pennsylvania. Bucknell athletes compete against smaller schools that are scattered from Maryland, throughout Pennsylvania, and as far as upstate New York, suggesting long and time-consuming travel in buses.

Whether schools have major athletics program that can support air travel or are smaller with modest budgets centered around coach bus travel, their athletes are physically unavailable for many kinds of laboratory and experiential types of classes. NCAA athletes experience travel-related fatigue and stress that is atypical for other college students, and at odds with pursuing a degree. These economic realities point toward an employment relationship.

## IV. CONCLUSION

Most people who have attended an NCAA school, whether small or large, are familiar with intramural athletics. Universities and colleges organize these competitions between students in various sports. SACRED HEART UNIVERSITY, INTRAMURAL SPORTS, https://www.sacredheart.edu/sacred-heart-life/fitness-recreation--sports/intramural-sports/. Intramural teams play a defined season and use playoffs to determine a champion. *Duquesne Intramurals, 2022 Men's League Champions*, https://www.facebook.com/duquesneim/posts/5426948420668862



This is amateur college athletics.

For more accomplished athletes, schools offer club sports. Cornell University's 28-page guide for club sports explains: "Only current Cornell University students may participate in competitive sport club activities or activities that are physical in nature (i.e., boxing, contact martial arts, etc.)." CORNELL UNIVERSITY, PHYSICAL ACTIVITY CLUB TRAINING 2021-2022, https://scl.cornell.edu/sites/scl/files/downloads/basic_page/REAL%20Phy sical%20Activitiy%20Club%20Training%202021.pdf.



This is amateur college athletics for more skilled, more devoted college athletes.

However, a "white out" football game with 106,572 fans at Penn State's Beaver Stadium is not a contest with amateur college athletes. Gabe Angieri, *Penn State's White Out by the Numbers*, ONWARD STATE (Sept. 15, 2021).



The NCAA would have this Court believe that there is no difference between intramural sports, club sports, and NCAA competitions that generate lucrative media deals. Amateurs play before a handful of friends in intramural games. Club sports may attract a small and raucous following of fans. But these amateur contests do not hold even a dim candle to cultural fixtures such as March Madness, Rose Bowl, Heisman Trophy, College World Series, and homecoming football games.

The NCAA fails to appreciate the import of *National Collegiate Athletic Ass'n v. Board of Regents of University of Oklahoma*, 468 U.S. at 120. The NCAA had sold TV rights to CBS that required the network to carry "national and regional telecasts," including "Division II and Division III games." *Id.* at 93. The NCAA was promoting a more authentic version of amateur football, unlike the current flood of football broadcasts centered around Power Five conference games. The only vestige of that long-forgotten marketing of amateur college football is the Army-Navy game, played to a national TV audience, often in Philadelphia. Kevin Kelly, *Future Sites Set for Army-Navy Game through 2022*, FBSCHEDULES (August 22, 2017).

The NCAA's Panglossian Brief entirely omits this important context. In addition, one might think that the NCAA prevailed in this seminal 1984 decision. But no, just several sentences later in the passage that the NCAA cites the Supreme Court handed this monopolist a bruising defeat, stating that the "NCAA has restricted rather than enhanced the place of intercollegiate athletics in the Nation's life." *National Collegiate Athletic Ass'n v. Board of Regents of University of Oklahoma*, 468 U.S. at 120.

The NCAA's antiquated principle of amateurism cannot overcome the economic reality that NCAA institutions "employ" athletes under 29 U.S.C. § 203(g) of the FLSA when these universities and college "suffer or permit" these athletes "to work." NCAA athletes are employees just like classmates are employees who earn a minimum wage as resident advisors, campus tour guides, teaching assistants, and cafeteria cashiers in jobs that are properly classified under the FLSA.

Dated:      July 14, 2022          CHIMICLES SCHWARTZ KRINER
                                        & DONALDSON-SMITH LLP

                               By:      */s/ Benjamin F. Johns*
                                        Benjamin F. Johns
                                        361 W. Lancaster Avenue

Haverford, PA  19041
bfj@chimicles.com
Tel:  610-642-8500

Attorney of Record for
*Amicus Curiae* Professor Michael
H. LeRoy

# CERTIFICATION OF COMPLIANCE
## WITH WORD COUNT LIMIT

The undersigned counsel certifies that the foregoing brief of Professor Michael H. LeRoy as Amicus Curiae in Support of Plaintiffs-Appellees contains 5,413 words, excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

This certification is made based upon the word count function of the Microsoft Word word-processing system used to prepare the foregoing brief.

_____

Benjamin F. Johns

Dated: July 14, 2022

# CERTIFICATE OF SERVICE

I certify that on July 14, 2022, a true and correct copy of the foregoing Amicus Brief was filed via this Court's CM/ECF filing system which will electronically send notice to all registered users.

*/s/ Benjamin F. Johns*
Benjamin F. Johns